2025-1075

---

# United States Court of Appeals

# for the Federal Circuit

---

**In re: GESTURE TECHNOLOGY PARTNERS, LLC,**

*Appellant*

Appeal from the United States Patent and Trademark Office in
*Ex parte* Reexamination Control No. 90/014,901

**OPENING BRIEF OF APPELLANT
GESTURE TECHNOLOGY PARTNERS, LLC**

*/s/ Fred I. Williams*
Fred I. Williams
Principal Attorney
WILLIAMS SIMONS & LANDIS PLLC
The Littlefield Building
601 Congress Ave., Suite 600
Auston, TX 78701
512.543.1354 telephone
fwilliams@wsltrial.com

John Wittenzellner
WILLIAMS SIMONS & LANDIS PLLC
1735 Market Street, Suite A#453
Philadelphia, PA 19103
512.543.1373 telephone
johnw@wsltrial.com

January 27, 2025

COUNSEL FOR APPELLANT GESTURE TECHNOLOGY PARTNERS, LLC

## PATENT CLAIMS AT ISSUE

Claims 1-30 of U.S. Patent No. 7,933,431 are at issue:

1.    A method for controlling a handheld computing device comprising the steps of:

holding said device in one hand;

moving at least one finger in space in order to signal a command to said device;

electro-optically sensing light reflected from said at least one finger using a sensing means associated with said device;

determining from said sensed light the movement of said finger, and

using said sensed finger movement information, controlling said device in accordance with said command.

2.    A method according to claim 1, wherein at least one camera is utilized to effect said electro-optical sensing.

3.    A method according to claim 1, including the further step of acquiring an image of at least a portion of the user of the device.

4.    A method according to claim 1, wherein said movement is sensed in 3 dimensions.

5.    A method according to claim 1, wherein movement of one finger relative to another finger is sensed.

6.    A method according to claim 1, wherein movement of two fingers is sensed.

7.    Handheld computer apparatus comprising:

a housing;

a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object;

computer means within said housing for analyzing said image to determine information concerning a position or movement of said object; and

means for controlling a function of said apparatus using said information.

8.    Apparatus according to claim 7, wherein said object is a finger.

9.    Apparatus according to claim 7, further including a display function which is controlled.

10.    Apparatus according to claim 9, wherein said display is 3D display.

11.    Apparatus according to claim 7, further including means for transmitting information.

12.    Apparatus according to claim 7, further including a light source for illuminating said object.

13.    Apparatus according to claim 7, wherein said apparatus is a cellular phone.

14.    A method for controlling a handheld computing device comprising the steps of:

providing a computer within said device;

associating a camera with said device, said camera viewing at least a portion of the body of a user operating said device or an object held by said user, in order provide image data concerning said portion or object;

using said computer, analyzing said image data to determine information concerning a user input command; and

from said determined information, controlling a function of said device.

15. A method according to claim 14, wherein reflected light from said body portion or object is imaged by said camera.

16. A method according to claim 14, wherein said information includes the position of the portion or object.

17. A method according to claim 14, wherein said information includes the change in position of the portion or object.

18. A method according to claim 14, wherein said information includes the velocity or path of the portion or object.

19. A method according to claim 14, wherein said information is obtained in 3 dimensions.

20. A method according to claim 14, wherein said information includes the pointing direction of the portion or object.

21. A method according to claim 14, wherein a display is controlled.

22. A method according to claim 21, wherein a virtual image on said display is moved or changed.

23. A method according to claim 21, wherein said display is a 3D display.

24. A method according to claim 23, wherein said display is a stereoscopic display.

25. A method according to claim 14, including the further step of transmitting data to a further device.

26. A method according to claim 14, wherein said camera operates at 30 frames per second or greater.

27.    A method according to claim 14, wherein said controlled function relates to a game.

28.    A method according to claim 14, including the further step of acquiring a picture of the user of the handheld device.

29.    A method according to claim 14, wherein two fingers of the user are sensed and a pinching action determined.

30.    A method according to claim 14, wherein said body portion indicates an expression of said user.

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number**   25-1075

**Short Case Caption**   In re Gesture Technology Partners, LLC

**Filing Party/Entity**   Gesture Technology Partners, LLC

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 01/27/2025

Signature:  /s/ Fred I. Williams

Name:   Fred I. Williams

FORM 9. Certificate of Interest

| 1. Represented Entities.<br>Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest.<br>Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders.<br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Gesture Technology Partners, LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

FORM 9. Certificate of Interest

Form 9 (p. 3)
March 2023

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable              ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑    Yes (file separate notice; see below)    ☐    No    ☐    N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable              ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

I.      STATEMENT OF RELATED CASES.......................................1

II.     JURISDICTIONAL STATEMENT ..................................1

III.    STATEMENT OF THE ISSUES ....................................2

IV.     STATEMENT OF THE CASE AND FACTS ...................2

    A.      Procedural Background ....................................2

    B.      Subject Matter of the '431 Patent.........................7

V.      SUMMARY OF THE ARGUMENT ...................8

VI.     STANDARD OF REVIEW.........................10

VII.    ARGUMENT................................12

    A.      The Patent Office Erred In Finding That The Estoppel Provision Of 35 U.S.C. § 315(e)(1) Does Not Apply To Pending *Ex Parte* Reexamination Proceedings. ..............................12

    B.      The Board Erred In Construing The Term "Cellular Phone" In Claim 13. ...........................18

    C.      The Board Erred In Determining That *Liebermann* Anticipates Claims 7-9, 11, 13-22, 25, 26, And 28-30.........................20

        1.      *Liebermann* does not anticipate independent claim 7..............20

            a.      *Liebermann* fails to disclose the preamble of claim 7....20

            b.      *Liebermann* fails to disclose claim element 7[c]...........28

            c.      *Liebermann* fails to disclose claim element 7[d]...........33

        2.      *Liebermann* does not anticipate claim 13. ...............39

        3.      *Liebermann* does not anticipate claim 11. ...............41

        4.      *Liebermann* does not anticipate independent claim 14............42

a.  *Liebermann* fails to disclose the preamble of claim 14. .......................................................................42

b.  *Liebermann* fails to disclose claim element 14[c]..........43

c.  *Liebermann* fails to disclose claim element 14[d]..........44

5.  *Liebermann* does not anticipate claims 16-18. .........................45

6.  *Liebermann* does not anticipate dependent claim 19................46

7.  *Liebermann* does not anticipate dependent claims 8, 9, 15, 20-22, 25, 26, and 28-30. ..........................................................50

D.  The Board Erred In Determining That *Liebermann* Renders Obvious Claims 1, 2-6, and 12............................................................50

1.  *Liebermann* is non-analogous art.............................................50

a.  *Liebermann* fails the first test for analogous art..............51

b.  *Liebermann* fails the second test for analogous art. .......53

2.  *Liebermann* does not render obvious independent claim 1. ......54

a.  *Liebermann* does not teach or suggest the preamble of claim 1. ...........................................................................54

b.  *Liebermann* does not teach or suggest claim element 1[a]................................................................................55

c.  *Liebermann* does not teach or suggest claim element 1[d]................................................................................58

d.  *Liebermann* does not teach or suggest claim element 1[e]................................................................................58

3.  *Liebermann* does not render obvious dependent claim 4. ........59

4.  *Liebermann* does not render obvious dependent claims 2, 3, 5, 6, and 12................................................................................60

E.  The Board Erred In Determining That The Cited Art Renders Obvious Dependent Claims 10, 23, 24, And 27..................................60

F.     The Board Erred By Not Vacating The Reexam Order Because No Substantial New Question (SNQ) Of Patentability Exists..................61

G.     The USPTO Does Not Have Jurisdiction Over the Expired '431 Patent. .................................................................................62

VIII.  CONCLUSION AND RELIEF SOUGHT ....................................................65

## TABLE OF AUTHORITIES

**Cases**

*Airbus S.A.S. v. Firepass Corp.*, 793 F.3d 1376 (Fed. Cir. 2015) ..........................14

*Airbus S.A.S. v. Firepass Corp.*, 941 F.3d 1374 (Fed. Cir. 2019) ..........................52

*Alarm.com Inc. v. Hirshfield*, 26 F.4th 1348 (Fed. Cir. 2022) .................. 12, 13, 14

*AlterWAN, Inc. v. Amazon.com, Inc.*, 63 F.4th 18 (Fed. Cir. 2023) .......................55

*Apple Inc. v. Gesture Technology Partners, LLC*, Nos. 2023-1501,

2023-1554, slip op. (Fed. Cir. Jan. 27, 2025) ......................................................63

*Applications in Internet Time, LLC v. RPX Corp.*, 897 F.3d 1336

(Fed. Cir. 2018) ............................................................................. 15, 18

*Ariosa Diagnostics, Inc. v. Illumina, Inc.*, No. IPR2014-01093,

Paper 81 (P.T.A.B. May 24, 2016) ........................................................6

*Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044

(Fed. Cir. 2017) ................................................................................14

*Donner Technology, LLC v. Pro Stage Gear, LLC*, 979 F.3d 1353

 (Fed. Cir. 2020) ............................................................................ 51, 53

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288 (Fed. Cir. 2009) ...... 28, 34

*Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l*, 222 F.3d 951 (Fed. Cir. 2000).....22

*Honeywell Int'l, Inc. v. Arkema Inc.*, 939 F.3d 1345 (Fed. Cir. 2019)....................18

*In re Abbott Diabetes Care, Inc.*, 696 F.3d 1142 (Fed. Cir. 2012)..........................11

*In re Donaldson Co.*, 16 F.3d 1189 (Fed. Cir. 1994) ..............................................14

*In re Klein*, 647 F.3d 1343 (Fed. Cir. 2011) ...................................................... 12, 50

*In re Man Mach. Interface Techs. LLC*, 822 F.3d 1282 (Fed. Cir. 2016) ..............12

*In re Portola Packaging, Inc.*, 110 F.3d 786 (Fed. Cir. 1997) ...............................10

*In re Rambus, Inc.*, 753 F.3d 1253 (Fed. Cir. 2014)..................................................11

*In re Recreative Techs. Corp.*, 83 F.3d 1394 (Fed. Cir. 1996) ......................... 17, 61

*In re Schreiber*, 128 F.3d 1473 (Fed. Cir. 1997) .....................................................27

*In re Suitco Surface, Inc.*, 603 F.3d 1255 (Fed. Cir. 2010) .....................................11

*In re Vivint, Inc.*, 14 F.4th 1342 (Fed. Cir. 2021) ....................................... 10, 12, 13

*IntelCorp. v. Qualcomm Inc.*, 21 F.4th 801 (Fed. Cir. 2021) ..................................11

*Mylan Pharms. Inc. v. Merck Sharp & Dohme Corp.*, 50 F.4th 147

    (Fed. Cir. 2022)...................................................................................................11

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,

    138 S. Ct. 1365 (2018)................................................................................. 63, 65

*P&G v. Kraft Foods Global, Inc.*, 549 F.3d 842 (Fed. Cir. 2008) ..........................61

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc) .........................18

*Richardson v. Suzuki Motor Co.*, 868 F.2d 1226 (Fed. Cir. 1989).........................31

*RPX Corp. v. Applications in Internet Time, LLC*, IPR2015-01750, Paper 128

    (P.T.A.B. Oct. 2, 2020)......................................................................................15

*Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524 (Fed. Cir. 1987)...............19

v

*Unified Patents, LLC v. MemoryWeb, LLC*, IPR2021-01413, Paper 56

(P.T.A.B. Mar. 8, 2023) .........................................................................16

*Unified Patents, LLC v. MemoryWeb, LLC*, IPR2021-01413, Paper 76

(P.T.A.B. May 22, 2023) ......................................................................16

*Uniloc 2017 LLC v. Facebook Inc.*, 989 F.3d 1018 (Fed. Cir. 2021).....................14

*Verdegaal Bros. v. Union Oil Co. of California*, 814 F.2d 628

(Fed. Cir. 1987) .....................................................................................25

*Wasica Fin. GmbH v. Cont'l Auto. Sys.*, 853 F.3d 1272 (Fed. Cir. 2017) ....... 32, 33

**Statutes**

28 U.S.C. §1295 ...........................................................................................2, 6

35 U.S.C. § 134 ...............................................................................................4

35 U.S.C. § 141 ............................................................................................2, 6

35 U.S.C. § 302 ..............................................................................................17

35 U.S.C. § 303 ......................................................................................... 17, 61

35 U.S.C. § 304 ..............................................................................................17

35 U.S.C. § 306 ................................................................................................4

35 U.S.C. § 315 .................................................................... 12, 13, 16, 17

35 U.S.C. § 6 ....................................................................................................1

**Other Authorities**

77 Fed. Reg. 46615 (Aug. 6, 2012).............................................................12

MPEP § 2210 ...................................................................................................14

### Regulations

37 C.F.R. § 1.540 ...........................................................................................17

37 C.F.R. § 1.550 ...........................................................................................17

37 C.F.R. § 41.37 .............................................................................................4

37 C.F.R. § 41.41 .............................................................................................4

## I.    STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant Gesture Technology Partners, LLC states that no other appeal in or from the same proceeding in the originating tribunal was previously before this or any other appellate court.

Cases pending in this or any other court which will directly affect or be directly affected by this Court's decision in the pending appeal are listed below.

- *Gesture Technology Partners, LLC v. Unified Patents, LLC*, 2023-1444 (Court of Appeals for the Federal Circuit)

- *Apple Inc. v. Gesture Technology Partners, LLC*, 2023-1475 (Court of Appeals for the Federal Circuit)

- *In re: Gesture Technology Partners, LLC*, 2024-1585 (Court of Appeals for the Federal Circuit)

- *Apple Inc. v. Gesture Technology Partners, LLC*, 2023-1494 (Court of Appeals for the Federal Circuit)

- *Gesture Technology Partners, LLC v. Apple Inc.*, 4:22-cv-04806-YGR (U.S. District Court for the Northern District of California)

- *Gesture Technology Partners, LLC v. LG Electronics Inc. et al.*, 2:21-cv-19234-EP-MAH (U.S. District Court for the District of New Jersey)

## II.    JURISDICTIONAL STATEMENT

Pursuant to 35 U.S.C. § 6(b), the Patent Trial and Appeal Board (the "Board") issued its Decision on Appeal on September 13, 2024 (the "Decision").  Appx0001-Appx0050.  Patent Owner timely filed a Notice of Appeal on October 10, 2024.

Appx0947-Appx0949.    This Court has jurisdiction pursuant to 28 U.S.C. §1295(a)(4)(A) and 35 U.S.C. § 141(b).

## III.     STATEMENT OF THE ISSUES

1.     Whether the Board committed legal error, in violation of the APA, when it found that the estoppel provision of 35 U.S.C. § 315(e)(1) does not apply to pending *ex parte* reexamination proceedings.

2.     Whether the Board erred by construing the term "cellular phone" to include specialized phones for the deaf.

3.     Whether the Board erred by finding that U.S. Patent No. 5,982,853 ("*Liebermann*") discloses or renders obvious claims 1-9, 11-22, 25, 26, 28-30.

4.     Whether the Board erred by finding that a substantial new question of patentability exists to order *ex parte* reexamination.

5.     Whether the Board erred by finding that the USPTO has jurisdiction over expired patents.

## IV.     STATEMENT OF THE CASE AND FACTS

### A.     Procedural Background

This appeal involves one patent owned by Appellant:   U.S. Patent No. 7,933,431 (the "'431 Patent").  The '431 Patent was filed on July 12, 2010, as U.S. Patent Application No. 12/834,281.  Appx0112.  The '431 Patent issued on April 26,

2011. *Id*. The '431 Patent claims priority to several patent applications, including U.S. Provisional Patent Application No. 60/142,777, which was filed on July 8, 1999. Appx0112. The '431 Patent expired in July 2020. *See id*.

The '431 Patent has faced a barrage of validity challenges since Appellant began asserting its patent rights four years ago, including three proceedings in the Patent Office. First, Unified Patents, LLC filed a petition for *inter partes* review of the '431 Patent (IPR2021-00917) on May 14, 2021.[1] Appx1102-Appx1164 (*Unified Patents, LLC v. Gesture Technology Partners, LLC*, IPR2021-00917, Paper 1 (P.T.A.B. May 14, 2021)). Second, Apple, Inc. filed a petition for *inter partes* review (IPR2021-00920) of the '431 Patent one week later, relying on the same primary prior-art reference as Unified Patents.[2] Appx1179-Appx1260 (*Apple Inc. v. Gesture Technology Partners, LLC*, IPR2021-00920, Paper 1 (P.T.A.B. May 21, 2021)). Both Apple and Samsung Electronics Co., Ltd. are members of Unified Patents. Appx1166 (IPR2021-00917, Paper 7 at 1 n.2 (P.T.A.B. Sept. 22, 2021)).

Third, Samsung Electronics Co., Ltd. bided its time before filing its request for *ex parte* reexamination of the '431 Patent on November 11, 2021. Appx0152-

---

[1] The appeal of the final written decision in IPR2021-00917 is currently on appeal to this Court as *Gesture Technology Partners, LLC v. Unified Patents, LLC*, No. 2023-1444. The Court heard oral argument on December 4, 2024, and a decision is pending.

[2] The appeal of the final written decision in IPR2021-00920 is currently on appeal to this Court as *Apple Inc. v. Gesture Technology Partners, LLC*, No. 2023-1475. The Court heard oral argument on December 4, 2024, and a decision is pending.

Appx0263.  The Patent Office issued an order granting *ex parte* reexamination of the '431 Patent on January 11, 2022 (the "Reexam Order").  Appx0449-Appx0472.

During the reexamination proceeding, the Examiner issued a Final Office Action on September 20, 2022 (the "Final OA"), rejecting claims 1-31 of the '431 Patent.  Appx0555-Appx0640.  Appellant filed a Notice of Appeal to the Board, pursuant to 35 U.S.C. §§ 134 and 306, on November 21, 2022 (*see* Appx0641), and then filed an Appeal Brief pursuant to 37 C.F.R. § 41.37 on January 23, 2023 ("Appeal Br.").  Appx0718-Appx0793.  The Examiner issued an Answer on May 16, 2023 ("Answer") (Appx0794-Appx0853), and Appellant filed a Reply Brief pursuant to 37 C.F.R. § 41.41 on July 17, 2023.  Appx0854-Appx0901.  An Oral Hearing was conducted by the Board on July 15, 2024.  *See* Appx0934-Appx0946.  On September 13, 2024, the Board issued its Decision on Appeal (the "Decision").  Appx0001-Appx0050.  The Board affirmed the Examiner's rejections of claims 1-30 of the '431 Patent, but reversed the Examiner's rejection of claim 31:

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/Basis | Affirmed | Reversed |
|---|---|---|---|---|
| 7–9, 11, 13–22, 25, 26, 28–31 | 102 | Liebermann | 7–9, 11, 13–22, 25, 26, 28–30 | 31 |
| 1–6, 12 | 103 | Liebermann | 1–6, 12 | |
| 10, 23 | 103 | Liebermann, Maruno | 10, 23 | |
| 24 | 103 | Liebermann, Maruno, Maguire | 24 | |
| 10, 23, 24, 27 | 103 | Liebermann, Mack | 10, 23, 24, 27 | |
| Overall Outcome | | | 1–30 | 31 |

Appx0044-45 (Decision, pp. 44-45). This case is one of the rare instances in which one of the Administrative Patent Judges (Judge Dougal) filed a dissent. Appx0046-Appx0049 (Decision, pp. 46-49).

During the pendency of the appeal to the Board, Appellant repeatedly requested leave from the Board to terminate the *ex parte* reexamination under 35 U.S.C. §§ 315(e) or 325(d). Recognizing that a final written decision was imminent in the IPR2021-00917 (filed by Unified Patents), Appellant requested leave to file a motion to terminate the *ex parte* reexamination on October 6, 2022. Appx1177-Appx1178. The Board denied that request as premature on October 11, 2022. Appx1177. Appellant renewed its request on December 6, 2022, after the final written decision issued on November 21, 2022. Appx0706-Appx0707. The Board denied the renewed request and ordered Appellant to "file any motions or petitions concerning *ex parte* reexamination No. 90/014,901 in *ex parte* reexamination No.

90/014,901, rather than in this AIA proceeding, and in accordance with the rules governing *ex parte* reexamination." Appx0706. In doing so, the Board disregarded its precedent *Ariosa Diagnostics, Inc. v. Illumina, Inc.*, in which the Board presiding over an *inter partes* review proceeding exercised its discretion under 35 U.S.C. § 325(d) to terminate three *ex parte* reexamination proceedings <u>after</u> issuing a final written decision in the *inter partes* review proceeding. *Ariosa Diagnostics, Inc. v. Illumina, Inc.*, No. IPR2014-01093, Paper 81 at 16 (P.T.A.B. May 24, 2016). On December 12, 2022, Appellant requested reconsideration of its request to file a motion to terminate the *ex parte* reexamination, noting that the Board had deviated from its precedent in *Ariosa*. Appx0705. The Board denied Appellant's request for reconsideration. Appx0704.

Appellant followed the Board's instruction to "file any motions or petitions" in the *ex parte* reexamination—filing a petition under 37 C.F.R. § 1.181 to terminate the *ex parte* reexamination on January 10, 2023. Appx0643-0717. Adding insult to injury, the Patent Office summarily dismissed the petition by disregarding the plain language of 35 U.S.C. §§ 315(e)(1) and this Court's precedent. Appx0902-Appx0913.

Pursuant to 28 U.S.C. § 1295(a)(4)(A)-(B) and 35 U.S.C. § 141(b), a Notice of Appeal was filed with this Court on October 10, 2024. Appx0947-0949.

## B.    Subject Matter of the '431 Patent

The '431 Patent is directed to a handheld computer apparatus that includes a camera for obtaining an image of an object.  *See* Appx0140-Appx0141 ('431 Patent, 11:54-13:44).  Figure 8A of the '431 Patent is reproduced below:



Appx0122 ('431 Patent, Fig. 8A) (excerpted and annotated).  Figure 8B of the '431 Patent is reproduced below:



Appx0122 ('431 Patent, Fig. 8B) (excerpted and annotated).  The handheld computer apparatus analyzes the image of the object captured by the camera and determines one or more positions of the object.  *See, e.g.*, Appx0137 ('431 Patent, 6:9-18),

Appx0138 ('431 Patent, 7:22-29), Appx0140-Appx0141 ('431 Patent, 11:54-13:67), Appx0143 ('431 Patent, 17:34-50), Appx0147 ('431 Patent, 25:62-26:5). The handheld computer apparatus also selects a function based on the determined position(s) of the object and then executes the function. *See id*.

## V.    SUMMARY OF THE ARGUMENT

First, the Patent Office committed legal error, in violation of the APA, when it found that the estoppel provision of 35 U.S.C. § 315(e)(1) does not apply to pending *ex parte* reexamination proceedings. Based on that error, the Patent Office refused to address Appellant's petition under 37 C.F.R. § 1.181 to terminate the *ex parte* reexamination that is the subject of this appeal. The plain language of the statute covers pending *ex parte* reexamination proceedings because parties are precluded from "maintain[ing]" proceedings before the Patent Office after a final written decision. The Patent Office provides no basis to diverge from the plain language of the statute. In fact, the Patent Office's interpretation of 35 U.S.C. § 315(e)(1) is contrary to the related statutes regarding reexamination and the Patent Office's rules. Accordingly, Appellant respectfully submits that the Court should vacate the Board's decision and remand with instructions to apply the correct meanings of real party in interest and privy, and to comply with the APA to determine whether the *ex parte* reexamination should be terminated under 35 U.S.C. § 315(e)(1), as the Court did in *Applications in Internet Time, LLC v. RPX Corp.*

Second, both Appellant and the Board agree that claim 7 has multiple means-plus-function limitations. The Board erred, however, by finding that *Liebermann* discloses the corresponding structures or the functions of those limitations. In support of its position, the Board cited extensively to *Liebermann*'s "identifiers" and the sending of the "identifiers" from *Liebermann*'s device to *Liebermann*'s "central processing facility." But how *Liebermann*'s "identifiers" are calculated and what they represent is either undisclosed or ambiguous. And *Liebermann's* sending function operates independently of the content of the "identifiers." In fact, one of the three Administrative Patent Judges (Judge Dougal) filed a dissent in which he disagreed with the majority regarding whether *Liebermann*'s "identifiers" are sufficient to render the claims invalid. Appx0046-Appx0049. Accordingly, *Liebermann* does not anticipate claim 7.

Third, the Board erred by determining that *Liebermann* discloses the "cellular phone" of claim 13. There is no reasonable dispute that an ordinary "cellular phone" necessarily has an audio output (e.g., speaker) so that the user can listen to another individual (speaking into another phone device) during a voice telephone call. By virtue of being a telephone for the deaf, *Liebermann*'s "portable transmitter/receiver" lacks that necessary audio output. Instead, *Liebermann*'s device has an LCD screen for displaying signing animation to the deaf user. Accordingly, *Liebermann* cannot anticipate claim 13.

<u>Fourth</u>, the claimed "handheld computer apparatus" is a device small enough to be used or operated while being held in the hand. But *Liebermann* never discloses that its "portable transmitter/receiver" meets those requirements. In fact, *Liebermann* never discloses the dimensions/weight of its device and the Board even concedes that *Liebermann* does not describe holding its device in one hand. And portable does not necessarily mean "handheld" (e.g., a portable typewriter is not a handheld device). Accordingly, *Liebermann* cannot anticipate the independent claims.

<u>Fifth</u>, the Patent Office does not have jurisdiction over expired patents, therefore, Appellant respectfully submits that the Court should vacate the Board's decision.

## VI.    STANDARD OF REVIEW

This Court reviews the interpretation of the reexamination statute as a question of law *de novo*, without deference to the Patent Office. *See In re Portola Packaging, Inc.*, 110 F.3d 786, 788 (Fed. Cir. 1997). Patent Office decisions are reviewed under the standards of the Administrate Procedure Act, which requires the Court to "'decide all relevant questions of law' and to set aside agency actions that are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *In re Vivint, Inc.*, 14 F.4th 1342, 1348 (Fed. Cir. 2021)

"Claim construction is ultimately a question of law, decided *de novo* on review, as are the intrinsic-evidence aspects of a claim-construction analysis. But we review any underlying fact findings about extrinsic evidence, such as extra-patent usage, for substantial-evidence support when the appeal comes from the Board." *IntelCorp. v. Qualcomm Inc.*, 21 F.4th 801, 808 (Fed. Cir. 2021) (cleaned up). The Board's decision may be vacated and remanded to the Board to consider the patentability grounds under the proper construction. *In re Abbott Diabetes Care, Inc.*, 696 F.3d 1142, 1150 (Fed. Cir. 2012).

Anticipation is a question of fact, reviewed for substantial evidence on appeal. *In re Rambus, Inc.*, 753 F.3d 1253, 1256 (Fed. Cir. 2014). Substantial evidence is something less than the weight of the evidence but more than a mere scintilla of evidence . . . and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1259 (Fed. Cir. 2010) (cleaned up). Anticipation determinations that are based on an improper construction should be vacated. *See id*. at 1259-61.

"Obviousness is a mixed question of law and fact, and we review the Board's ultimate obviousness determination *de novo* and underlying fact-findings for substantial evidence." *Mylan Pharms. Inc. v. Merck Sharp & Dohme Corp.*, 50 F.4th 147, 152 (Fed. Cir. 2022) (cleaned up). Obviousness determinations that are based on an improper construction should be vacated. *In re Man Mach. Interface Techs.*

*LLC*, 822 F.3d 1282, 1288-89 (Fed. Cir. 2016).  The Board's determination that a prior art reference is analogous art presents an issue of fact, reviewed for substantial evidence.  *In re Klein*, 647 F.3d 1343, 1347 (Fed. Cir. 2011).

"The ultimate question of whether the reexamination is based on a substantial new question of patentability remains a question of law."  *In re Vivint, Inc.*, 14 F.4th 1342, 1348 (Fed. Cir. 2021) (cleaned up).

## VII.  ARGUMENT

### A.    The Patent Office Erred In Finding That The Estoppel Provision Of 35 U.S.C. § 315(e)(1) Does Not Apply To Pending *Ex Parte* Reexamination Proceedings.

The estoppel provision of 35 U.S.C. § 315(e)(1) provides:

> The petitioner in an inter partes review of a claim in a patent under this chapter that results in a final written decision under section 318(a), or the <u>real party in interest or privy of the petitioner, may not request or maintain</u> a proceeding before the Office with respect to that claim on any ground that the petitioner raised or reasonably could have raised during that inter partes review.

35 U.S.C. § 315(e)(1) (emphasis added).  A "proceeding before the Office" in § 315(e)(1) includes *ex parte* reexamination.  *See Alarm.com Inc. v. Hirshfield*, 26 F.4th 1348, 1351-52 (Fed. Cir. 2022) (discussing the applicability of § 315(e)(1) to *ex parte* reexamination); 77 Fed. Reg. 46615, 46622 (Aug. 6, 2012) ("Therefore, the new estoppel provisions apply to the filing of a subsequent request for *ex parte* reexamination. . . .").  There is "nothing in the statutes or regulations preventing the

Patent Office from reconsidering a decision ordering *ex parte* reexamination." *In re Vivint*, 14 F.4th at 1351-52.

Title 35 U.S.C. § 315(e)(1) clearly contemplates two scenarios in which estoppel applies after the issuance of a final written decision: "the real party in interest or privy of the petitioner, <u>may not request or maintain</u> a proceeding before the Office. . . ." 35 U.S.C. § 315(e)(1) (emphasis added). In the first scenario, 35 U.S.C. § 315(e)(1) precludes "the real party in interest or privy of the petitioner" from requesting *ex parte* reexamination after the issuance of a final written decision—"the real party in interest or privy of the petitioner, may not request . . . a proceeding before the Office. . . ." 35 U.S.C. § 315(e)(1). In the second scenario, pending *ex parte* reexamination proceedings should be terminated after the issuance of a final written decision—"the real party in interest or privy of the petitioner, may not . . . maintain a proceeding before the Office. . . ." *See id.*; *see also Alarm.com Inc.*, 26 F.4th at 1351-52.

The Patent Office has previously misinterpreted 35 U.S.C. § 315(e)(1) as being limited to only the first scenario, where a request for *ex parte* reexamination is filed after issuance of a final written decision, as set forth in MPEP 2210:

> The estoppel provisions of AIA 35 U.S.C. 315(e)(1) or 35 U.S.C. 325(e)(1) are based on *inter partes* review and post-grant review, respectively, and they only prohibit the filing of a subsequent request for *ex parte* reexamination, once estoppel attaches; <u>there is no estoppel as to the Office maintaining an existing *ex parte* reexamination proceeding</u>.

13

MPEP § 2210 (emphasis added). That interpretation improperly carves out *ex parte* reexamination proceedings from the meaning of a "proceeding before the Office" despite the express language of the statute that encompasses both scenarios, and contrary to this Court's precedent that a "proceeding before the Office" in § 315(e)(1) includes *ex parte* reexamination. *See Alarm.com Inc.*, 26 F.4th at 1351-52; *see also In re Donaldson Co.*, 16 F.3d 1189, 1192-93 (Fed. Cir. 1994) (en banc) ("When statutory interpretation is at issue, the plain and unambiguous meaning of a statute prevails in the absence of clearly expressed legislative intent to the contrary.").

Fortunately, however, the Patent Office's misinterpretation of 35 U.S.C. § 315(e)(1) is not binding here. *See Airbus S.A.S. v. Firepass Corp.*, 793 F.3d 1376, 1380 (Fed. Cir. 2015). This Court has held that "Section 315(e)(1)'s use of 'maintain' contemplates that the estoppel provision 'governs at <u>any stage</u> of a subsequent proceeding before the PTO—its application is not limited to the institution stage.'" *Uniloc 2017 LLC v. Facebook Inc.*, 989 F.3d 1018, 1027 (Fed. Cir. 2021) (emphasis added). That is because, as this Court has noted, "Congress was just as concerned about applying estoppel to subsequent *ex parte* reexamination proceedings as in IPR (or CBM) proceedings." *See Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1050 n.4 (Fed. Cir. 2017).

The second scenario applies here because Samsung maintained *ex parte* reexamination proceedings after the Board issued a final written decision in IPR2021-00917.  There is no dispute that Samsung is a paying member of Unified Patents, an organization that files IPRs on behalf of its members.  *See* Appx1166, Appx0687, Appx0710-Appx0711.  As set forth in Appellant's petition under 37 C.F.R. § 1.181 to terminate the *ex parte* reexamination, substantial evidence shows that Samsung is a real party in interest or privy of Unified Patents as a result of the pay-for-play relationship between Samsung and Unified Patents.  *See* Appx0653-Appx0660.  The Board has previously found—based on this Court's admonition to apply the correct meaning of real party in interest and privy and comply with the APA—that similar relationships are indicative of a real-party-in-interest relationship:  "That a member organization exists in part to file IPR petitions against patents being asserted or threatened to be asserted against its members is indicative of an RPI relationship between the organization and its members."  *RPX Corp. v. Applications in Internet Time, LLC*, IPR2015-01750, Paper 128 at 26 (P.T.A.B. Oct. 2, 2020) (emphasis added); *see also Applications in Internet Time, LLC v. RPX Corp.*, 897 F.3d 1336, 1358 (Fed. Cir. 2018).  Moreover, the Board has previously found that Samsung is a real party in interest of Unified Patents:

> Having considered all the evidence of record and the parties'
> arguments, we find that Unified has a long-term, established, mutually
> beneficial relationship with its members, Apple and Samsung.  We also
> find that Apple and Samsung are clear beneficiaries to this proceeding

and that Unified is representing their interests.  We therefore find that Unified has failed to show, by a preponderance of the evidence, that Apple and Samsung are not RPIs in this proceeding.

*Unified Patents, LLC v. MemoryWeb, LLC*, IPR2021-01413, Paper 56 at 33 (P.T.A.B. Mar. 8, 2023).  The Director of the Patent Office subsequently vacated that decision on the ground that the determination was not necessary to resolve the proceeding, without addressing the underlying facts and determination, which are equally applicable here.  *See Unified Patents, LLC v. MemoryWeb, LLC*, IPR2021-01413, Paper 76 (P.T.A.B. May 22, 2023).

The Patent Office refused to address the same facts when Appellant filed its petition under 37 C.F.R. § 1.181 to terminate the *ex parte* reexamination that is the subject of this appeal.  Instead, the Patent Office found that the estoppel provision of 35 U.S.C. § 315(e)(1) does not apply to pending *ex parte* reexamination proceedings because "the Office maintains a reexamination proceeding, not the requester." Appx0909.  The Patent Office's decision acknowledges, then disregards this Court's precedent that indicates otherwise.  *See* Appx0909-Appx0910.

The Patent Office's reasoning—that 35 U.S.C. § 315(e)(1) does not apply to pending *ex parte* reexaminations because the Patent Office, not the requestor, maintains reexamination proceedings—also contradicts both the applicable statues and the Patent Office's rules for conducting *ex parte* reexamination.  The process begins with the petitioner filing a request for *ex parte* reexamination.  35 U.S.C

§ 302. 35 U.S.C. §303(a) requires that the Patent Office determine whether to order *ex parte* reexamination within three months after the filing of a request. Following that order, the patent owner can file a statement, after which the requester can file a reply. 35 U.S.C. § 304. And the Patent Office can consider statements from the requester <u>at any time</u> during *ex parte* reexamination proceedings. *See* 37 C.F.R. § 1.540. Similarly, under 37 C.F.R. § 1.550(g), the "<u>active</u> participation of the *ex parte* reexamination requester ends with the reply pursuant to § 1.535," but the requester remains part of the proceeding. *See* 37 C.F.R. § 1.550(g) (emphasis added). Thus, the requester maintains the *ex parte* reexamination even after the Director orders *ex parte* reexamination.

This Court has held that "when a section of the MPEP is inconsistent with the statute it must yield to the legislative purpose." *In re Recreative Techs. Corp.*, 83 F.3d 1394, 1398 (Fed. Cir. 1996). Under its plain language, the estoppel provision in 35 U.S.C. § 315(e)(1) applies to pending *ex parte* reexamination proceedings because "the real party in interest or privy of the petitioner, may not request or <u>maintain</u> a proceeding before the Office with respect to that claim on any ground that the petitioner raised or reasonably could have raised during that inter partes review." 35 U.S.C. § 315(e)(1) (emphasis added). The Patent Office erred in finding that the estoppel provision of 35 U.S.C. § 315(e)(1) does not apply to pending *ex parte* reexamination proceedings. That erroneous conclusion of law constitutes an

abuse of discretion. *Honeywell Int'l, Inc. v. Arkema Inc.*, 939 F.3d 1345, 1347 (Fed. Cir. 2019). Accordingly, Appellant respectfully submits that the Court should vacate the Board's decision and remand with instructions to apply the correct meanings of real party in interest and privy, and to comply with the APA to determine whether the *ex parte* reexamination should be terminated under 35 U.S.C. § 315(e)(1), as the Court did in *Applications in Internet Time, LLC v. RPX Corp.*

## B.    The Board Erred In Construing The Term "Cellular Phone" In Claim 13.

The words of a claim "are generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). The "ordinary meaning" of a claim term "is its meaning to the ordinary artisan after reading the <u>entire</u> patent." *Id*. at 1321 (emphasis added).

Dependent claim 13 recites "a cellular phone." The "cellular phone" of claim 13 should have its ordinary meaning, which necessarily includes (i) being capable of answering a voice telephone call from another individual operating another phone device, (ii) having an audio output (e.g., built-in speaker) so that the user of the claimed "cellular phone" can listen to the other individual (speaking into the other phone device) during the voice telephone call, and (iii) having a microphone to capture the voice of the user of the claimed "cellular phone," such that the captured voice can be transmitted to the other individual (listening on the other phone device) during the voice telephone call. There should be no reasonable dispute that a skilled

artisan would recognize that a "cellular phone" includes those three capabilities because voice calling was the main feature of a cellular phone at the time of the claimed invention. Accordingly, it would be illogical for the ordinary meaning of the "phone" portion of a "cellular phone" to exclude any of those three features. Even if the specification of the '431 Patent does not expressly disclose features (i)-(iii), there is no need for such a disclosure: features (i)-(iii) are fundamental and well-known features/capabilities of an ordinary "cellular phone," and a "patent need not teach, and preferably omits, what is well known in the art." *Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1534 (Fed. Cir. 1987).

According to the Board, "Appellant attempts to restrict the term 'cellular phone' to exclude cellular phones for hearing impaired persons" and "[w]e, therefore, conclude that a . . . (POSITA) would have understood the claimed 'cellular phone' as including cellular phones (such as Liebermann's) for the hearing impaired." Appx0011 (Decision, p. 11). Appellant respectfully disagrees. As a threshold matter, cellular phones for deaf persons would be lacking feature (ii)—audio output. Further, cellular phones for deaf persons are highly specialized devices requiring LCD screens for displaying signing animation. *See* Appx0970 (*Liebermann*, 6:15-23). Considering the terms "deaf," "hearing impaired," "hearing loss," "hard of hearing," "sign language," and "signing" are completely absent from the '431 Patent, and considering that the '431 Patent expressly discloses that "it

might just say the message <u>to the user</u> of the phone <u>through the speaker of the</u> <u>cellphone</u>," Appx0141 ('431 Patent, 13:40-42) (emphasis added), a POSITA would not understand the term "cellular phone," as recited by claim 13, to include cellular phones for the hearing impaired.

For the aforementioned reasons, the Board's improper construction of the term "cellular phone" in claim 13 should be vacated.

### C. The Board Erred In Determining That *Liebermann* Anticipates Claims 7-9, 11, 13-22, 25, 26, And 28-30.

#### 1. *Liebermann* does not anticipate independent claim 7.

##### a. *Liebermann* fails to disclose the preamble of claim 7.

The preamble of claim 7 recites a "[h]andheld computer apparatus." Appx0147 ('431 Patent, 25:61-62). Both the Board and Appellant agree that the preamble is limiting. *See* Appx0013-Appx0015 (Decision, pp. 13-15). The Board construed the term "handheld computer apparatus" to mean a device "small enough to be used or operated while being held in the hand." Appx0014 (Decision, p. 14). Appellant proposed a different construction during the proceedings: a device "designed for operation by a user while being held in at least one of the user's hands." Appx0737 (Appeal Br., p. 14). Although Appellant proposed a different construction, the Board's decision is not supported by substantial evidence under either construction.

*Liebermann* discloses "a portable transmitter/receiver . . . for use by a deaf person." Appx0970 (*Liebermann*, 5:62-63). Figure 6 of *Liebermann* is reproduced below:



Appx0957 (*Liebermann*, Fig. 6) (annotated). As shown in Figure 6, *Liebermann* sometimes refers to its "portable transmitter/receiver" as a "cellular telephone." *See id*. The "portable transmitter/receiver" of Figure 6 is "supported in a stable position and the deaf person is positioned so that the camera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions. The signing motions captured by the camera are converted into digital data for processing." Appx0970 (*Liebermann*, 6:2-7).

In its Decision, the Board concluded that *Liebermann's* "portable transmitter/receiver" is of a "size that permits it to be held in one hand while [the user is] signing with the other hand." Appx0014 (Decision, p. 14). But that conclusion is not supported by any evidence, much less substantial evidence. *Liebermann* never discloses its "portable transmitter/receiver" is of a "size that permits it to be held in one hand." In fact, *Liebermann* never discloses the dimensions or weight of its "portable transmitter/receiver." While the Board cites to Figure 6 of *Liebermann* to support that characterization, Figure 6 merely shows *Liebermann's* "portable transmitter/receiver" without any measurements. *See* Appx0014-Appx0015 (Decision, pp. 14-15) (citing Appx0957 (*Liebermann,* Fig. 6)). Accordingly, it is impossible to determine the dimensions/weight of *Liebermann's* "portable transmitter/receiver" from *Liebermann's* Figure 6. And the Board's reliance on Figure 6 is impermissible under this Court's precedent. *See Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l*, 222 F.3d 951, 956 (Fed. Cir. 2000) ("Under our precedent, however, it is well established that patent drawings do not define the precise proportions of the elements and may not be relied on to show particular sizes if the specification is completely silent on the issue."). Additionally, "portable" does not equate to "handheld." There are many "portable" things in the world, for example a suitcase or portable typewriter, that are not "handheld."

According to the Board/Examiner, "Liebermann states 'In a cellular phone, the operation is much the same in its operation as <u>the hard wired telephone</u>'" and "it is well understood in the art that a 'cellular telephone' would <u>allow a user to hold</u> the telephone, being a similar operation to that of a <u>hard wired telephone</u>." Appx0806 (Answer, p. 12) (citing Appx0971 (*Liebermann*, 7:18-28)) (emphasis added). That is misleading. In that passage, *Liebermann* is comparing the operation of its "portable transmitter/receiver" (aka *Liebermann's* "cellular telephone") with the operation of *Liebermann's* "hard wired telephone[s]" (e.g., a desktop PC with a video camera, a set-top box with television, a public kiosk). *See* Appx0970 (*Liebermann*, 5:53-61), Appx0956 (*Liebermann*, Figs. 5A-5C). Unsurprisingly, *Liebermann* never discloses any of its "hard wired telephone[s]" as being "small enough to be used or operated while being held in the hand." Accordingly, even if *Liebermann's* "portable transmitter/receiver" (the Board-identified "handheld computer apparatus") has a similar operation to *Liebermann's* "hard wired telephone," that still does not mean that *Liebermann's* "portable transmitter/receiver" is a "handheld computer apparatus," as claim 7 requires.

Further, while an ordinary "cellular telephone" is a handheld computer apparatus, *Liebermann's* "portable transmitter/receiver" is <u>not</u> an ordinary "cellular telephone." To the contrary, *Liebermann's* "portable transmitter/receiver" is a highly specialized telephone for the deaf. *Liebermann* refers to its "portable

transmitter/receiver" as a "cellular telephone" because it transmits "through a cellular telephone network" (Appx0970 (*Liebermann*, 6:1-2)), <u>not</u> because its "portable transmitter/receiver" is "small enough to be used or operated while being held in the hand." Again, there is no disclosure of *Liebermann's* "portable transmitter/receiver" being small enough to be held in a user's hand, much less used or operated while being held in the user's hand.

Additionally, to the extent that *Liebermann* discloses single-hand signing (e.g., "finger spelling"), *Liebermann* never discloses that its "portable transmitter/receiver" is small enough to be held in the user's free hand (i.e., non-signing hand). For example, there is no indication in *Liebermann's* Figures 14A and 14B, which allegedly show the user performing "finger spelling" with his right hand, that *Liebermann's* "portable transmitter/receiver" is in the user's left hand. *See* Appx0965 (*Liebermann,* Figs. 14A, 14B). In fact, the Board/Examiner even concedes that *Liebermann* "does not expressly describe . . . 'holding said device in one hand.'" Appx0577 (Final OA, p. 22), Appx0837 (Answer, p. 43).

To the contrary, *Liebermann* discloses that during operation the "portable transmitter/receiver" must be "supported in a stable position." Appx0970 (*Liebermann*, 6:2-6). The term "stable position" appears exactly once within *Liebermann*, to describe a "portable transmitter/receiver" that is clearly designed to be positioned on a flat surface during use. *See id*. In the very same sentence,

*Liebermann* also discloses the "deaf person is positioned so that camera lens 10 will record the signing movement of the hands." *Id.* (emphasis added). If "camera lens 10" is recording both "hands" of the deaf user, the "portable transmitter/receiver" is not being held in either of the deaf user's hands. Accordingly, the "stable position" does not correspond to holding *Liebermann's* "portable transmitter/receiver" in one hand during use or operation. Thus, *Liebermann* fails to disclose the claimed "handheld computer apparatus."

In its Decision, the Board also "conclude[d] nothing in the structure or function of Liebermann's device precludes such single hand signing use of Liebermann's device. Similarly, the claim does not preclude one person from holding the cellular phone to record a second person's hands. Appellant acknowledges that such use of Liebermann's device is theoretically possible." Appx0014-Appx0015 (Decision, pp. 14-15) (citing Appx0944 (Oral Hr'g Tr., p. 10[3])) (emphasis added). But the test for anticipation is not what is "theoretically possible" or what is not precluded. Instead, the test for anticipation requires that "each and every element as set forth in the claim [be] found, either expressly or inherently described, in a single prior art reference." *Verdegaal Bros. v. Union Oil Co. of California*, 814 F.2d 628, 631 (Fed. Cir. 1987) (emphasis added). Something

---

[3]The Decision cites page 13 of the Oral Hearing Transcript. *See* Appx0015 (Decision, p. 15). But the Oral Hearing Transcript only has 12 pages and the term "theoretically possible" appears on page 10. *See* Appx0934-Appx0946.

may be "theoretically possible" but still not described by the reference. As an example, it is "theoretically possible" that *Liebermann's* "portable transmitter/receiver" is gold-plated; nothing in *Liebermann* precludes it's "portable transmitter/receiver" from being gold-plated. But because *Liebermann* fails to expressly or inherently disclose gold-plating, *Liebermann* cannot anticipate a claim requiring a gold-plated device. Similarly, because *Liebermann* does not disclose a device small enough to be used or operated while being held in the hand, *Liebermann* cannot anticipate independent claim 7, which undisputedly requires a "[h]andheld computer apparatus."

According to the Board, the "Examiner's *prima facie* showing need only explain why the prior art apparatus is <u>capable of the function</u> of being 'handheld' . . . . Because the Examiner <u>correctly finds</u> that Liebermann discloses a 'portable' 'cellular[]telephone' of a handheld size, the Examiner has found a reason to believe that the apparatus of Liebermann would have been capable of performing the claimed function." Appx0015 (Decision, p. 15) (emphasis added). The Board's position is fatally flawed for multiple reasons.

As explained by this Court,

A patent applicant is free to recite features of an apparatus either structurally or functionally . . . There is nothing intrinsically wrong with [defining something by <u>what it does rather than what it is</u>] in drafting patent claims. . . Yet, choosing to define an <u>element functionally, i.e., by what it does</u>, carries with it a risk . . . where the Patent Office has reason to believe that <u>a functional limitation</u> asserted to be critical for

> establishing novelty in the claimed subject matter may, in fact, be an inherent characteristic of the prior art, it possesses the authority to require the applicant to prove that the subject matter shown to be in the prior art does not possess the characteristic relied on.

*In re Schreiber*, 128 F.3d 1473, 1478 (Fed. Cir. 1997) (cleaned up). As a threshold matter, "handheld" is a structural feature of the claimed apparatus (i.e., what the device is), <u>not</u> a functional one: "handheld" undisputedly imposes size requirements/restrictions on the claimed components. Accordingly, it is insufficient for the Board/Examiner to merely show why *Liebermann's* "portable transmitter/receiver" is allegedly capable of being "handheld."

Further, even if "handheld" was a functional feature of the claimed apparatus, the Examiner did <u>not</u> "correctly find[] that Liebermann <u>discloses</u> a 'portable' 'cellular[]telephone' <u>of a handheld size</u>." Appx0015 (Decision, p. 15). As discussed above, (1) *Liebermann* never discloses the dimensions/weight of its "portable transmitter/receiver," (2) to the extent *Liebermann* discloses single-hand signing, *Liebermann* never discloses its "portable transmitter/receiver" is small enough to be held in the non-signing hand, (3) *Liebermann's* use of the term "cellular telephone" is a red herring: it pertains to *Liebermann's* "portable transmitter/receiver" transmitting over a "cellular network," not its size, and (4) "portable" does not necessarily mean "handheld" (i.e., small enough to be used or operated while being held in the hand) (e.g., a portable typewriter is portable but not handheld).

27

Accordingly, *Liebermann* fails to disclose the "handheld computer apparatus" of claim 7.

### b.    *Liebermann* fails to disclose claim element 7[c].

Claim element 7[c] recites "computer means within said housing for analyzing said image to determine information concerning a position or movement of said object."  Appx0147 ('431 Patent, 26:1-3).  Both the Board and Appellant agree that (i) claim element 7[c] is a means-plus-function limitation under 35 U.S.C. § 112, ¶6, (ii) the corresponding structure is a general purpose computer programmed with an algorithm to cause the general purpose computer to: (1) analyze target image(s) of an object captured by the camera means; and (2) determine position(s) of the object, and equivalents thereof, and (iii) the limitation's function is analyzing the image obtained by the camera means to determine information concerning a position or movement of an object.  *See* Appx0008 (Decision, p. 8).

The fundamental disagreement between Appellant and the Board is whether *Liebermann's* "portable transmitter/receiver" (the Board-identified "handheld computer apparatus") has the corresponding structure of claim element 7[c]:  "A challenger who seeks to demonstrate that a means-plus-function limitation was present in the prior art must prove that the corresponding structure—or an equivalent—was present in the prior art." *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1299 (Fed. Cir. 2009).  Appellant asserts that *Liebermann* does not

28

disclose the corresponding structure of claim element 7[c], and thus cannot disclose claim element 7[c].

*Liebermann* is a distributed system in which the computationally intense processing occurs at a "central processing facility" (also called "the Center"), which is physically separate from *Liebermann's* "portable transmitter/receiver" (the Board-identified "handheld computer apparatus").  Figure 2 of *Liebermann* is reproduced below:



Appx0953 (*Liebermann*, Fig. 2) (annotated).  Figure 3 of *Liebermann* is reproduced below:



Appx0954 (*Liebermann*, Fig. 3) (annotated).  As explained by *Liebermann*,

The deaf person uses sign language in front of the transmitter/receiver device containing the camera.  The images captured by the camera are of the finger and hand motions and of body motions and of facial expressions and motions captured by a digital device which <u>does initial processing</u>.  In the <u>initial processing</u>, each of the frames containing a captured image undergoes a process <u>whereby the image is collapsed into a small set of fixed identifiers</u>.  At the end of the initial processing, the resulting information is sent as data . . . to the data processing center.

The rest of the processing is completed <u>at the center</u>.  This includes <u>identification of the letters, numbers and words, conversion to standard sign language, and the conversion to spoken language which results in the equivalent text of the signed content</u> . . . Processing in the <u>center utilizes artificial intelligence</u> such as neural networks trained for the specific applications of the device.

30

Appx0970 (*Liebermann*, 6:42-63) (emphasis added).

According to the Board, "the Examiner found that Liebermann teaches 'computer means' in the form of a 'digital device which does initial processing.'" Appx0020 (Decision, p. 20) (quoting Appx0560 (Final OA, p. 5)). While it is undisputed that the "initial processing" is executed by *Liebermann's* "portable transmitter/receiver" (the Board-identified "handheld computer apparatus"), that finding is insufficient to show that *Liebermann*'s "portable transmitter/receiver" has "a general purpose computer programmed with an algorithm to cause the general purpose computer to . . . determine position(s) of the object," as claim element 7[c] requires. Specifically, the steps executed during the "initial processing" are undisclosed and ambiguous. Additionally, while *Liebermann* discloses that the output of the "initial processing" is a "small set of fixed identifiers" in the "form of tables of numbers" (Appx0969 (*Liebermann*, 4:67)), it is undisclosed how the "tables of numbers" are calculated and it is ambiguous as to what they represent or mean. Unsurprisingly, the Board provides zero evidence that *Liebermann's* "initial processing" includes "determin[ing] position(s) of the object," as claim element 7[c] requires. Appx0020 (Decision, p. 20). Accordingly, *Liebermann* fails to disclose claim element 7[c], much less anticipate claim 7. *See Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1236 (Fed. Cir. 1989) (anticipation requires that the "identical invention must be shown in as complete detail as is contained in the patent claim");

31

*Wasica Fin. GmbH v. Cont'l Auto. Sys.*, 853 F.3d 1272, 1284 (Fed. Cir. 2017) ("it has long been understood that ambiguous references do not, as a matter of law, anticipate a claim").

Further, as discussed above, the Board and Appellant agree that claim element 7[c]'s function under 35 U.S.C. § 112, ¶6 is "analyzing the image obtained by the camera means to determine information concerning a position or movement of an object." *See* Appx0008 (Decision, p. 8). The Board mapped *Liebermann's* "initial processing" and "identifiers" to the claimed "analyzing" and "information concerning a position or movement of an object," respectfully. *See* Appx0018-Appx0019 (Decision, pp. 18-19). According to the Board, "identifiers" are "on their face 'information concerning a position or movement' as required by claim 7" because they are "identifiers of the digitized signing motions." Appx0018-Appx0019 (Decision, pp. 18-19) (quoting Appx0969 (*Liebermann*, 3:40-42) ("transmitting the digitized signing motions or their digital identifiers to the translating means")). But the Board also concedes that *Liebermann's* "set of identifiers is described variously as Pertinent Data of the image, a manageable identifier of the image, and a Reduced Data Set (RDS) of the image." Appx0025 (Decision, p. 25) (cleaned up). At bottom, how the "identifiers" are determined during *Liebermann's* "initial processing" and what they actually mean is ambiguous. And "it has long been understood that ambiguous references do not, as a matter of

law, anticipate a claim." *Wasica Fin.*, 853 F.3d at 1284.  Thus, *Liebermann* does not disclose claim element 7[c].

### c.     *Liebermann* fails to disclose claim element 7[d].

Claim element [7(d)] recites "means for controlling a function of said apparatus using said information."  Appx0147 ('431 Patent, 26:1-5).  "[S]aid information" is "information concerning a position or movement of said object." *See id*.  Both Appellant and the Board agree that (i) claim element 7[d] is a means-plus-function limitation under 35 U.S.C. § 112, ¶6, (ii) the corresponding structure is the handheld computer apparatus programmed with an algorithm to cause the handheld computer apparatus to: (1) receive position information; (2) <u>correlate the position information with a function of the handheld computer apparatus</u>; and (3) cause the handheld computer apparatus to perform the function, or equivalents thereof, and (iii) the limitation's function under 35 U.S.C. § 112, ¶6 is controlling a function of said handheld computer apparatus using said information.   *See* Appx0008-Appx0010 (Decision, pp. 8-10).  In his dissent, Judge Dougal found that *Liebermann* does not disclose claim element 7[d].   *See* Appx0046-0049 (Decision, pp. 46-49) (Dougal, J., dissenting).

According to the Board, "Appellant has not argued a particular definition for the term 'correlate.'"  That is false.  As explained by Appellant in its Reply Brief under 37 C.F.R. § 41.41,

> the handheld device has multiple functions, and the position
> information determines which function of the multiple functions is to
> be performed by the handheld computer apparatus. Thus, different
> position information would result in different functions being
> performed by the handheld computer apparatus.

Appx0876 (Reply Br., p. 20). In other words, "correlate" pertains to a selection

process: the position information is used to select the function of the handheld

computer apparatus to be performed. That is consistent with the specification of the

'431 Patent. Specifically, the '431 Patent explains that the purpose of its control of

function invention is to "add functionality to the device, without complicating its

base function, and/or alternatively add a method to interact with the device to

achieve other purposes." Appx0140 ('431 Patent, 11:62-67); *see also* Appx0140

('431 Patent, 12:1-9) ("perform a control function"); Appx0140 ('431 Patent, 12:29-

35) ("multitude of added functions"); Appx0140 ('431 Patent, 12:59-64) ("perform

the function desired").

The fundamental disagreement between Appellant and the Board is whether

*Liebermann* discloses the corresponding structure of claim element 7[d]: "A

challenger who seeks to demonstrate that a means-plus-function limitation was

present in the prior art must prove that the corresponding structure—or an

equivalent—was present in the prior art." *Fresenius*, 582 F.3d at 1299. Appellant

asserts that *Liebermann* does not disclose at least a "handheld computer apparatus

programmed with an algorithm to cause the handheld computer apparatus to . . .

correlate the position information with a function of the handheld computer apparatus," as required by claim element 7[d].

The Board mapped the "image" captured by *Liebermann's* "camera" to the "position information." Appx0023-Appx0024 (Decision, pp. 23-24). The Board also mapped the sending of the "identifiers" between *Liebermann's* "portable transmitter/receiver" (the Board-identified "handheld computer apparatus") and *Liebermann's* "central processing facility" to the "function" performed by the "handheld computing device." *See id.* But *Liebermann* discloses "[i]n the processing, each of the frames containing a captured image undergoes a process whereby the image is transformed into manageable identifiers. It is the set of identifiers, in the form of tables of numbers, that travels the normal telephone lines to the central processing facility." Appx0969-Appx0970 (*Liebermann*, 4:64-5:2). In other words, while different captured images may result in different "identifiers," *Liebermann's* sending function is always selected, and the sending function always operates in the same manner: it transmits the "identifiers" from *Liebermann's* "portable transmitter/receiver" to *Liebermann's* "central processing facility." There is no relationship, or correlation, between the content of the captured image and the selection of the sending function. Similarly, there is no relationship, or correlation, between the content of the captured image and the act of performing the function of sending the "identifiers" to the "central processing facility;" the "identifiers" are

35

always transmitted to the "central processing facility" independent of the particular content. *See* Appx0048 (Decision, p. 48) (Dougal, J., dissenting). Accordingly, *Liebermann* fails to disclose the corresponding structure of claim element 7[d], and thus fails to disclose claim element 7[d].

According to the Board, *Liebermann's* "sending function changes as the image changes . . . Stated differently, the function is not just repeatedly 'sending,' it is a first function of 'sending information X correlated to a first image' and then a different function of 'sending information Y correlated to a second image.'" Appx0024 (Decision, p. 24) (emphasis added). The Board's position is untenable. *Liebermann* discloses a single, static sending function being fed different inputs (e.g., a first set of identifiers corresponding to a first image, a second set of identifiers corresponding to a second image). *See* Appx0969-Appx0970 (*Liebermann*, 4:64-5:2). Regardless of the input (i.e., identifiers), the single sending function always operates in the same way: it sends the received input (i.e., identifiers) from *Liebermann's* "portable transmitter/receiver" to *Liebermann's* "central processing facility." *See id.* Contrary to the Board's contentions, the sending function does not change as the input changes. Again, there is no relationship, or correlation, between the content of the captured image and the act of performing the function of sending the "identifiers" to the "central processing facility. Accordingly, *Liebermann* fails

to disclose the corresponding structure of claim element 7[d], and thus fails to disclose claim element 7[d].

Further, both the Board and Appellant agree that with respect to "correlate the position information with a function of the handheld computer apparatus," the "function" includes one or more of: (a) a display function, (b) a command to print, (c) an image transmission function, or (d) an e-mail transmission function. Appx0009 (Decision, p. 9). With respect to "(c) an image transmission function," the '431 Patent discloses the example of the cell phone (i.e., a handheld computer apparatus) acquiring an image of a user or a house, and then transmitting the image to a "remote location" over a mobile phone link. *See* Appx0140-Appx0141 ('431 Patent, 12:65-13:7). In other words, the '431 Patent discloses an "image transmission function" is a function that transmits the image itself, not merely transmitting data related to the image.

It is undisputed that the sending of the "identifiers" from *Liebermann's* "portable transmitter/receiver" to *Liebermann's* "central processing facility" is <u>not</u> a display function, a command to print, or an email transmission function. The Board concluded, however, that "an artisan would have understood *Liebermann's* controlling transmission of a set of identifiers as an image transmission function." Appx0025 (Decision, p. 25). But that conclusion is contrary to the express disclosure of *Liebermann*: "It is the <u>set of identifiers . . . that travels</u> the normal

telephone lines to the central processing facility (i.e., the Center).  These <u>identifiers, and not the images themselves,</u> are then correlated with a database of vocabulary and grammar by using artificial intelligence at the Center."  Appx0969-Appx0970 (*Liebermann*, 4:66-5:5) (emphasis added).  In other words, *Liebermann* expressly discloses that it is <u>not</u> transmitting the image.

Additionally, the Board concedes that *Liebermann's* "set of identifiers is described variously as Pertinent Data of the image, a manageable identifier of the image, and a Reduced Data Set (RDS) of the image."  Appx0025 (Decision, p. 25) (cleaned up). *See also* Appx0969 (*Liebermann*, 3:40-42) ("transmitting the <u>digitized signing motions or their digital identifiers</u> to the translating means") (emphasis added).  In each one of those descriptions, the "identifiers" are something other than the image itself.  Accordingly, an artisan would not have understood *Liebermann's* sending of "identifiers" to be an image transmission function.  Thus, *Liebermann* fails to disclose the corresponding structure of claim element 7[d], and thus fails to disclose claim element 7[d].

Further, as discussed above, the Board and Appellant agree that claim element 7[d]'s function under 35 U.S.C. § 112, ¶6 is "controlling a function of said handheld computer apparatus using said information."  *See* Appx0008-Appx0010 (Decision, pp. 8-10).  The Board mapped *Liebermann's* "identifiers" and *Liebermann's* sending of the "identifiers" to the claimed "information" and claimed "function,"

respectively.  But as discussed above, *Liebermann's* "identifiers" do not control *Liebermann's* sending function.  *Liebermann* discloses a single sending function that always operates in the same way:  it sends the "identifiers," independent of their content, from *Liebermann's* "portable transmitter/receiver" to *Liebermann's* "central processing facility."  *See* Appx0969-Appx0970 (*Liebermann*, 4:64-5:2).  *See also* Appx0049 (Decision, p. 49 n.15) (Dougal, J., dissenting).  Accordingly, *Liebermann* fails to disclose the function of claim element 7[d], and thus fails to disclose claim element 7[d].

For the aforementioned reasons, the Board's determination that *Liebermann* anticipates claim 7 should be vacated or reversed.

### 2.    *Liebermann* does not anticipate claim 13.

As discussed above in Section VII.B, the "cellular phone" of claim 13 should be given its ordinary meaning, which necessarily includes (i) being capable of answering a voice telephone call from another individual operating another phone device, (ii) having an audio output (e.g., built-in speaker) so that the user of the claimed "cellular phone" can listen to the other individual (speaking into the other phone device) during the voice telephone call, and (iii) having a microphone to capture the voice of the user of the claimed "cellular phone," such that the captured voice can be transmitted to the other individual (listening on the other phone device) during the voice telephone call.   The Board/Examiner mapped *Liebermann's*

"portable transmitter/receiver" in Figure 6 to the claimed "cellular phone" of claim 13. *See* Appx0562-0563 (Final OA, pp. 7-8). That is improper.

*Liebermann's* "portable transmitter/receiver" is a specialized telephone for the deaf. *See* Appx0970 (*Liebermann*, 5:62-63) ("A portable transmitter/receiver . . . for use by a deaf person is shown in Fig. 6."). As discussed above in Section VII.B, a POSITA would not interpret the claimed "cellular phone" to include phones for the deaf. *Liebermann* is unsurprisingly silent regarding its specialized "portable transmitter/receiver" including an audio output for the deaf user to listen to the other individual (speaking into the other phone device) during a voice telephone call. Instead, *Liebermann's* "portable transmitter/receiver" has an "LCD display panel" for communicating with the deaf user. *See* Appx0970 (*Liebermann*, 6:15-23) ("verbal expressions are translated by the artificial intelligence into digital data for signs. These signs are displayed on the LCD panel 14."). Accordingly, *Liebermann* does not disclose the claimed "cellular phone," and thus does not anticipate claim 13.

With respect to the existence of a "speaker" and "microphone," the Board referenced the use of *Liebermann's* "portable transmitter/receiver" as a "communicator." *See* Appx0026 (Decision, p. 26). That is misleading. *Liebermann* discloses

> When the phone for the deaf is equipped with a microphone and a speaker instead of, or in addition to a second telephone channel, it may

> be turned into a <u>communicator</u> . . . The <u>communicator</u> enables the deaf person to conduct a "conversation" with any normally hearing person in the <u>close proximity</u>. The signing motion of the deaf person are <u>processed by the center</u> and is transmitted back to the device as a normal voice transmission which the speaker renders as speech to the normally hearing person.

Appx0971 (*Liebermann*, 7:33-40) (emphasis added). Accordingly, the built-in "speaker" is not involved when a voice telephone call is received from another individual operating another phone device, and the built-in "speaker" does not render the voice of the other individual (speaking into the other phone device) during the voice telephone call. Similarly, the built-in "microphone" does not capture the voice of the deaf user such that the captured voice can be transmitted to the other individual (listening on the other phone device) during the voice telephone call. Accordingly, even when *Liebermann's* "portable transmitter/receiver" is acting as a "communicator," *Liebermann's* device still does not meet at least requirements (ii) and (iii) of the claimed "cellular phone." Thus, *Liebermann* fails to anticipate claim 13.

### 3. *Liebermann* does not anticipate claim 11.

Dependent claim 11 recites "means for transmitting information." Both the Board and Appellant agree that "means for transmitting information" is a means-plus-function limitation under §112, ¶ 6, the limitation's function is transmitting information, and that the corresponding structure is a cellular phone and equivalents thereof. Appx0011-Appx0012 (Decision, pp. 11-12).

41

The Board/Examiner mapped *Liebermann's* "portable transmitter/receiver" to the "means for transmitting." Appx0562 (Final OA, p. 7). But as discussed above regarding the preamble of claim 7 and dependent claim 13, *Liebermann's* "portable transmitter/receiver" is not an ordinary "cellular phone." Thus, *Liebermann's* "portable transmitter/receiver" does not disclose claim 11. And the Board/Examiner provides no evidence that *Liebermann's* "portable transmitter/receiver" is an equivalent of an ordinary "cellular phone." In fact, the Board never addressed Appellant's arguments regarding claim 11. *Compare* Appx0757 (Appeal Br., p. 34) *with* Appx0013-Appx0032 (Decision, pp. 13-32).

For the aforementioned reasons, the Board's finding that *Liebermann* anticipates claim 11 is not supported by substantial evidence. Accordingly, the Board's determination that *Liebermann* anticipates claim 11 should be vacated or reversed.

### 4. *Liebermann* does not anticipate independent claim 14.

#### a. *Liebermann* fails to disclose the preamble of claim 14.

The preamble of claim 14 recites a "method for controlling a handheld computing device." Appx0147 ('431 Patent, 26:18-19).

As discussed above in Section VII.C.1.a, *Liebermann* fails to disclose the "handheld computer apparatus" of independent claim 7. *Liebermann* fails to

disclose the "handheld computing device" of independent claim 14 for the same reasons.

### b. *Liebermann* fails to disclose claim element 14[c].

Claim element 14[c] recites "using said computer, analyzing said image data to determine information concerning a user input command." Appx0147 ('431 Patent, 26:20-26). The "computer" is a component within the "handheld computing device." *See id.*

The Board/Examiner mapped *Liebermann's* "initial processing" and "identifiers" to the claimed "analyzing said image data" and "information concerning a user input command," respectfully. *See* Appx0019-Appx0020 (Decision, pp. 19-20). According to the Board, *Liebermann's* "identifiers" identify "the digitized signing motions." Appx0018-Appx0019 (Decision, pp. 18-19) (quoting Appx0969 (*Liebermann*, 3:40-42)) (emphasis added). But even if that is true, the Board proffers no evidence, much less substantial evidence, that *Liebermann's* "identifiers" are "information concerning a user input command," as claim element 14[c] requires. *Liebermann's* "signing motion" corresponds to a word being formed in sign language (e.g., by a deaf person) during a conversation with another person (*see* Appx0970 (*Liebermann*, 6:6-18)); *Liebermann's* "signing motion" is not a "user input command" (e.g., a user command to print, a user command to email, a user command to capture or store an image, etc.), as claim

43

element 14[c] requires. *Liebermann's* "signing motion" does not control any function of *Liebermann's* "portable transmitter/receiver." Accordingly, *Liebermann's* "identifiers" (the Board-identified "information") do not "concern[] a user input command." That is contrary to what claim element 14[c] requires. Thus, *Liebermann* fails to disclose claim element 14[c].

### c.    *Liebermann* fails to disclose claim element 14[d].

Claim element 14[d] recites "from said determined information, controlling a function of said device." Appx0147 ('431 Patent, 26:24-28). The term "said determined information" is information that is determined by a "computer" within the "handheld computing device." *See id*. In his dissent, Judge Dougal found that *Liebermann* does not disclose claim element 14[d]. *See* Appx0046-0049 (Decision, pp. 46-49) (Dougal, J., dissenting).

The Board/Examiner mapped *Liebermann's* "identifiers" and the sending of the "identifiers" between *Liebermann's* "portable transmitter/receiver" and the "central processing facility" to the claimed "information" and "function," respectively. *See* Appx0018-Appx0020 (Decision, pp. 18-20). But as discussed above with respect to claim element 7[c], *Liebermann's* "identifiers" (the Board-identified "information") do not control *Liebermann's* sending function (the Board-identified "function"). *Liebermann* discloses a single sending function that is always selected and that always operates in the same way: it sends the "identifiers,"

independent of their content, from *Liebermann's* "portable transmitter/receiver" to *Liebermann's* "central processing facility." *See* Appx0969-Appx0970 (*Liebermann*, 4:64-5:2). *See also* Appx0048-Appx0049 (Decision, pp. 48-49) (Dougal, J., dissenting). *Liebermann's* "identifiers" (the Board-identified "information") do not control any function of *Liebermann's* "portable transmitter/receiver", much less its sending function (the Board-identified "function"). Thus, *Liebermann* fails to disclose claim element 14[d].

For the aforementioned reasons, the Board's determination that *Liebermann* anticipates claim 14 should be vacated or reversed.

### 5. *Liebermann* does not anticipate claims 16-18.

Dependent claims 16-18 require that the "information" itself include specific details about the "user input command:"

- Claim 16: "wherein said information includes the position of the portion or object;"

- Claim 17: "wherein said information includes the change in position of the portion or object;" and

- Claim 18: "wherein said information includes the velocity or path of the portion or object."

Appx0147 ('431 Patent, 26:31-37). Again, the Board/Examiner mapped *Liebermann's* "identifiers" to the claimed "information." *See* Appx0018-Appx0020

(Decision, pp. 18-20). According to the Board, *Liebermann's* "identifiers" identify "the digitized signing motions" (Appx0019 (Decision, p. 19)), and "an artisan would have understood such signing motions as including position, change in position, and path." Appx0028 (Decision, p. 28). But even if the "signing motions" do include "position, change in position, and path," that does not necessarily mean that the "identifiers" (the Board-identified "information") <u>themselves</u> includes such details, as claims 16-18 require. *Liebermann* does not disclose how or what it means for its "identifiers" to identify signing motions. In fact, *Liebermann* discloses very little about its "identifiers" beyond the fact that they take "the form of tables of numbers." Appx0969 (*Liebermann*, 4:67). That falls drastically short of the requirements of anticipation.

For the aforementioned reasons, the Board's determination that *Liebermann* anticipates claims 16-18 is not supported by substantial evidence, and should be vacated or reversed.

### 6. *Liebermann* does not anticipate dependent claim 19.

Claim 19 recites "wherein said information is obtained in 3 dimensions." Appx0147 ('431 Patent, 26:38-39). The Board/Examiner mapped *Liebermann's* "identifiers" to the claimed "information." Appx0018-Appx0020 (Decision, pp. 18-20). But *Liebermann* fails to disclose that the "identifiers" have 3 dimensions, as claim 19 requires. As noted by the Board/Examiner, *Liebermann* "discloses that

'Recently, three dimensional video cameras have been developed. The use of such devices may facilitate recognition of signing motions by enhancing spatial differences.'" Appx0831 (Answer, p. 37) (quoting Appx0974 (*Liebermann*, 13:29-31)). Those two sentences, at the end of *Liebermann's* specification, are the sole mention of anything three dimensional in *Liebermann*. Further, the exact meaning of "enhancing spatial differences" is undisclosed and ambiguous. But the common usage of "spatial differentiation" in image processing describes enhancing edge detection between objects (e.g., between the signing user's hands and the background), but does not denote three-dimensional processing. Further still, the interplay between these two sentences and *Liebermann's* "identifiers" is also undisclosed and ambiguous. That falls drastically short of the requirements for anticipation.

In support of its position, the Board argues that in American Sign Language (ASL) "[a]t any particular instant, one has to combine information about the handshape (Stokoe's 'dez'), the motion (Stokoe's 'sig') and the spatial location of the hands relative to the rest of the body (Stokoe's 'tab')." Appx0029 (Decision, p. 29) (quoting Appx0972 (*Liebermann*, 10:59-64)). But Stokoe's 'dez,' 'sig,' and 'tab' refer to general handshapes (e.g., flat hand, fist), general movements (e.g., moving upward, moving downward), and general body parts (e.g., forehead, cheek), respectively, by name not by coordinates. *See* Appx1088, Appx1092, Appx1099.

So Stokoe's notation does <u>not</u> have any dimensions, much less 3 dimensions as claim 19 requires. Even if Stokoe's notation did have 3 dimensions, the relationship, if any, between *Stokoe's* notation and *Liebermann's* "identifiers" (the Board-identified "information") is undisclosed and ambiguous.

According to the Board, "because we conclude that the position determination of Liebermann's Figure 9 (central processing facility) involves a position in three-dimensions, we also conclude that Liebermann's 'portable transmitter/receiver' sufficiently discloses capturing and determining movement in three dimensions as required by claim 19." Appx0030 (Decision, p. 30). The Board's conclusions are flawed for at least three reasons.

First, the Board is assuming that the embodiment disclosing *Liebermann's* 3D camera also utilizes the processes depicted in Figure 9, which includes "calculating the center of gravity of a hand, performing a fast Fourier transform [(FFT)], and conduction path analysis." *See* Appx0029 (Decision, p. 29) (citing Appx0960 (*Liebermann*, Fig. 9)). But none of that is disclosed by *Liebermann*. Instead, *Liebermann's* 3D camera is mentioned only once near the very end of the reference. *See* Appx0974 (*Liebermann,* 13:29-31). No details regarding the operation of the 3D camera or whether it interacts with *Liebermann's* other disclosed processes (e.g., Figure 9) are disclosed.

Second, the Board is also assuming that when *Liebermann's* 3D camera is in use, the center of gravity calculations, the path analysis, and/or the FFT algorithm necessarily input or determine three-dimensional coordinates. None of that is disclosed by *Liebermann*. Moreover, performing a "path analysis" of hands does not necessarily implicate three-dimensions. For example, hands moving left to right follow a one- or two-dimensional path. Calculating "centers of gravity" for both hands also does not necessarily implicate three dimensions, especially when the "center of gravity" is being calculated from an image.

Third, even if *Liebermann's* "portable transmitter/receiver" does "captur[e] and determin[e] movement in three dimensions," the relationship, if any, between the "determine[ed] movement in three dimensions" and *Liebermann's* "identifiers" (the Board-identified "information") is undisclosed and ambiguous. That is insufficient to disclose "wherein said information is obtained in 3 dimensions," as claim 19 requires.

Further, to allegedly meet the requirements of claim 19, the Board references *Liebermann's* multiple camera embodiment. *See* Appx0030 (Decision, p. 30) (quoting Appx0974 (*Liebermann*, 13:4-8)) ("It may be desirable to utilize more than one camera to allow the signing person 'free' movement in his or her environment to track down spatial positions in that environment.") (emphasis added by Board). But "spatial positions" does not necessarily mean 3 dimensions. And even if "spatial

49

positions" does mean 3 dimensions, the relationship, if any, between the "spatial positions" and *Liebermann's* "identifiers" (the Board-identified "information") is undisclosed. Again, that is insufficient to support an anticipation rejection.

For the aforementioned reasons, the Board's finding that *Liebermann* anticipates claim 19 is not supported by substantial evidence, and should be vacated or reversed.

### 7. *Liebermann* does not anticipate dependent claims 8, 9, 15, 20-22, 25, 26, and 28-30.

As discussed above, *Liebermann* fails to anticipate claims 7 and 14. Each of claims 8, 9, 15, 20-22, 25, 26, and 28-30 depends from and adds limitations to independent claims 7 or 14. Accordingly, for the reasons set forth above regarding independent claims 7 and 14, the Board's determination that *Liebermann* anticipates claims 8, 9, 15, 20-22, 25, 26, and 28-30 is not supported by substantial evidence and should be vacated or reversed.

### D. The Board Erred In Determining That *Liebermann* Renders Obvious Claims 1, 2-6, and 12.

### 1. *Liebermann* is non-analogous art.

*Liebermann* is non-analogous art and thus it cannot be used in an obviousness rejection. A reference qualifies as prior art for an obviousness determination only when it is analogous to the claimed invention. *See In re Klein*, 647 F.3d 1343, 1348 (Fed. Cir. 2011). Two separate tests define the scope of analogous prior art: (1)

whether the art is from the same field of endeavor, regardless of the problem addressed and, (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved. *Donner Technology, LLC v. Pro Stage Gear, LLC*, 979 F.3d 1353, 1359 (Fed. Cir. 2020).

### a.    *Liebermann* fails the first test for analogous art.

According to the Board, "Liebermann is directed to an input device for optically sensing human positions or orientations." Appx0034 (Decision, p. 34). That is an improper interpretation of *Liebermann's* field of endeavor because it does not expressly include "phones for the deaf." *Liebermann* is replete with references to "phones for the deaf:" *Liebermann's* Title, Abstract, "Background Art" section, "Brief Description of the Drawings" section, "Detailed Description" section, drawings, and independent claims all disclose or reference phones for the deaf. *See, e.g.*, Appx0951 (*Liebermann*, Title ("Telephone for the deaf and method of using same"), Abstract ("An electronic communications system for the deaf") (emphasis added)), Appx0968 (*Liebermann*, 1:10-15) ("The present invention relates to electronic apparatus for communication by the deaf, and, more particularly, to such apparatus which enables the deaf person to communicate through use of sign language.") (emphasis added), Appx0969 (*Liebermann*, 3:14-18 ("It is also an object to provide such an electronic communication system wherein the deaf person and

the person communicating with the deaf person do so through a central facility")
(emphasis added), 4:12-17 ("FIG. 4 is a schematic presentation of the several steps
in the intervention and operation of the processing center when <u>a call is received by
the deaf person's telephone</u>; FIGS. 5a-5c are perspective views of a <u>deaf person's
receiver/transmitter installation</u> embodying the present invention") (emphasis
added)), Appx0970 (*Liebermann*, 6:64-65 ("The normally hearing person who <u>calls
a deaf person</u> dials the deaf person's phone number.") (emphasis added)), Appx0974
(*Liebermann*, 13:37-38 ("The system may function as a <u>telephone for the deaf</u>")
(emphasis added)), Appx0974 (*Liebermann*, independent claim 1 ("An electronic
communications system for the <u>deaf</u>") (emphasis added), independent claim 12 ("In
a method for electronic communication for the <u>deaf</u>") (emphasis added)), Appx0975
(*Liebermann*, independent claim 26 ("An electronic communications system <u>for the
deaf</u>") (emphasis added)).  In fact, the term "deaf" appears <u>more than 120 times</u>
within *Liebermann*.  Accordingly, *Liebermann's* field of endeavor must expressly
include "phones for the deaf."  *See Airbus S.A.S. v. Firepass Corp.*, 941 F.3d 1374,
1380-81 (Fed. Cir. 2019) (the court finding the PTAB's reliance on the title,
specification, and claims of a prior art reference to determine the reference's field of
endeavor reasonable).

In contrast, Appellant maintains that the field of endeavor for the '431 Patent
is controlling functions of handheld devices using images captured by the handheld

devices.  *See* Appx0140-Appx0141 ('431 Patent, 11:62-13:45), Appx0122 ('431 Patent, Fig. 8A, 8B), Appx0147 ('431 Patent, claims 1, 7, and 14).  Phones for the deaf do not belong to that field of endeavor.  In fact, the terms "deaf," "hearing impaired," "hearing loss," and "hard of hearing" are completely absent from the '431 Patent.  Thus, *Liebermann* fails the first test for analogous art.

### b.    *Liebermann* fails the second test for analogous art.

Regarding the second test for analogous art, as explained by this Court,

> the dividing line between reasonable pertinence and less-than-reasonable pertinence is context dependent, <u>it ultimately rests on the extent to which the reference of interest and the claimed invention relate to a similar problem or purpose</u> . . . Thus, when addressing whether a reference is analogous art with respect to a claimed invention under a reasonable-pertinence theory, <u>the problems to which both relate must be identified and compared</u>.

*Donner Tech., LLC*, 979 F.3d  at 1359 (emphasis added).  In other words, under the second test for analogous art, the Board/Examiner must identify the problem being solved by the '431 Patent, identify the problem being solved by *Liebermann*, and compare the two problems.

According to the Board, *Liebermann* solves the problem of "sensing signing motions for deaf persons."  Appx0037 (Decision, p. 37).  But that is not an accurate description of the problem being solved by *Liebermann*.  *Liebermann* states that "deaf persons have <u>substantial difficulties</u> in communicating with persons at remote locations," Appx0968 (*Liebermann*, 1:30-31) (emphasis added), and then discloses

solutions to the "substantial difficulties" including "an electronic communication system wherein the deaf person and the person communicating with the deaf person do so through a central facility containing a translating means for processing elements of digitized image data" and "a system in which a hearing person may have his speech converted into digitized signing motions which are displayed to the deaf person." Appx0969 (*Liebermann*, 3:14-24). Accordingly, *Liebermann* is directed towards solving the problem of deaf persons trying to communicate with other persons at remote locations.

Appellant maintains that the problems to which the '431 Patent relates include determining touchless user input commands to handheld devices and controlling functions within handheld devices. *See* Appx0140-Appx0141 ('431 Patent, 11:62-13:45), Appx0122 ('431 Patent, Fig. 8A, 8B), Appx0147 ('431 Patent, claims 1, 7, and 14). Those are not the problems to which *Liebermann* relates, thus *Liebermann* fails the second test for analogous art.

Because *Liebermann* fails both tests for analogous art, *Liebermann* is non-analogous art and cannot be cited in any obviousness rejections.

### 2. *Liebermann* does not render obvious independent claim 1.

#### a. *Liebermann* does not teach or suggest the preamble of claim 1.

Like independent claim 14, the preamble of independent claim 1 also recites "a handheld computing device." Appx0147 ('431 Patent, 25:39-41). *Liebermann*

fails to teach or suggest the claimed "handheld computing device" for all the reasons discussed above with respect to the preamble of claim 14.

> **b.** ***Liebermann* does not teach or suggest claim element 1[a].**

Claim element 1[a] recites "holding said device in one hand." Appx0147 ('431 Patent, 25:41). As a threshold matter, the Board takes the incredible position that step 1[a] "encompasses any of holding the device before [], during, or after [the other claimed] steps." Appx0038 (Decision, p. 38). But the Board's position requires completely ignoring the preamble of claim 1, which expressly recites a "handheld computer device." This Court has cautioned against such "depart[ures] from common sense in claim construction." *AlterWAN, Inc. v. Amazon.com, Inc.*, 63 F.4th 18, 24 (Fed. Cir. 2023). Yet that is exactly what the Board has done. Consistent with the preamble, Appellant asserts that step 1[a] is performed during steps 1[b]-1[e].

*Liebermann* discloses that during operation the "portable transmitter/receiver" must be "supported in a stable position." Appx0970 (*Liebermann*, 6:2-6). The term "stable position" appears exactly once within *Liebermann*, to describe a "portable transmitter/receiver" that is clearly designed to be positioned on a flat surface during use. *See id*. In the very same sentence, *Liebermann* also discloses the "deaf person is positioned so that camera lens 10 will record the signing movement of the hands." *Id*. (emphasis added). If "camera lens

10" is recording both "hands" of the deaf user, the "portable transmitter/receiver" is not being held in either of the deaf user's hands. Accordingly, the "stable position" does not correspond to holding *Liebermann's* "portable transmitter/receiver" in one hand. That is contrary to what claim element 1[a] requires.

The Board glossed over Appellant's stability arguments and "conclude[d] that it was a well-known routine in the optical arts to make a handheld optical device sufficiently stable by bracing the user's arm or hand (e. g., bracing a camera, bracing binoculars, bracing a scope when used on a pistol)." Appx0037-Appx0039 (Decision, pp. 37-39). But the Board proffers no evidence that *Liebermann's* "portable transmitter/receiver" has a shape/size/weight similar to that of a camera, binoculars, or a pistol scope such that it could be made "sufficiently stable by bracing the user's arm or hand." Again, *Liebermann* never discloses the dimensions/weight of its "portable transmitter/receiver," and "portable" does not necessarily mean "handheld."

According to the Board/Examiner, "allow[ing] deaf users to utilize the device more often" is the motivation for holding *Liebermann's* "portable transmitter/receiver" in one hand during operation. Appx0578 (Final OA, p. 23). But the Board/Examiner does not explain why holding the "portable transmitter/receiver" in one hand "allow[s] deaf users to utilize the device more often." *See id*. Nor does the Board/Examiner provide any evidence that users of

*Liebermann* would use the "portable transmitter/receiver" less often due to a lack of stable surfaces. To the contrary, operating *Liebermann's* "portable transmitter/receiver" while holding it in one hand would stymie its use and frustrate the deaf users; they would not utilize the device more often, and thus the Board/Examiner's proposed motivation is not realized.

At best, only "finger spelling" remains possible with the deaf user's free hand if the "portable transmitter/receiver" were held in one hand during use. But limiting the deaf user to finger spellings would frustrate use and make the user less likely to use the device. The equivalent would be requiring a speaking user to spell out each word during a conversation, rather than simply speaking the word. In either instance, the conversation would take substantially more time and would be more prone to error. That is why "[f]inger spellings are used as an alternative means for the case when sign words cannot be remembered or understood, and so conversation using only finger spellings is <u>rarely had</u>. This conventional method is <u>not satisfactory</u> for conversation, because each word in a sentence is expressed by giving the finger spellings of all characters or letters of the word." Appx1063 (U.S. Patent No. 5473705, 2:3-9) (emphasis added). Accordingly, there is no motivation for a user to hold *Liebermann's* "portable transmitter/receiver" in one hand, as claim element 1[a] requires.

### c. *Liebermann* does not teach or suggest claim element 1[d].

Claim element 1[d] recites "determining from said sensed light the movement of said finger." Appx0147 ('431 Patent, 25:39-50). The determined "movement of said finger" concerns a "command to said [handheld computing] device." *Compare* claim element 1[d] *with* claim element 1[b] ("moving at least one finger . . . to signal a command to said device"). The Board mapped *Liebermann's* "identifiers" to the determined "movement of said finger." *See* Appx0018-Appx0020 (Decision, pp. 18-20), Appx0048 (Decision, p. 48) (Dougal, J., dissenting) ("the 'sensed finger movement information' . . . is the unique identifiers"). But as discussed above in reference to claim element 14[c], *Liebermann's* "identifiers" do <u>not</u> concern a "command to said device." Accordingly, *Liebermann* fails to teach or suggest claim element 1[d].

### d. *Liebermann* does not teach or suggest claim element 1[e].

Claim element 1[e] recites "using said sensed finger movement information, controlling said [handheld computing] device in accordance with said command." Appx0147 ('431 Patent, 25:39-50). In his dissent, Judge Dougal found that *Liebermann* does not teach or suggest claim element 1[e]. *See* Appx0046-0049 (Decision, pp. 46-49) (Dougal, J., dissenting).

58

The Board/Examiner mapped *Liebermann's* "identifiers" and the sending of the "identifiers" between *Liebermann's* "portable transmitter/receiver" and the "central processing facility" to the claimed "sensed finger movement information" and "controlling said [handheld computing] device," respectively. *See* Appx0018-0020 (Decision, pp. 18-20). But as discussed above in reference to claim element 14[d], *Liebermann's* "identifiers" do <u>not</u> control *Liebermann's* sending function or any function of *Liebermann's* "portable transmitter/receiver." Accordingly, *Liebermann* fails to teach or suggest claim element 1[e].

For the aforementioned reasons, the Board's findings that *Liebermann teaches* or suggests every limitation of independent claim 1 are not supported by substantial evidence. Accordingly, the Board's determination that *Liebermann* renders claim 1 obvious should be vacated or reversed.

### 3.    *Liebermann* does not render obvious dependent claim 4.

*Liebermann* does not render obvious claim 1. Claim 4 depends from and adds limitations to claim 1. Accordingly, for the reasons set forth above regarding claim 1, the Board's determination that *Liebermann* renders dependent claim 4 obvious is not supported by substantial evidence and should be vacated or reversed.

Further, claim 4 recites "wherein said movement is sensed in 3 dimensions." Appx0147 ('431 Patent, 25:56-57). Both the Board and Appellant agree that claim 4 should be interpreted to mean "wherein said movement is determined in 3

dimensions." Appx0012 (Decision, p. 12). As discussed above in reference to claim element 1[d], the Board mapped *Liebermann's* "identifiers" to the determined "movement of said finger." But as discussed above in reference to claim 19, *Liebermann* fails to disclose that its "identifiers" have 3 dimensions, as claim 4 requires. Accordingly, the Board's determination that *Liebermann* renders dependent claim 4 obvious is not supported by substantial evidence and should be vacated or reversed.

### 4. *Liebermann* does not render obvious dependent claims 2, 3, 5, 6, and 12.

As discussed above, *Liebermann* neither discloses nor renders obvious independent claims 1 and 7. Claims 2, 3, 5, 6, and 12 depend from and add limitations to claims 1 or 7. Accordingly, for the reasons set forth above regarding claims 1 and 7, the Board's determinations that claims 2, 3, 5, 6, and 12 are rendered obvious by *Liebermann* is not supported by substantial evidence and should be vacated or reversed.

### E. The Board Erred In Determining That The Cited Art Renders Obvious Dependent Claims 10, 23, 24, And 27.

As discussed above, *Liebermann* neither discloses nor renders obvious independent claims 7 and 14. *Maruno, Maguire, and Mack* do not cure the deficiencies of *Liebermann* with respect to claims 7 and 14. Claims 10, 23, 24, and 27 depend from and add limitations to claim 7 or 14. Accordingly, for the reasons

set forth above regarding claims 7 and 14, the Board's determinations that claims 10, 23, 24, and 27 are rendered obvious by the cited art are not supported by substantial evidence and should be vacated or reversed.

**F. The Board Erred By Not Vacating The Reexam Order Because No Substantial New Question (SNQ) Of Patentability Exists**

Section 303 of Title 35 "requires the examiner to determine whether a 'substantial new question of patentability' is raised by the reexamination request. Only if a new question of patentability is raised, can the patent be reexamined." *In re Recreative Techs. Corp.*, 83 F.3d 1394, 1396 (Fed. Cir. 1996). The USPTO "considers the standard for reexamination met when there is a substantial likelihood that a reasonable examiner would consider the prior art patent or printed publication important in deciding whether or not the claim is patentable." *P&G v. Kraft Foods Global, Inc.*, 549 F.3d 842, 848 (Fed. Cir. 2008) (cleaned up).

In the order dated January 11, 2022 ("Reexam Order") granting the request for *ex parte* reexamination of the '431 Patent, the Office noted that "the perceived patentable features of independent claim 1 [and claim 14] revolve around the functions of a handheld computing device . . . the perceived patentable features of independent claim 7 revolve around the functions of a handheld computer apparatus." Appx0457 (Reexam Order, p. 7) (emphasis added). The Office asserts that *Liebermann* or a combination of *Liebermann* and one or more of *Maruno*, *Maguire*, and *Mack* raises a SNQ of patentability because *Liebermann* or the

mentioned combination appears to "describe the features that are deemed to be the patentable features of independent claims 1, 7, and 14 in the original prosecution of the '431 Patent" (i.e., the functions of a "handheld computer apparatus" or "handheld computing device"). Appx0462-Appx0466 (Reexam Order, pp. 12-16); Appx0043-Appx0044 (Decision, pp. 43-44). Appellant disagrees.

As discussed above, *Liebermann* does not disclose at least a "handheld computer apparatus" or a "handheld computing device." In other words, *Liebermann* does not provide the "perceived patentable features" of independent claims 1, 7, and 14 in the original prosecution of the '431 Patent. As also discussed above, *Maruno*, *Maguire*, and *Mack* do not cure these deficiencies of *Liebermann*. Thus, a reasonable examiner would not consider *Liebermann* by itself or in combination with *Maruno*, *Maguire*, and/or *Mack* to be important in deciding whether one or more claims of the '431 Patent are patentable, and *Liebermann* alone or combined with *Maruno*, *Maguire*, and/or *Mack* does not raise a SNQ of patentability. The order for *ex parte* reexamination should be vacated.

## G. The USPTO Does Not Have Jurisdiction Over the Expired '431 Patent.

Appellant maintains its position that the Patent Office does not have jurisdiction over expired patents, but notes that the Court rejected Appellant's arguments on this issue in the opinion issued today in *Apple Inc. v. Gesture Technology Partners, LLC*, Nos. 2023-1501, 2023-1554, slip op. at 5-7 (Fed. Cir.

Jan. 27, 2025).  In *Oil States*, the Supreme Court explained that the "decision to <u>grant</u> a patent is a matter involving public rights—specifically, the grant of a public franchise." *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373 (2018) (emphasis in original).  "Specifically, patents are public franchises that the Government grants to the inventors of new and useful improvements."  *Id*. (internal quotation marks omitted).  The Court explained that "Congress [has] significant latitude to assign [the] adjudication of public rights to entities other than Article III courts."  *Id*. at 1373.  In exercising its "significant latitude," Congress grants public franchises "subject to the qualification that the PTO has the authority to reexamine—and perhaps cancel—a patent claim in an inter partes review."  *Id*. at 1368, 1374 (internal quotation marks omitted).  Accordingly, so long as the public franchise exists, the Patent Office may have jurisdiction to amend and cancel the claims of the patent (e.g., via *ex parte* reexamination).

When a patent expires, however, the public franchise ceases to exist and the franchisee (e.g., the patent owner) no longer has the right to exclude others.  At most, the franchisee may be entitled to collect damages arising from the public franchise that formerly existed through an infringement action in district court.  But because the public franchise no longer exists after the patent expires, the Patent Office has nothing in its authority to cancel or amend.  Expiration thus removes the patent from the Patent Office's jurisdiction and returns it to the sole jurisdiction of the Article III

courts, which have exclusive authority to govern claims for damages. If this were not so, the Patent Office would purport to have authority to retroactively modify a public franchise that no longer exists, in a setting where the expired public franchise does not enjoy any presumption of validity and in which amendment of claims is no longer permitted.

The '431 Patent issued in April 2011, and expired in July 2020, long before the *ex parte* reexamination request was filed in November 2021. With the expiration of the '431 Patent in July 2020, the USPTO ceased to have jurisdiction over the '431 Patent, and the order granting reexamination should be vacated as a result.

In rejecting Patent Owner's argument, the Board argued "we disagree that Appellant has no rights under the expired patent." Appx0042 (Decision, p. 42). Appellant never argued that it had no rights under the expired patent. Appellant argued that the USPTO loses its jurisdiction to cancel or amend the patent when the patent expires. *See* Appx0784-Appx0785 (Appeal Br., pp. 61-62).

Further, in rejecting Appellant's argument, the Board noted "the statute authorizing reexamination [(35 U.S.C. § 302)] does not limit the timing of reexamination in the manner argued by Appellant" and this Court "regularly reviews Board decisions where a patent under reexamination expired prior to the Board issuing its decision." Appx0041-Appx0042 (Decision, pp. 41-42). But the USPTO's jurisdiction over expired patents was not challenged in those cases and the

Board failed to evaluate the statute authorizing reexamination in view of the *Oil States* decision.  Appellant assets that the USPTO does not have jurisdiction over expired patents in view of the *Oil States* decision for the foregoing reasons.

## VIII. CONCLUSION AND RELIEF SOUGHT

For the foregoing reasons, Appellant respectfully requests that the Court (1) vacate the Board's decision and remand with instructions to apply the correct meaning of real party in interest and privy and comply with the APA to determine whether the *ex parte* reexamination should be terminated under 35 U.S.C. § 315(e)(1), (2) vacate or reverse the Board's determinations that claims 1-30 of the '431 Patent are anticipated or rendered obvious by the cited art, (3) vacate the order granting *ex parte* reexamination of the '431 Patent, and (4) vacate the Board's Decision because the USPTO does not have jurisdiction over expired patents such as the '431 Patent.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system on January 27, 2025.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:    January 27, 2025                    */s/ Fred I. Williams*
                                              Fred I. Williams

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 25-1075

**Short Case Caption:** In re Gesture Technology Partners, LLC

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 13,758 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 01/27/2025

Signature: /s/ Fred I. Williams

Name: Fred I. Williams

Save for Filing

# ADDENDUM

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

*Ex parte* GESTURE TECHNOLOGY PARTNERS, LLC
Patent Owner and Appellant

---

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2
Technology Center 3900

---

Before ALLEN R. MacDONALD, MICHAEL J. ENGLE, and
BRENT M. DOUGAL, *Administrative Patent Judges*.

Opinion for the Board by MacDONALD, *Administrative Patent Judge*.

Opinion dissenting-in-part and concurring-in-part by DOUGAL,
*Administrative Patent Judge*.

DECISION ON APPEAL[1]

---

[1] This Panel's January 19, 2024 decision in Appeal 2023-002523,
Reexamination Control 90/014,902 involving a continuation of this
'431 Patent, is referenced throughout this Decision.

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

## STATEMENT OF THE CASE[2]

Pursuant to 35 U.S.C. §§ 134(b) and 306, Gesture Technology

Partners, LLC[3] appeals from the final rejection of claims 1−31.  Appeal

Br. 5−65.  We have jurisdiction under 35 U.S.C. § 6(b).  We affirm in part.


## CLAIMED SUBJECT MATTER

Claims 1, 4, 7, and 13 are illustrative of the claimed subject matter

(bracketed material according to Appellant's labeling of claim limitations,

emphasis, and formatting added):

1. A method for controlling a ***handheld*** computing device
comprising the steps of:

   [1(a)] holding said device in one hand;

   [1(b)] moving at least one finger in space in order to signal a
   command to said device;

   [1(c)] electro-optically sensing light reflected from said at
   least one finger using a sensing means ***associated with***
   said device;

   [1(d)] ***determining*** from said sensed light the ***movement*** of
   said finger, and

   [1(e)] using said sensed finger movement information,
   controlling said device in accordance with said
   command.

4. A method according to claim 1, wherein said movement is
***sensed in 3 dimensions***.

7. ***Handheld*** computer apparatus comprising:

---

[2] On July 15, 2024, a hearing directed to this appeal was held.

[3] "Appellant" refers to "applicant" as defined in 37 C.F.R. § 1.42 (2022).
Appellant identifies the real party in interest as Gesture Technology
Partners, LLC.  Appeal Br. 1.

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

[7(a)] a housing;

[7(b)] a camera means **associated with** said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object;

[7(c)] computer means within said housing for analyzing said image to determine information **concerning a position or movement** of said object; and

[7(d)] means for controlling a function of said apparatus using said information.

13. Apparatus according to claim 7, wherein said apparatus is a **cellular phone**.

## REFERENCES[4]

The Examiner relies on the following references:

| Name | Reference | Date |
|------|-----------|------|
| Maguire | US 5,644,324 | July 1, 1997 |
| Liebermann | US 5,982,853 | Nov. 9, 1999 |
| Maruno | US 6,191,773 B1 | Feb. 20, 2001 |
| Mack | US 6,198,485 B1 | Mar. 6, 2001 |

## REJECTIONS[5]

### A.

The Examiner rejects claims 7–9, 11, 13–22, 25, 26, and 28–31 under pre-AIA 35 U.S.C. § 102 as being anticipated by Liebermann.  Final Act. 4–19.

---

[4] All citations herein are by the first named inventor.

[5] For simplicity herein, we refer to the Examiner's rejection under § 102(e) as a rejection under § 102; and we refer to the Examiner's rejections under § 103(a) as rejections under § 103.

3

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

For this rejection, Appellant presents arguments for claims 7, 13, 14, 16–19, and 31. Appeal Br. 12–47. To the extent that Appellant discusses this rejection of claims 8, 9, 11, 15, 20–22, 25, 26, and 28–30, Appellant merely references (or repeats) the arguments directed to claims 7, 13, and/or 14. Appeal Br. 34, 48. Such a referenced (or repeated) argument is not an argument for "separate patentability." Thus, Appellant does not present separate arguments for this rejection of these claims. Therefore, this rejection of these claims turns on our decision as to the rejection of claims 7, 13, and/or 14. We do not address separately the merits of this § 102 rejection of claims 8, 9, 11, 15, 20–22, 25, 26, and 28–30 further herein.

B.

The Examiner rejects claims 1–6 and 12 under 35 U.S.C. § 103 as being unpatentable over Liebermann. Final Act. 20–25.

For this rejection, Appellant presents separate arguments for claims 1 and 4. Appeal Br. 48–59. To the extent that Appellant discusses this rejection of claims 2, 3, 5, 6, and 12, Appellant merely references (or repeats) the argument directed to claims 1 and 7. Appeal Br. 59. Therefore, this rejection of these claims turns on our decision as to the rejection of claims 1 and 7.

C.

The Examiner rejects claims 10, 23, 24, and 27 under 35 U.S.C. § 103 as being unpatentable over various combinations of Liebermann with Maruno, Maguire, and/or Mack. Final Act. 26–36.

To the extent that Appellant discusses these rejections of claims 10, 23, 24, and 27, Appellant merely references (or repeats) the arguments

4

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

directed to claims 1, 7, and 14.  Appeal Br. 59–61.  Therefore, these
rejections of claims 10, 23, 24, and 27 turn on our decision as to the
rejection of claims 1, 7, and 14.

## PRINCIPLES OF LAW – ANTICIPATION

As articulated by the Federal Circuit, "[a]nticipation requires the
presence in a single prior art disclosure of all elements of a claimed
invention arranged as in the claim." *Connell v. Sears, Roebuck & Co.*, 722
F.2d 1542, 1548 (Fed. Cir. 1983).  The requirement that the prior art
elements themselves be "arranged as in the claim" means that claims cannot
be "treated . . . as mere catalogs of separate parts, in disregard of the part-to-
part relationships set forth in the claims and that give the claims their
meaning." *Lindemann Maschinenfabrik GMBH v. Am. Hoist & Derrick Co.*,
730 F.2d 1452, 1459 (Fed. Cir. 1984).  "[U]nless a reference discloses within
the four corners of the document not only all of the limitations claimed but
also all of the limitations *arranged or combined in the same way as recited
in the claim*, it cannot be said to prove prior invention of the thing claimed
and, thus, cannot anticipate under 35 U.S.C. § 102." *Net MoneyIN, Inc. v.
VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008) (emphasis added).  For
a claim to be anticipated, each claim element must be disclosed, either
expressly or inherently, in a single prior art reference, and the claimed
arrangement or combination of those elements must also be disclosed, either
expressly or inherently, in that same prior art reference.

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

## PRINCIPLES OF LAW – CLAIM CONSTRUCTION

### A. *Phillips*[6]

"During reexamination proceedings of unexpired patents, . . . the Board uses the broadest reasonable interpretation consistent with the specification standard, or BRI." *In re CSB-Sys. Int'l, Inc.*, 832 F.3d 1335, 1340 (Fed. Cir. 2016) (quotation omitted). However, "[i]f, as is the case here, a reexamination involves claims of an expired patent, a patentee is unable to make claim amendments and the PTO applies the claim construction principles outlined by this court in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005)." *In re Rambus, Inc.*, 753 F.3d 1253, 1256 (Fed. Cir. 2014) (citing MPEP § 2258(G)).

### B. Ordinary And Customary Meaning

Under *Phillips*, "the words of a claim are generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312 (quotation omitted). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313.

### C. In View Of The Specification

"[I]t is fundamental that claims are to be construed in the light of the specifications." *United States v. Adams*, 383 U.S. 39, 49 (1966). However, "limitations are not to be read into the claims from the specification." *In re*

---

[6] The subject '431 Patent of this appeal expired in July 2020 before the filing of the November 11, 2021 Request for Reexamination. *See* Appeal Br. 62. Also, the Examiner acknowledges the '431 Patent term "is expired." Final Act. 3; Ans. 4, 9.

6

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

*Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993) (citing *In re Zletz*, 893
F.2d 319, 321 (Fed. Cir. 1989)).

## D. Capable Of

The patentability of an apparatus depends on the actual structure
claimed, not on the use, function, or result thereof. *In re Danly*, 263 F.2d
844, 848 (CCPA 1959). Because an apparatus is a structure, the apparatus
must be distinguished from the prior art on the basis of structure, and where
there is reason to conclude that the structure of the prior art is inherently
capable of performing the claimed function, the burden shifts to the
applicant or patent owner to show that the claimed function patentably
distinguishes the claimed structure from the prior art structure. *See In re
Schreiber*, 128 F.3d 1473, 1478 (Fed. Cir. 1997); *In re Hallman*, 655 F.2d
212, 215 (CCPA 1981).


## OPINION

We have reviewed the Examiner's rejections in light of Appellant's
arguments (Appeal Brief) that the Examiner has erred. We disagree with
Appellant's conclusions. Except as noted below, we adopt as our own
(1) the findings and reasons set forth by the Examiner in the action from
which this appeal is taken and (2) the reasons set forth by the Examiner in
the Examiner's Answer in response to Appellant's Appeal Brief.


## A. Claim Construction

Appellant raises the following arguments in contending that the
Examiner erred in construing the claims. *See* Appeal Br. 8–12.

7

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

A.1. Claim Construction – Claim 7, element [7(c)],
"computer means . . . for analyzing said image to determine
information concerning a position of said object"

Appellant argues:

In the final written decision of IPR2021-00917, the PTAB *found* that claim element [7(c)] is a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6. . . . The PTAB *found* that the corresponding structure is "a general purpose computer programmed with an algorithm to cause the general purpose computer to: (1) analyze target image(s) of an object captured by the camera means; and (2) determine position(s) of the object," *and equivalents thereof*. . . . Further, the PTAB *found* that the limitation's function is "*analyzing the image obtained by the camera means to determine information concerning a position or movement of an object*." [*Unified Patents, LLC v. Gesture Technology Partners, LLC*, IPR2021-00917, Final Written Decision, Paper 31, (P.T.A.B. Nov. 21, 2022).] A PTAB "decision is binding in the case in which it is made, even if it is not designated as precedential or informative."

Appeal Br. 8–9 (emphasis added).

Given the above findings of the IPR2021-00917 PTAB panel, we agree with Appellant.

To the extent that Appellant's argument(s) relies on the "computer means . . . for analyzing said image to determine information concerning a position or movement of said object" limitation, we address that issue below.

A.2. Claim Construction – Claim 7, element [7(d)],
"means for controlling a function of said
apparatus using said information"

Appellant argues:

In the final written decision of IPR2021-00917, the PTAB *found* that claim element [7(d)] is a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6. . . . The PTAB *found* that the corresponding structure is the handheld computer apparatus

8

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

> programmed with an algorithm to cause the handheld computer apparatus to (1) receive position information, (2) correlate the position information with a function of the handheld computer apparatus, and (3) cause the handheld computer apparatus to perform the function, ***and equivalents thereof*** . . . . Further, the PTAB ***found*** that the limitation's function is "controlling a function of said [handheld computer] apparatus using said information." . . . A PTAB "decision is binding in the case in which it is made, even if it is not designated as precedential or informative."

Appeal Br. 9–10 (emphasis added).

Unlike the "computer means" of above Section A.1., the IPR2021-00917 PTAB panel pointed out that "Patent Owner does not address Petitioner's ['means for controlling'] construction." IPR2021-00917, Final Written Decision 12 (citing PO Resp. 6–11). That is, here the IPR2021-00917 PTAB panel's construction determination accepted Petitioner's unchallenged claim construction.

> According to Petitioner, the limitation's function "is controlling a function of said apparatus using said information" and the corresponding structure "is a general purpose computer programmed with an algorithm to cause the general purpose computer to" (1) receive position information, (2) correlate the position information with a function of the apparatus, and (3) cause the apparatus to perform the function, wherein the function includes one or more of: (a) a display function, (b) a command to print, (c) ***an image transmission function***, or (d) an e-mail transmission function. . . . ***Patent Owner does not address Petitioner's construction***.

IPR2021-00917, Final Written Decision 12 (emphasis added).

For purposes of this appeal, we agree with Appellant's proposed claim construction. However, we note that while Appellant proposes that "controlling" requires that the computer to "correlate the position

9

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

information with a function of the apparatus," Appellant has not argued a

particular definition for the term "correlate." We find the general definition

of the term "correlate" (a verb) includes:[7]

> 1. to place in or bring into mutual or reciprocal relation; establish
> in orderly connection: *to correlate expenses and income.*

To the extent that Appellant's argument(s) relies on the "means for

controlling a function of said apparatus using said information" limitation,

we address that issue below.

### A.3. Claim Construction – Claim 13, "cellular phone"

Appellant argues:

> The "cellular phone" of claim 13 should have its plain and
> ordinary meaning, which necessarily includes (i) being capable
> of answering a voice telephone call from another individual
> operating another phone device, (ii) having an audio output (e.g.,
> built-in speaker, earphone jack, etc.) so that the user of the
> claimed "cellular phone" can listen to the other individual
> (speaking into the other phone device) during the voice telephone
> call, and (iii) having a microphone to capture the voice of the
> user of the claimed "cellular phone," such that the captured voice
> can be transmitted to the other individual (listening on the other
> phone device) during the voice telephone call. There should be
> no reasonable dispute that a POSITA would recognize that a
> "cellular phone" includes those three capabilities. In fact, at the
> time of the invention, voice calling was the main feature of a
> cellular phone. Accordingly, it would be illogical for the
> ordinary meaning of the "phone" portion of "cellular phone" to
> exclude such a microphone and audio output. The Examiner has
> provided no evidence that would warrant departing from the
> plain and ordinary meaning of the term "cellular phone."

Appeal Br. 10.

---

[7] The Random House Dictionary of the English Language – Unabridged
(1983).

10

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

We are not persuaded by Appellant's argument. Appellant attempts to restrict the term "cellular phone" to exclude cellular phones for hearing impaired persons. We find no meaningful basis for such a restriction and it is contradicted by the record. For example, Liebermann labels item 8 in figure 6 as a "Cellular Telephone Version." At column 5, lines 62–63, Liebermann describes this device as "[a] portable transmitter/receiver generally designated by the numeral 8 for use by a deaf person is shown in FIG. 6[.]" Appellant's attorney argument, on the other hand, fails to point to anything in the claim, the rest of the Specification, or the extrinsic evidence supporting its myopic view that the term "cellular phone" excludes cellular phones for hearing impaired persons. We, therefore, conclude that a person of ordinary skill in the art (POSITA) would have understood the claimed "cellular phone" as including cellular phones (such as Liebermann's) for the hearing impaired.

To the extent that Appellant's argument(s) relies on "cellular phone" limitation, we address that issue below.

### A.4. Claim Construction – Claim 11, "means for transmitting information"

Appellant argues:

> In the final written decision of IPR2021-00917, the PTAB determined that "means for transmitting information" is a means-plus-function limitation under § 112, ¶ 6, that the limitation's function "is transmitting information," and that the corresponding structure is "a cell phone and equivalents thereof."

Appeal Br. 11.

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

For purposes of this appeal, we agree with Appellant's proposed claim construction. To the extent that Appellant's argument(s) relies on "means for transmitting information" limitation, we address that issue below.

### A.5. Claim Construction – Claim 4,
"wherein said movement is sensed in 3 dimensions"

Appellant argues:

> Claim 4 recites "wherein said movement is sensed in 3 dimensions." The United States District Court for the Eastern District of Texas [*Gesture Technology Partners, LLC v Huawei Device Co. Ltd.*, 2021 WL 4760632, E. D. Texas (October 21, 2021)] determined that the term "wherein said movement is sensed in 3 dimensions" means "wherein said movement is determined in 3 dimensions." See Ex. CC-3, filed by third-party requestor on November 11, 2021, pp. 35–37. That court explained that "the disputed term refers to 'said movement,' which refers back to movement determined in the 'determining' step in Claim 1. Defendants' proposal of 'determined' is therefore appropriate." Ex. CC-3, p. 36.
>
>> The Court accordingly hereby construes "wherein said movement is sensed in 3 dimensions" to mean "wherein said movement is determined in 3 dimensions."
>
> Ex. CC-3, p. 37. Accordingly, "wherein said movement is sensed in 3 dimensions" should be interpreted to mean "wherein said movement is determined in 3 dimensions."

Appeal Br. 11–12 (emphasis omitted).

For purposes of this appeal, we agree with Appellant's proposed claim construction. To the extent that Appellant's argument(s) relies on "movement is sensed in 3 dimensions" limitation, we address that issue below.

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

### B. Section 102 – Liebermann

Appellant raises the following arguments in contending that the Examiner erred in rejecting claims 7, 13, 14, 16−19, and 31 under 35 U.S.C. § 102 as being anticipated. *See* Appeal Br. 12–47.

#### B.1. Claim 7 – Preamble − Section 102 – Liebermann

#### B.1.a. Claim 7, preamble, "handheld computer apparatus"

Appellant argues:

> The fundamental disagreement between Patent Owner and the Examiner is whether *Liebermann* discloses a "handheld computer apparatus," as the preamble of claim 7 requires.

Appeal Br. 12.

> [I]n the context of the '431 claims, "handheld" is referring to the operation of the device, not just its transportation. To be the claimed device, the device must be ***capable of*** being operated while held in the user's hand—i.e., handheld. . . . Because *Liebermann's* "portable transmitter/receiver" is recording, with a camera, the movement of <u>both</u> "hands" of the deaf person, *Liebermann's* "portable transmitter/receiver" is <u>not</u> being held in either of the deaf person's hands during operation. Thus, *Liebermann's* "portable transmitter/receiver" is <u>not</u> the "[h]andheld computer apparatus" of claim 7, because ***it cannot be operated while being held in a hand*** of a user—i.e., handheld.
>
> According to the Examiner, "there is no specific requirement that the apparatus [of claim 7] is held in only one hand while using the apparatus." Action, p. 43. Again, the preamble of claim 7 expressly recites a "[h]andheld computer apparatus." '431 Patent, claim 7 (emphasis added). "Handheld computer apparatus" ***necessarily means*** the "computer apparatus" ***is designed*** for operation by a user ***while being held in at least one*** of the user's hands.

Appeal Br. 14 (emphasis added).

13

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

We are not persuaded by Appellant's argument. We reach the same
decision as in our January 19, 2024 decision in Appeal 2023-002523,
Reexamination Control 90/014,902 at pages 8–9 and 13–15. Here,
Appellant argues that "handheld" requires that the apparatus be "designed"
to be held in a hand while being operated, rather than, "handheld" in claim 7
placing size requirements/restrictions on the claimed components. The
general definition of the term "handheld" (an adjective) includes:[8]

> 1. held in the hand or hands: *a handheld torch.*
>
> 2. small enough to be used or operated while being held in the
> hand or hands: *a handheld hair drier.*
>
> 3. something small enough to be used or operated while held in
> the hand or hands.

However, we do not find any requirement that "handheld" be so "designed."
Rather, it is sufficient that the device be "small enough to be used or
operated while being held in the hand," whether explicitly "designed" so or
not.

Second, even if we adopt Appellant's additional requirement that the
device not merely be of a certain size, but must also be "designed" to be held
in a hand while being operated, we conclude that Liebermann's "Cellular
Telephone Version" (item 8 in figure 6) is designed to be a certain size that
permits it to be held in one hand while signing with the other hand.
Although Appellant presented an argument, at the November 27, 2023
hearing (Pages 3–4) for Appeal 2023-002523, that such single hand signing
usage of Liebermann's device is not reasonable, we disagree. We conclude

---

[8] The Random House Dictionary of the English Language – Unabridged
(1983).

14

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

nothing in the structure or function of Liebermann's device precludes such single hand signing use of Liebermann's device. Similarly, the claim does not preclude one person from holding the cellular phone to record a second person's hands. Appellant acknowledges that such use of Liebermann's device is theoretically possible. July 15, 2024 Hearing Transcript 13.

The Examiner's *prima facie* showing need only explain why the prior art apparatus is **capable of** the function of being "handheld." The Examiner points out:

> [I]n viewing the illustration of Fig. 6, the portable transmitter/receiver 8 would clearly allow a user to hold the apparatus, and it is well understood in the art that a "cellular telephone" would allow a user to hold the telephone, being a similar operation to that of a hard wired telephone. Further, in col. 5, line 62–col. 6, line 14, Liebermann states "A portable transmitter/receiver generally designated by the numeral 8 for use by a deaf person is shown in FIG. 6 ... Also seen is an antenna 18 for the device so that it may be transported and communicate as a wireless remote or through a cellular telephone network."

Ans. 12.

Because the Examiner correctly finds that Liebermann discloses a "portable" "cellular telephone" of a handheld size, the Examiner has found a reason to believe that the apparatus of Liebermann would have been **capable of** performing the claimed function. As discussed below, Appellant, however, provides no convincing evidence or explanation in support of their argument that Liebermann is not so capable. Appellant has the burden of demonstrating either that the asserted prior art is incapable of performing the claimed functions or that the claimed functions necessarily require that the claimed device have a structure that is patentably distinct from the prior art. Appellant has not met this burden.

15

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

B.1.b. Claim 7 Element [7(c)] – Section 102 – Liebermann
"computer means . . . for analyzing said image to determine information
concerning[9] a position or movement of said object"

Appellant states:

> The fundamental disagreement between Patent Owner and the
> Examiner is whether *Liebermann* discloses its "portable
> transmitter/receiver" (the Examiner's identified "handheld
> computer apparatus") "analyz[es] said image to determine
> information ***concerning*** a position or movement of said object."
> Patent Owner asserts it does not.

Appeal Br. 19 (emphasis added).

*Liebermann* is a distributed system in which the
computationally intense processing involving artificial
intelligence, including gesture recognition, occurs in a physically
separate "central processing facility" (also called "the
Center"). . . .

> The deaf person uses sign language in front of the
> transmitter/receiver device containing the camera.
> The images captured by the ***camera*** are of the finger
> and hand motions and of body motions and of facial
> expressions and motions captured by a digital
> device which does <u>***initial processing***</u>. In the <u>initial
> processing</u>, each of the frames containing a captured
> image undergoes a process <u>whereby the image is
> collapsed into a small set of fixed identifiers</u>. At the
> end of the initial processing, the resulting
> information is sent as data . . . to the data processing
> center. . . .

*Liebermann*, 6:42–63 (emphasis added).

---

[9] We are unable to find where Appellant provides a particular definition for
the term "concerning," and the general definition of the preposition
"concerning" is "related to." Dictionary.com,
https://www.dictionary.com/browse/concerning. (Accessed July 19, 2024).

APPX0016

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

> . . . [C]laim element [7(c)] is a means-plus-function limitation,
> where the corresponding structure is "a general purpose
> computer programmed with an algorithm to cause the general
> purpose computer to: (1) analyze target image(s) of an object
> captured by the camera means; and (2) determine position(s) of
> the object," and equivalents thereof.

Appeal Br. 20–21 (emphasis added).

Appellant argues:

> In fact, as shown in the quote above, the "portable
> transmitter/receiver" only collapses an image "into a small set of
> fixed identifiers." . . .

> [T]he Examiner mapped *Liebermann's* "portable
> transmitter/receiver" of Figure 6 to the claimed "handheld
> computer apparatus." The Examiner also ***mapped*** *Liebermann's*
> initial image processing "whereby the image is collapsed into a
> small set of fixed identifiers" to the claimed "analyzing said
> image to determine information concerning a position or
> movement of said object." Action, pp. 5–6 (citing *Liebermann*,
> 6:47–52). But *Liebermann **is silent on the details and content***
> of the "small set of fixed identifiers." . . . *Liebermann* also fails
> to disclose that the "identifiers" are "information ***concerning*** a
> position or movement of said object."

Appeal Br. 21–22 (emphasis added).

Also, Appellant argues:

> According to the Examiner, "looking at Figs. 9 and 10,
> *Liebermann* expressly illustrates parts of this '<u>initial
> processing</u>'. . . ." Action, pp. 48–49 (emphasis added). The
> Examiner's position is flawed for several reasons. . . .

> [T]he modules in Liebermann's ***Figure 9 and Figure 10*** are
> ***executed by*** *Liebermann's* "***central processing facility***," not by
> *Liebermann's* "portable transmitter/receiver" (the Examiner's
> identified "handheld computer apparatus"). The components in
> *Liebermann's* Figure 9 and Figure 10 are not part of the "initial

17

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

> processing" performed by *Liebermann's* "portable transmitter/receiver."

Appeal Br. 23–24 (emphasis added).

> [T]he Examiner attempts to **link the modules** in Figure 9 and Figure 10 **with the** "**initial processing**" performed by *Liebermann's* "portable transmitter/receiver." *See* Answer, pp. 15–16. . . .
>
> This is a gross mischaracterization of *Liebermann*. *Liebermann* **is silent regarding the relationship**, if any, **between** the "**initial processing**" (or the "set of fixed identifiers")**and the modules** in Figure 9 and Figure 10 of *Liebermann*. For example, *Liebermann's* "set of fixed identifiers" **is not described or shown as being the input or output of any module** in Figure 9 or Figure 10 of *Liebermann*.

Reply Br. 14 (emphasis added).

> Further, Appellant argues:
>
> [B]oth Patent Owner and the Examiner agree that in this reexamination proceeding, claim element [7(c)] is a means-plus-function limitation . . . . The Examiner's anticipation rejection is flawed because the Examiner **failed to identify the corresponding structure**, or an equivalent, in *Liebermann*[.]

Reply Br. 15 (emphasis added).

We are not persuaded by Appellant's argument. First, Appellant acknowledges (Appeal Br. 20) that Liebermann's transmitter/receiver contains a camera and Liebermann's digital device (not the "central processing facility") does "initial processing" where an image is collapsed into a small set of fixed identifiers. *See also* Appeal Br. 21.

Second, we disagree with Appellant's contention that Liebermann is *silent* on the details and content of the "small set of fixed identifiers." Liebermann discloses "transmission means for transmitting the *digitized*

18

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

*signing motions or their digital identifiers* to the translating means."
Liebermann, col. 3:40–42. It is inescapable that the content of
Liebermann's "identifiers" is "digitized signing motions." The word "their"
in the phrase "their digital identifiers" unambiguously refers to "digitized
signing motions." Therefore, Liebermann's "digital identifiers" are
identifiers of the digitized signing motions. We conclude that "digitized
signing motions"—and hence "their digital identifiers"—are on their face
"information concerning a position or movement" as required by claim 7.

Third, Appellant correctly points out (throughout the Briefs and
particularly at Appeal Br. 23–24) that the modules of Figures 9 and 10 are
executed at Liebermann's "central processing facility" rather than
Liebermann's "portable transmitter/receiver." However, to the extent that
Appellant argues there is no link between Liebermann's Figures 9 and 10
modules and the initial processing, we disagree. In discussing Figures 9–12,
Lieberman states:

> FIGS. 9-12 are schematics of the system software
> modules for converting signing to speech and speech to
> animation, including system training methods.
>
> The overall operation of a preferred electronic
> communications system is set forth hereinafter.
>
> The deaf person uses sign language in front of the
> transmitter/receiver device containing the camera. The images
> captured by the camera are of the finger and hand motions and
> of body motions and of facial expressions and motions captured
> by a digital device which does initial processing. In the initial
> processing, each of the frames containing a captured image
> undergoes a process whereby the image is collapsed into a small
> set of fixed identifiers. At the end of the initial processing, *the
> resulting information is sent as data* on a regular and designated

19

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

phone line using an internal modem in the device *to the data processing center*.

The rest of the processing is completed at the center.

Liebermann, col. 6:37–53 (emphasis added). We conclude that Liebermann's Figures 9–12 (and their accompanying discussion) are relevant to establishing that the claims are properly rejected at least as to how the modules of Figures 9–12 rely upon (and/or place requirements upon) the data from the initial processing at the cellular telephone. We reach our conclusion by relying upon what Lieberman teaches about this initial processing.

Fourth, as Appellant acknowledges (Appeal Br. 21–22), the Examiner's rejection maps Liebermann's "initial processing" to the claimed "analyzing." Again, as Appellant also acknowledges (Appeal Br. 20), Liebermann's digital device (not the "central processing facility") does this initial processing. We conclude that the initial processing of an image (discussed above) whereby the image is collapsed into a small set of fixed identifiers teaches the "analyzing" as required by claim [7(c)]. We conclude that claim 7 only requires at least some of the "analyzing" (not all) be performed at the handheld device. That is, supplemental processing modules at a central processing facility is not precluded by claim 7.

Fifth, as to Appellant's argument that "the Examiner failed to identify the corresponding structure, or an equivalent, in *Liebermann*" (Reply Br. 15), we disagree. At page 5, lines 6–8, of the Final Action, the Examiner found that Liebermann teaches "computer means" in the form of "a digital device which does initial processing."

20

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

> B.1.c. Claim 7 Element [7(d)] – Section 102 – Liebermann –
> "means for controlling a function of
> said apparatus using said information"

Appellant argues:

> [C]laim element [7(d)] is a means-plus-function limitation, where the corresponding structure is a handheld computer apparatus programmed with an algorithm to cause the handheld computer apparatus to (1) *receive* position information, (2) *correlate* the position information with a function of the handheld computer apparatus, and (3) *cause* the handheld computer apparatus *to perform* the function, and equivalents thereof. *Liebermann is silent* regarding its "portable transmitter/receiver" (the Examiner's identified "handheld computer apparatus") being programmed with an algorithm to "(1) *receive* . . . , (2) *correlate* . . . , and (3) *cause* the handheld computer apparatus *to perform* the function." Accordingly, *Liebermann* does not disclose the corresponding structure (or an equivalent) of claim element [7(d)], and thus does not disclose claim element [7(d)]. . . . The Examiner is misguided. As discussed above regarding claim element [7(c)], the modules in *Liebermann's **Figures 9 and 10*** are executed by *Liebermann's* "central processing facility," <u>not</u> *Liebermann's* "portable transmitter/receiver" (the Examiner's identified "handheld computer apparatus").

Appeal Br. 26–27 (emphasis added).

> The PTAB also found . . . that the "function includes one or more of: (a) a display function, (b) a command to print, (c) ***an image transmission function***, or (d) an e-mail transmission function." [*Unified Patents, LLC v. Gesture Technology Partners, LLC*, IPR2021-00917, Final Written Decision, Paper 31, (PTAB Nov. 21, 2022)]. The Examiner's anticipation rejection is flawed because the ***Examiner failed to identify the corresponding structure, or an equivalent***, in *Liebermann*[.]

Reply Br. 19 (emphasis added).

21

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

> The Examiner mapped . . . Liebermann's "sen[ding resulting information] as data on a regular and designated phone line using an internal modem in the device to the data processing center (Mapping B)" to the claimed function.   Action, p. 6 (citing *Liebermann*, Abstract, 6:42–63).  Both mappings are flawed.

Appeal Br. 27 (emphasis omitted).[10]

Also, Appellant argues:

> [A]ccording to the Examiner, *Liebermann* "describes <u>controlling the apparatus to transmit</u> this 'information concerning a position or movement' <u>to the data processing center</u> for further processing . . . Thus, these sections are seen to teach the function of '<u>controlling a function of said apparatus</u> using said information.'" Answer, p. 21 (emphasis added).  Thus, in at least one instance, the Examiner mapped *Liebermann's* "transmit" function to the claimed "function."

> But *Liebermann's* "transmit" function is ***always executed*** regardless of *Liebermann's* "set of identifiers" (the Examiner-identified "information concerning a position") because *Liebermann's* "central processing facility" is always required to process *Liebermann's* "set of identifiers."

Reply Br. 21 (emphasis added).

Further, Appellant argues:

> *Liebermann's* "set of identifiers" is ***not an image***.   *See Liebermann*, 4:66–5:5 ("It is the <u>set of identifiers . . . that travels</u> the normal telephone lines to the central processing facility (i.e., the Center).  These <u>identifiers, and not the images themselves,</u> are then correlated with a database of vocabulary and grammar by using artificial intelligence at the Center.") (emphasis added).

---

[10] The Examiner provides two distinct mappings of Liebermann to claim element [7(d)].  As discussed below, we agree with the Examiner's Mapping B (mapping to the controlling function the sending resulting information resulting from initial processing as data to the data processing center).  Therefore, we do not address Examiner's Mapping A.

22

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

> Accordingly, *Liebermann's* transmit function is also ***not*** "(c) ***an image transmission function***."

Reply Br. 21 (emphasis added).

Furthermore, Appellant argues:

> Mapping B is ... flawed. The only telephone lines disclosed in *Liebermann* are "copper or fiberoptic telephone lines." *Liebermann*, 5:11. . . . Thus, *Liebermann's* "portable transmitter/receiver" is not physically connected to "a regular and designated phone line." Accordingly, even if *Liebermann's* "portable transmitter/receiver" has the corresponding structure of claim element [7(d)], that structure is not "sen[ding information] as data on a regular and designated phone line using an internal modem in the device to the data processing center." *Liebermann*, 6:50–53.

Appeal Br. 29.

Though we agree with some of Appellant's arguments, they are not enough to overcome the rejection. First, as discussed as to claim element [7(c)] in above section B.1.b., we reach our conclusion by relying upon what Lieberman teaches about the initial processing because Appellant correctly points out that the modules of Figures 9 and 10 are executed at Liebermann's "central processing facility" rather than Liebermann's "portable transmitter/receiver."

Second, we agree with the Examiner's Mapping B (mapping to the controlling function the sending resulting information resulting from initial processing as data to the data processing center). In Liebermann, the device

(1) receives from a camera a captured image representing finger position information,

(2) correlates that image with a transmission function by transforming the image into unique identifiers to be transmitted, and

23

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

> (3) causes the device to perform the function of sending the unique
>    identifiers.

Then the device captures a second image, correlates to new different unique identifiers, and causes a different sending function (encompassing new identifiers) to be performed. The sending function changes as the image changes. Although this might be viewed as a minor function difference over time, it maps to the claimed means plus function required by the claim. Stated differently, the function is not just repeatedly "sending," it is a first function of "sending information X correlated to a first image" and then a different function of "sending information Y correlated to a second image" (in contrast to a basic alarm where the same information is always sent).

Third, as to Appellant's argument that the rejection fails because "*Liebermann's* 'transmit' function is always executed regardless of *Liebermann's* 'set of identifiers'" (Reply Br. 21), Appellant's argument appears premised on aligning Liebermann's "transmit" function to the claimed controlling function as solely the final repeated and generic act of sending data regardless of its content. We disagree. Rather, we conclude that Liebermann's "transmit" function is controlled from moment to moment to send varying digitized data during the process of "transmitting the digitized signing motions or their digital identifiers to the translating means." Liebermann, col. 3:40–42. We agree with the Examiner that Mapping B shows that Liebermann correlates the information with a function of the handheld device and causes the handheld device to perform the function.

24

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

Fourth, as to Appellant's argument that the Examiner errs in finding an image transmission function because "*Liebermann's* 'set of identifiers' is not an image" (Reply Br. 22), we disagree. Liebermann's set of identifiers is described variously as Pertinent Data of the image (Liebermann Figure 1), a manageable identifier of the image (Liebermann 4:60–66), and a Reduced Data Set (RDS) of the image (Liebermann 12:26–33). Contrary to Appellant's argument, we conclude that an artisan would have understood Liebermann's controlling transmission of a set of identifiers as an image transmission function.

Fifth, as to Appellant's argument that "the Examiner failed to identify the corresponding structure, or an equivalent, in *Liebermann*[.]" (Reply Br. 19), we disagree. At page 20, lines 4–6, of the Answer, the Examiner found that Liebermann teaches means for controlling in the form of "transmitter/ receiver device" as "a digital device which does initial processing."

Sixth, Appellant is simply mistaken that "[t]he only telephone lines disclosed in *Liebermann* are 'copper or fiberoptic telephone lines.'" Appeal Br. 29. We conclude that a POSITA would have understood Liebermann's cellular communication to be an equivalent to a regular and designated phone line. *See, e.g.*, Liebermann 5:62–6:2, Fig. 6 ("Cellular Telephone Version" depicting "antenna 18" to "communicate . . . through a cellular telephone network").

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

B.2. Claim 13 – Section 102 – Liebermann – "Cellular Phone"

Appellant raises the following argument in contending that the
Examiner erred in rejecting claim 13 under 35 U.S.C. § 102 as being
anticipated. Essentially, Appellant argues that a "cellular phone" for a
hearing impaired person would not be recognized as a "cellular phone"
unless it also is capable of a voice telephone call. Appeal Br. 30–33.

We are not persuaded by Appellant's argument. As we conclude in
the claim 13 claim construction above at Section A.3., a POSITA would
have understood the claimed "cellular phone" as including cellular phones
(such as Liebermann's) for the hearing impaired. Further, even if we agreed
with Appellant that voice capability is required, Liebermann teaches having
such for its hearing-impaired cellular phone:

> When the phone for the deaf **is equipped with a
> microphone and a speaker** instead of, or in addition to a second
> telephone channel, it may be turned into a communicator.
> Obviously, one can opt to have both of these options to double
> the usefulness of the device.

Liebermann 7:29–33 (emphasis added). At page 6 of the Final Action, the
Examiner directs Appellant to Liebermann, column 7, lines 18–49.

B.3. Claim 14 – Section 102 – Liebermann

B.3.a. Claim 14, preamble, "handheld"

Essentially, Appellant restates the arguments for the preamble of
claim 7. We are not persuaded by Appellant's argument for the reasons
already given above.

26

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

B.3.b. Claim 14 Element 14[c] – Section 102 – Liebermann –
"using said computer, analyzing said image data
to determine information concerning a user input command"

Essentially, Appellant restates the arguments for the element [7(c)] of claim 7. We are not persuaded by Appellant's argument for the reasons already given above.

Further, Appellant argues:

*Liebermann's* "pointers" or "animated images" do not disclose the claimed "image data" of claim element [14(c)] because *Liebermann's* "pointers" or "animated images" **do not come from** a "camera" associated with *Liebermann's* "portable transmitter/receiver" (the Examiner's identified "handheld computing device"), as claim 14 requires.

Appeal Br. 38–39 (emphasis added).

We are not persuaded by Appellant's argument. Liebermann at Figure 6, item 10, teaches a "camera" associated with Liebermann's "portable transmitter/receiver." Liebermann states "the camera lens 10 will record the signing movement of the hands and fingers." Col. 6:4–5.

B.3.c. Claim 14 Element [14(d)] – Section 102 – Liebermann –
"from said determined information,
controlling a function of said device"

Essentially, Appellant restates the arguments for the element [7(d)] of claim 7. We are not persuaded by Appellant's argument for the reasons already given above.

B.4. Claims 16–18 – Section 102 – Liebermann –
"position," "change in position," "velocity or path"

Claims 16–18 recite:

16. A method according to claim 14, wherein said information
     includes the ***position*** of the portion or object.

27

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

17. A method according to claim 14, wherein said information

includes the ***change in position*** of the portion or object.

18. A method according to claim 14, wherein said information

includes the velocity or ***path*** of the portion or object.

Appeal Br. 68–69 (emphasis added).

Appellant raises the following arguments in contending that the

Examiner erred in rejecting claims 16–18 under 35 U.S.C. § 102 as being

anticipated. As to claim 16, Appellant argues:

> [T]he Examiner mapped the "identifiers" that result from
> *Liebermann's* "initial image processing" to the claimed
> "information." *See* Action, pp. 9–10. . . . The Examiner cites
> to [column 12:44–52] of *Liebermann* to disclose claim 16.
> Action, p. 11. But the relationship, if any, between the
> "identifiers" and the content of that cited passage is unclear and
> undisclosed.

Appeal Br. 41–42. As to claims 17 and 18, Appellant restates the argument

for claim 16. Appeal Br. 42–45.

We are not persuaded by Appellant's argument. As we found above

in addressing the arguments directed to claim element 7[(c)], Liebermann

discloses identifiers of digitized signing motions. We further find that an

artisan would have understood such signing motions as including position,

change in position, and path.[11] Therefore, we agree with the Examiner that

Liebermann teaches claims 16–18.

---

[11] For example, in American Sign Language, the sign for "more" is "[b]oth
'flat-0' hands (handshape) with the palms facing each other (orientation)
slightly apart in space (location) taps twice on the fingers of both hands
(movement)." https://www.handspeak.com/ word/1433/. The position,
change in position, and path are all important in that sign.

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

### B.5. Claim 19 – Section 102 – Liebermann – "obtained in 3 dimensions"

Claim 19 recites:

19. A method according to claim 14, wherein said information is

obtained in 3 dimensions.

Appeal Br. 69.

Appellant raises the following argument in contending that the Examiner erred in rejecting claim 19 under 35 U.S.C. § 102 as being anticipated.

> *Liebermann* fails to disclose that the "identifiers" have 3 dimensions, as required by claim 19. *Liebermann* discloses "[3D] video cameras have been developed." *Liebermann*, 13:29-30. But this provides no additional details regarding the content or format of *Liebermann's* "identifiers" that are determined from the image. Nor does it state that such cameras are used to obtain information in 3 dimensions, as required by the claim.

Appeal Br. 45–46 (emphasis added).

We are not persuaded by Appellant's argument. First, "ASL is a visual-spatial language requiring simultaneous, multiple, dynamic articulations," and "[a]t any particular instant, one has to combine information about the handshape (Stokoe's 'dez'), the motion (Stokoe's 'sig') and the spatial location of the hands relative to the rest of the body (Stokoe's 'tab')." Liebermann, 10:59–64 (internal quotations added). Figure 9 discloses in other portions of the conversion process that a "*2 hand FFT and their location*" are determined by the static gesture manager. We conclude a POSITA would have understood that calculating the center of gravity of a hand, performing a fast Fourier transform, and conducting path analysis as discussed in Liebermann includes determining the position of a

29

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

point on the user's hand. Further, we conclude a POSITA would have understood that such a position determination is in three-dimensions.

Second, because we conclude that the position determination of Liebermann's Figure 9 (central processing facility) involves a position in three-dimensions, we also conclude that Liebermann's "portable transmitter/receiver" sufficiently discloses capturing and determining movement in three dimensions as required by claim 19. Liebermann discusses image capture and initial processing generally at column 4, line 60, through column 5, line 2, and column 6, lines 42–52.

Third, Liebermann states:

> The illustrated embodiments all utilize a single video camera[]. It may be desirable to utilize more than one camera to allow the signing person "free" movement in his or her environment to track down ***spatial positions*** in that environment.

Liebermann 13:4–8 (emphasis added).

### B.6. Claim 31 – Section 102 – Liebermann –
### "an aid[12] to speech recognition"

Claim 31 recites:

31. A method according to claim 14, wherein said information

provides an aid to speech recognition.

Appeal Br. 70.

---

[12] We are unable to find where Appellant provides a particular definition for the term "aid," and the general definition of the noun "noun" is "help or support." Dictionary.com, https://www.dictionary.com/browse/aid (accessed Aug. 13, 2024).

30

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

Appellant raises the following argument in contending that the Examiner erred in rejecting claim 31 under 35 U.S.C. § 102 as being anticipated.

> *Liebermann* fails to disclose, however, that the "identifiers" (the Examiner's identified "information"), which result from processing an image of the deaf person, play any role in ***aiding*** the "speech recognition algorithms" executed by *Liebermann's* "Center" on the voice input of the hearing person. It would be nonsensical to use the sign language of one individual to recognize the spoken word of a different person. Accordingly, Liebermann fails to disclose "wherein said information provides an ***aid*** to speech recognition," as recited by claim 31[.]

Appeal Br. 47 (emphasis added).

To the extent that Appellant is arguing claim 31 requires said information *directly* aids the speech recognition by changing said speech recognition, we disagree. We are unable to find a disclosed embodiment that is included within this narrow claim construction. The term "speech" does not appear in the '431 Patent, and the only instances of "voice" in the '431 Patent merely describe voice recognition being used either instead of gestures (e.g., 12:10–35) or in addition to gestures (e.g., 21:11–20, 22:41–43, 22:55–60). Appellant fails to direct us to any disclosure in the '431 Patent of gestures being used "to recognize the spoken word of a . . . person," as Appellant now argues should be required for the prior art. Appeal Br. 47.

Therefore, consistent with what is actually disclosed in the Specification, we construe claim 31 as encompassing situations where "said information" (e.g., gestures) in a relationship with speech recognition *directly* or *indirectly* helps or supports that speech recognition (e.g., both

31

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

gestures and speech together are used to reference an object). This construction is consistent with disclosed embodiments. *E.g.*, '431 Patent, 21:16–20 ("[I]n a setup mode, one can point a laser pointer at the dishwasher, and indicate to the computer that that spot is the dishwasher. The indication can be provided by . . . voice recognition . . . .").

> A claim construction that excludes a preferred embodiment is "rarely, if ever, correct." A construction that excludes all disclosed embodiments . . . is especially disfavored.

*Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*, 790 F.3d 1298, 1304 (Fed. Cir. 2015) (citations omitted).

In Liebermann, the gesture information (from Party A) aids an overall process (communication between Party A and Party B) where that process includes speech recognition (from Party B). However, we do not find where Liebermann's Party A gestures in a relationship with Party B speech recognition *directly* or *indirectly* helps or supports that speech recognition.

We conclude there is insufficient articulated reasoning to support the Examiner's finding that Liebermann discloses the disputed element, as recited by claim 31. Therefore, we conclude that there is insufficient articulated reasoning to support the Examiner's finding that claim 31 would have been anticipated by Liebermann, at the time of Appellant's invention.[13]

---

[13] While we find that Liebermann fails to anticipate claim 31, we reach no determination as to obviousness. However, we do ask "When signing, isn't it common to both sign AND say the words out loud?" For example, if the person being signed to is not completely deaf or has learned to at least partially read lips, the sign aids in speech recognition (i.e., the sign helps confirm what little the partially-deaf person can hear or whatever the lip-reader can read). We leave it to the Examiner to determine the appropriateness of a new ground based on obviousness.

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

### C. Claim 1 – Section 103 – Liebermann

Appellant raises the following arguments in contending that the Examiner erred in rejecting claims 1 and 4 under 35 U.S.C. § 103. Appeal Br. 48–59.

#### C.1. Claim 1 – Section 103 – Liebermann – First Argument – Liebermann is Non-Analogous Art

> *Liebermann* is non-analogous art and cannot be cited in any obviousness rejection.
>
> . . .
>
> A reference qualifies as prior art for an obviousness determination only when it is analogous to the claimed invention. . . . Two separate tests define the scope of analogous prior art: (1) whether the art is from the same field of endeavor, regardless of the problem addressed and, (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved.

Appeal Br. 48 (emphasis omitted).

#### C.1.a. Whether Liebermann is Analogous Art – First Test

As to claim 1, Appellant argues:

> Regarding the first test for analogous art, *Liebermann* discloses the
>
>> present invention relates to electronic apparatus for communication by the deaf, and, more particularly, to such apparatus which enables the deaf person to communicate through use of sign language.
>
> *Liebermann*, 1:10–15. . . . In contrast, the field of endeavor for the [Pryor] '431 Patent is
>
>> controlling functions of handheld devices using images captured by the handheld devices.

33

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

> *See generally*, '431 Patent, Title, 11:62−13:45, Figs. 8A and 8B,
> claims 1, 7, and 14.  This is not the same field of endeavor as
> *Liebermann*, and thus *Liebermann* fails the first test for
> analogous art.

Appeal Br. 49 (formatting added).

We are not persuaded by Appellant's argument.  Appellant starts from the wrong perspective—the field of endeavor of Liebermann—and then looks to see if the '431 Patent is in that field.  As Appellant notes in its citation of the law, the focus of the first test is whether the *prior art* is "within the field of the *inventor's* endeavor," not the other way around. Appeal Br. 48 (emphasis added); *see also In re Klein*, 647 F.3d 1343, 1348 (Fed. Cir. 2011) (citing *In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004); *In re Clay*, 966 F.2d 656, 658 (Fed. Cir. 1992)).  Thus, even if Liebermann is focused on a subset of the field of endeavor of the '431 Patent, it can still be within the same field of the '431 Patent.

Here, the '431 Patent defines its field of invention broadly:

> 1. Field of the Invention
>
> ***The invention relates to simple input devices for computers***, particularly, but not necessarily, intended for use with 3-D graphically intensive activities, ***and operating by optically sensing a human input to a display screen or other object and/or the sensing of human positions or orientations***.

'431 Patent, 2:7−11 (emphasis added).

Like the '431 Patent, Liebermann is directed to an input device for optically sensing human positions or orientations.

> It is an object of the present invention to provide a novel electronic communication system for use by deaf ***persons*** to enable them to communicate by ***signing***.

Liebermann, 3:11−13 (emphasis added).

34

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

> It has now been found that the foregoing and related
> objects may be readily attained in an electronic communications
> system for the deaf comprising a video apparatus for ***observing
> and digitizing the signing motions***, and means for translating the
> digitized motions into words and phrases.

Liebermann, 3:26–30 (emphasis added).  Also, Liebermann's Abstract
states his invention's concern with optically sensing human positions or
orientations.

> An electronic communications system for the deaf includes a
> video apparatus for observing and digitizing the facial, body and
> hand and finger signing motions of a deaf person, an electronic
> translator for translating the digitized signing motions into words
> and phrases, and an electronic output for the words and phrases.

Liebermann, Abstr.

Thus, although Liebermann's optical sensing of human input is
directed at a specific area within the '431 Patent's field of invention (i.e.,
Liebermann optically senses signing motions for deaf persons), it still fits
comfortably within the '431 Patent's defined field of invention of input
devices for optically sensing a human input from human positions or
orientations.

Therefore, we conclude that Liebermann is within the field of
endeavor of the claimed invention and thus is analogous art.

C.1.b. Whether Liebermann is Analogous Art – Second Test

Having determined that Liebermann is analogous art under the first
test, the second test is not necessary.  However, we address the second test
for completeness.  Turning to the second test for analogous art, Appellant
argues as follows:

> [T]he problems to which the '431 Patent relates include
> determining touchless user input commands to handheld devices

35

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

and controlling functions within handheld devices. *See generally*, '431 Patent, 11:62–13:45, Fig. 8A and 8B, claims 1, 7, and 14. These are not the problems to which *Liebermann* relates, thus *Liebermann* fails the second test for analogous art.

Appeal Br. 50.

We are not persuaded by Appellant's argument. The analysis of "[t]he problems to which the claimed invention and reference at issue relate" "must be carried out from the vantage point of a PHOSITA who is considering turning to the teachings of references outside her field of endeavor" and therefore must not "rule out all such art" that is "outside her field of endeavor." *Donner Tech., LLC v. Pro Stage Gear, LLC*, 979 F.3d 1353, 1360 (Fed. Cir. 2020). The Federal Circuit held that "if the two references have 'pertinent similarities' such that [the prior art reference] is reasonably pertinent to one or more of the problems to which the [patent-in-suit] pertains, then [the prior art reference] is analogous art." *Donner*, 979 F.3d at 1361. Such is the case here with Liebermann.

We determine that Liebermann is "reasonably pertinent to the particular problem with which the inventor is involved" because Appellant's claims define the particular problem of the '431 Patent's claim 1 as determining touchless user input commands and controlling functions (Appeal Br. 50), e.g., performing a function based on a camera output. As we determine above, Liebermann is directed to *an input device for optically sensing human positions or orientations*. In Liebermann, the output of the sensing is then used to control the functioning (control the particular output) of Liebermann's "translating means for processing elements of digitized image data." *Id.* Even if we limit the inventor's particular problem to the handheld environment, we still determine that Liebermann is "reasonably

36

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

pertinent to the particular problem with which the inventor is involved." *Id.*
Liebermann solving the problem for a specific niche (e.g., sensing signing
motions for deaf persons) shows that it falls within the same broad problem
of the '431 Patent, not outside it.

Therefore, we again conclude that Liebermann is analogous art.

### C.2. Claim 1 – Section 103 – Liebermann – Second Argument – Element [1(a)]

As to claim 1 Element [1(a)], Appellant argues:

> Claim element [l(a)] recites "***holding said device in one
> hand***." The Examiner recognized that Liebermann does not
> "expressly describe . . . holding said device in one hand."
> Action, p. 22. Instead, the Examiner contends that (1) "[a
> POSITA] would understand that the cellular telephone of
> *Liebermann* would allow for 'holding said device in one hand,'"
> and (2) the "motivation for doing so would have been that the
> system would allow deaf users to utilize the device more often,
> as the device can be ***carried and held*** while communicating with
> others." *Id.*, pp. 22–23. The Examiner is misguided.

Appeal Br. 50–51 (emphasis added).

Also, Appellant argues:

> *Liebermann* discloses that during operation the "portable
> transmitter/receiver" ***must be*** "supported in a ***stable*** position."
> *Liebermann*, 6:2–3. . . . Thus, operating the "portable
> transmitter/receiver" in a stable position is ***essential*** to both
> (1) capturing communication from the deaf user and
> (2) conveying communication to the deaf user.

> The Examiner's assertion that "[a POSITA] would
> understand that the cellular telephone of Liebermann would
> allow for 'holding said device in one hand'" is contrary to the
> disclosure of *Liebermann*. *See* Action, p. 22. The Examiner
> states that "holding the cellular telephone in one hand would
> allow the user to keep the device supported in a stable position,
> to allowing [sic] the user to sign with one hand [(i.e., finger

37

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

> spelling)], and to also allow the user to view the LCD panel."
> *Id.*, pp. 22–23 (internal quotations omitted). But the Examiner
> fails to explain how "holding the cellular telephone in one hand"
> provides the required "stable position."

Appeal Br. 51–52 (emphasis added).

> Further, Appellant argues:

> [T]he design of *Liebermann*, as well as the disclosure in the
> specification, ***teaches away*** from using the "portable
> transmitter/receiver" while holding it in one hand. . . .

> At best, only "finger spelling" remains possible with the
> deaf user's free hand if the "portable transmitter/receiver" were
> held in one hand during use. But limiting the deaf user to finger
> spellings would frustrate use and make the user ***less likely*** to use
> the device.

Appeal Br. 52–53 (emphasis added).

We are not persuaded by Appellant's arguments. First, Appellant's

argument is not commensurate with the scope of the claim. Claim 1's

"holding . . ." step at [1(a)] is performed separately from steps [1(b)]–[1(e)]

and step [1(a)] encompasses any of holding the device before (e.g., while

*carrying* the device before using at steps [1(b)]–[1(e)]), during, or after

performing steps [1(b)]–[1(e)]. *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,

512 F.3d 1338, 1345 (Fed. Cir. 2008) ("as a general rule the claim is not

limited to performance of the steps in the order recited, unless the claim

explicitly or implicitly requires a specific order"). Appellant's argument

focuses solely on holding during the performance of steps [1(b)]–[1(e)]. We

conclude Liebermann at column 5, line 61 and column 6, line 1, suggests

such *carrying* at least before using as "portable" and "transported"

respectively.

38

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

Second, even if we were to agree that Claim 1 at step [1(a)] requires the "holding . . ." occur during the performing of steps [1(b)]–[1(e)], we would still not be persuaded by Appellant's argument. Appellant points out Liebermann discloses that during operation, "[t]he device is supported in a stable position." Liebermann, 6:2–3. To the extent that stability is preferred during operation of Liebermann's camera, we conclude that it was a well-known routine in the optical arts to make a handheld optical device sufficiently stable by bracing the user's arm or hand (e.g., bracing a camera, bracing binoculars, bracing a scope when used on a pistol).

Third, we find that being more or less effective is not a teaching away. Just because better alternatives exist in the prior art does not mean that an inferior alternative is inapt for obviousness purposes. *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994) ("A known or obvious composition does not become patentable simply because it has been described as somewhat inferior to some other product for the same use."). Therefore, Appellant's argument that Liebermann teaches away because a user is "less likely to use the device" is not persuasive of Examiner error. Appeal Br. 54.

### C.3. Claim 1 – Section 103 – Liebermann – Third Argument – Element [1(d)]

Essentially, Appellant restates the arguments for element [7(c)] of claim 7. We are not persuaded by Appellant's argument for the reasons already given above.

### C.4. Claim 1 – Section 103 – Liebermann – Fourth Argument – Element [1(e)]

Appellant references the arguments for element [1(d)] of claim 1 and element [14(d)] of claim 14. Appeal Br. 58. That is, essentially, Appellant

39

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

references the arguments for elements [7(c)] and [7(d)] of claim 7.  We are
not persuaded by Appellant's argument for the reasons already given above.

### C.5. Claim 4 – Section 103 – Liebermann

Essentially, Appellant restates the arguments for claim 19.  We are not
persuaded by Appellant's argument for the reasons already given above.

### E. No Jurisdiction

Appellant raises the following jurisdictional argument in contending
that the Examiner erred in granting the reexamination request filed in
November 2021 on a patent that expired in July 2020.

> In *Oil States*, the Supreme Court explained that the
> "decision to *grant* a patent is a matter involving public rights-
> specifically, the grant of a public franchise." *Oil States Energy
> Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373
> (2018) (emphasis in original).  "Specifically, patents are public
> franchises that the Government grants to the inventors of new
> and useful improvements."  *Id.* (internal quotation marks
> omitted).  The Court explained that "Congress [has] significant
> latitude to assign [the] adjudication of public rights to entities
> other than Article III courts." *Id.* at 1368[, 1373].  In exercising
> its "significant latitude," Congress grants public franchises
> "subject to the qualification that the PTO has the authority to
> reexamine – and perhaps cancel – a patent claim in an inter partes
> review." *Id.* at 1368, 1374 (internal quotation marks omitted).
> Accordingly, so long as the public franchise exists, the PTO may
> have jurisdiction to amend and cancel the claims of the patent
> (e.g., via *ex parte* reexamination).
>
> When a patent expires, however, ***the public franchise
> ceases to exist*** and the franchisee (e.g., the patent owner) no
> longer has the right to exclude others.  At most, the franchisee
> may be entitled to collect damages from the public franchise that
> formerly existed through an infringement action in district court.
> But because the public franchise no longer exists, ***the USPTO***

40

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

> ***has nothing in its authority to cancel or amend***. Expiration
> removes the patent from the USPTO's jurisdiction and returns it
> to the sole jurisdiction of the Article III courts, which have
> exclusive authority to govern claims for damages. If this were
> not so, the USPTO would purport to have authority to
> retroactively modify a public franchise that no longer exists, in a
> setting where the expired public franchise does not enjoy any
> presumption of validity and in which amendment of claims is no
> longer permitted.

Appeal Br. 61–62 (emphasis added).

We are not persuaded by Appellant's argument. First, the Supreme
Court in *Oil States* expressly stated that "[p]atents thus remain subject to the
Board's authority to cancel outside of an Article III court." *Oil States
Energy Servs., LLC*, 138 S. Ct. 1374 (quotation omitted). Moreover, the
rejected claims here are the claims as issued; they have not been amended in
reexamination.

Second, the statute authorizing reexamination does not limit the
timing of a reexamination in the manner argued by Appellant. To the
contrary, the statute states:

> Any person ***at any time*** may file a request for reexamination by
> the Office of any claim of a patent on the basis of any prior art
> cited under the provisions of section 301.

35 U.S.C. § 302 (emphasis added). The regulation more specifically states a
request for an *ex parte* reexamination may be filed "at any time *during the
period of enforceability of a patent.*" 37 C.F.R. § 1.510(a) (emphasis
added). MPEP § 2211 further explains that "[t]he period of enforceability is
generally determined by adding 6 years to the date on which the patent
expires but the period may be extended if there is pending litigation." *See
also* 35 U.S.C. § 286.

41

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

Third, we disagree that Appellant has no rights under the expired

patent.

> It is well-established that [the Federal Circuit's] decision (and the
> Board's decision on remand) would have a consequence on any
> infringement that occurred during the life of the . . . patent. *See
> Genetics Inst. v. Novartis Vaccines*, 655 F.3d 1291, 1299 (Fed.
> Cir. 2011) ("[A]n expired patent may form the basis of an action
> for past damages subject to the six-year limitation under 35
> U.S.C. § 286."); *see also Keranos, LLC v. Silicon Storage Tech.,
> Inc.*, 797 F.3d 1025, 1033 (Fed. Cir. 2015) (Although "the
> patentee has fewer rights to transfer when the patent has
> expired," the owner of an expired patent can license the rights or
> transfer title to an expired patent.); *Mars, Inc. v. Coin Acceptors,
> Inc.*, 527 F.3d 1359, 1372 (Fed. Cir. 2008) ("Title to . . . an
> expired patent . . . includes more than merely the right to recover
> damages for past infringement.").

*Sony Corp. v. Iancu*, 924 F.3d 1235, 1238 n.1 (Fed. Cir. 2019).

Fourth, our reviewing court regularly reviews Board decisions where

a patent under reexamination expired prior to the Board issuing its decision.

In none of these cases has the Federal Circuit found a lack of jurisdiction

before the United States Patent and Trademark Office (USPTO). *See, e.g.*,

*In re Rambus, Inc.*, 753 F.3d 1253 (Fed. Cir. 2014) (involving appeal of an

*inter partes* reexamination of expired U.S. patent 6,034,918)[14]; *see also

CSB-Sys. Int'l*, 832 F.3d at 1338 ("[T]he '953 patent expired during the

reexamination.").

---

[14] The Board noted in a related *ex parte* reexamination appeal that "[t]he
'918 patent term expired during the reexamination proceedings." *Ex parte
Rambus, Inc.*, Appeal 2010-011178, 2011 WL 121775, at *6 (BPAI Jan. 12,
2011).

42

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

Finally, Appellant provides no citations or support for its assertion that the USPTO's jurisdiction ends at the time of expiration despite the patentee still being able to assert that its patent was valid and infringed within the statute of limitations. *See* 35 U.S.C. § 286.

We conclude the USPTO has jurisdiction for this reexamination so long as any right remains under the expired patent.

## F. No Substantial New Question (SNQ)

Appellant raises the following SNQ argument in contending that the Examiner erred in granting this reexamination request.

> Patent Owner respectfully asserts that no SNQs of patentability exist and thus the reexamination order should be vacated. . . .

> As discussed above, *Liebermann* does not disclose at least a "handheld computer apparatus" or a "handheld computing device." In other words, *Liebermann* does not provide the "perceived patentable features" of independent claims 1, 7, and 14 in the original prosecution of the '431 [challenged] Patent. As also discussed above, *Maruno*, *Maguire*, and *Mack* do not cure these deficiencies of *Liebermann*. Thus, a reasonable examiner would not consider *Liebermann* by itself or in combination with *Maruno*, *Maguire*, and/or *Mack* to be important in deciding whether one or more claims of the '431 [challenged] Patent are patentable, and *Liebermann* alone or combined with *Maruno*, *Maguire*, and/or *Mack* does not raise a SNQ of patentability.

Appeal Br. 63–64.

We are not persuaded by Appellant's argument. For the reasons already set forth above, we determine that Liebermann, Maruno, Maguire, and Mack do provide the teachings that were missing from the art

43

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

considered during the original prosecution of the challenged '431 Patent, and thus, do raise a SNQ of patentability.

CONCLUSION

Appellant has demonstrated the Examiner errs in rejecting claim 31 as being anticipated under 35 U.S.C. § 102.

We **reverse** the Examiner's rejection of claim 31 as being anticipated under 35 U.S.C. § 102.

The Examiner has not erred in rejecting claims 7−9, 11, 13−22, 25, 26, and 28−30 as being anticipated under 35 U.S.C. § 102.

We **affirm** the Examiner's rejection of claims 7−9, 11, 13−22, 25, 26, and 28−30 as being anticipated under 35 U.S.C. § 102.

The Examiner has not erred in rejecting claims 1−6, 10, 12, 23, 24, and 27 as being unpatentable under 35 U.S.C. § 103.

We **affirm** the Examiner's rejections of claims 1−6, 10, 12, 23, 24, and 27 as being unpatentable under 35 U.S.C. § 103.

44

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

## DECISION SUMMARY

In summary:

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/Basis | Affirmed | Reversed |
|---|---|---|---|---|
| 7–9, 11, 13–22, 25, 26, 28–31 | 102 | Liebermann | 7–9, 11, 13–22, 25, 26, 28–30 | 31 |
| 1–6, 12 | 103 | Liebermann | 1–6, 12 | |
| 10, 23 | 103 | Liebermann, Maruno | 10, 23 | |
| 24 | 103 | Liebermann, Maruno, Maguire | 24 | |
| 10, 23, 24, 27 | 103 | Liebermann, Mack | 10, 23, 24, 27 | |
| **Overall Outcome** | | | 1–30 | 31 |

## REQUESTS FOR EXTENSIONS OF TIME

Requests for extensions of time in this ex parte reexamination proceeding are governed by 37 C.F.R. § 1.550(c).  *See* 37 C.F.R. § 41.50(f).

## AFFIRMED IN PART

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

DOUGAL, *Administrative Patent Judge*, dissenting-in-part and concurring-in-part.

For the reasons discussed below, I respectfully dissent from the determination sustaining the rejections of claims 1–30.

At the same time, I concur and join in the decision reversing the rejection of claim 31. I also join my colleagues' decision in section E, determining that we have jurisdiction over the patent at issue.

*Claim 7 – Means for Controlling*

Both Appellant and the Examiner agree that Claim 7, element [7(d)], "means for controlling a function of said apparatus using said information," should be construed as a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6. Appeal Br. 9–10; Ans. 5–6. Both parties further apply the claim construction from the Final Written Decision in IPR2021-00917. Appeal Br. 9–10; Ans. 5–6. This Final Written Decision determined that the corresponding structure is a handheld computer apparatus programmed with an algorithm to cause the handheld computer apparatus to

> (1) receive position information,
> (2) correlate the position information with a function of the handheld computer apparatus, and
> (3) cause the handheld computer apparatus to perform the function, wherein the function includes one or more of: (a) a display function, (b) a command to print, (c) an image transmission function, or (d) an e-mail transmission function.

IPR2021-00917, paper 31, 12. "[T]he corresponding structure further encompasses equivalents thereof." *Id.* The limitation's function is "controlling a function of said [handheld computer] apparatus using said information." *Id.*

46

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

Though I agree with the majority that the Examiner's "Mapping A" is inadequate, I do not agree that "Mapping B" is sufficient. I respectfully disagree that the Examiner's "Mapping B" shows that Liebermann's handheld computer apparatus is programmed with an algorithm to cause the handheld computer apparatus to "(2) correlate the position information with a function of the handheld computer apparatus."

The majority addresses this aspect of the claim construction as follows:

> we agree with the Examiner's Mapping B (mapping to the controlling function the sending resulting information resulting from initial processing as data to the data processing center). In Liebermann the device
> (1) receives from a camera a captured image representing finger position information,
> (2) correlates that image with a transmission function by transforming the image into unique identifiers to be transmitted, and
> (3) causes the device to perform the function of sending the unique identifiers.

*See supra*, 23–24.

I agree that Liebermann teaches that: 1) the captured images can include position information, 2) the images undergo initial processing into unique identifiers at the handheld computer apparatus, and 3) the unique identifiers are sent to a central processing facility for additional processing.

But, I do not see how this correlates the *position information* with the image transmission function. The majority argues that Liebermann correlates the image with the transmission function. *Id.* at 23. The majority further argues that each image is different and so the unique identifiers for each image are different, and thus the "sending function changes as the image

47

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

changes." *Id.* at 24. Presumably, this means that because different position information is sent at different times, the sending function changes. But in Liebermann, once the image is captured and undergoes initial processing the unique identifiers will be sent or transmitted to the server independent of the particular content. *See* Liebermann 4:61–5:13. Liebermann merely teaches that "[i]n the processing, each of the frames containing a captured image undergoes a process whereby the image is transformed into manageable identifiers. It is the set of identifiers, in the form of tables of numbers, that travels the normal telephone lines to the central processing facility." *Id.* at 4:64–5:2. There is no relationship, or correlation, between the content of the image, such as whether or not it includes position information, and the act of performing the function of sending the unique identifiers to the central processing facility.

For this reason, I would not affirm the rejection of claim 7.


*Claims 1 and 14 – Controlling a Function*

Claim 1, element [d] requires "using said sensed finger movement information, controlling said device in accordance with said command." Claim 14 element [d] requires "from said determined information, controlling a function of said device." The Examiner fails to show how Liebermann teaches or suggests these claim elements for essentially the same reasons discussed above with respect to claim 7. Here, the "sensed finger movement information" (claim 1) or the "determined information" (claim 14) from Liebermann is the unique identifiers containing position information. But, as discussed above, there is no relationship between the

48

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

content of the image, such as whether or not it includes position information, and the act of performing the function of sending the unique identifiers to the central processing facility. Further, the content of the unique identifiers, i.e., the position information, does not control any function of Liebermann's device.[15] Thus, the Examiner has not shown how Liebermann anticipates or renders obvious either of independent claims 1 or 14.

For this reason, I would not affirm the rejections of claims 1 or 14.

*Dependent Claims*

As I would determine that the Examiner has not shown how Liebermann teaches or renders obvious any of the independent claims, I would also not affirm the rejections of any of the claims that depend from claims 1, 7, or 14.[16]

---

[15] Under 35 U.S.C. § 112, ¶ 6 the identified function of the "means for controlling a function of said apparatus using said information" was determined to be "controlling a function of said [handheld computer] apparatus using said information." IPR2021-00917, paper 31, 12. As the Examiner has not shown how the position information in the unique identifiers controls any function of the device, this is another reason why the Examiner has not shown that Liebermann anticipates claim 7.

[16] The rejections including Maruno, Maguire, and/or Mack do not address the above-identified deficiency in the rejection of the independent claims.

49

Appeal 2024-002449
Reexamination Control 90/014,901
Patent 7,933,431 B2

PATENT OWNER:

WILLIAMS SIMONS & LANDIS PLLC/GTP
THE LITTLEFIELD BUIDLING
601 CONGRESS AVE., STE 600
AUSTIN, TX 78701


THIRD PARTY REQUESTER:

PAUL HASTINGS LLP
2050 M. STREET NW
WASHINGTON, DC 20036

50

US007933431B2

(12) **United States Patent**     (10) **Patent No.:**     **US 7,933,431 B2**
Pryor     (45) **Date of Patent:**     **Apr. 26, 2011**

(54) **CAMERA BASED SENSING IN HANDHELD, MOBILE, GAMING, OR OTHER DEVICES**

(76) Inventor: **Timothy R. Pryor**, Tecumseh (CA)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **12/834,281**

(22) Filed: **Jul. 12, 2010**

(65) **Prior Publication Data**

US 2010/0277412 A1     Nov. 4, 2010

**Related U.S. Application Data**

(63) Continuation of application No. 11/980,710, filed on Oct. 31, 2007, now Pat. No. 7,756,297, which is a continuation of application No. 10/893,534, filed on Jul. 19, 2004, now Pat. No. 7,401,783, which is a continuation of application No. 09/612,225, filed on Jul. 7, 2000, now Pat. No. 6,766,036.

(60) Provisional application No. 60/142,777, filed on Jul. 8, 1999.

(51) **Int. Cl.**
*G06K 9/00*     (2006.01)

(52) **U.S. Cl.** ...................... 382/103; 382/104; 348/207.1

(58) **Field of Classification Search** .................. 382/103, 382/104; 348/207.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,878,174 A * | 3/1999 | Stewart et al. | ................ 382/293 |
| 6,342,917 B1 * | 1/2002 | Amenta | .................... 348/207.1 |
| 6,453,180 B1 * | 9/2002 | Endoh et al. | ................. 455/567 |
| 6,597,817 B1 * | 7/2003 | Silverbrook | ................ 382/289 |

* cited by examiner

*Primary Examiner* — Tom Y Lu

(74) *Attorney, Agent, or Firm* — Warner Norcross & Judd LLP

(57) **ABSTRACT**

Method and apparatus are disclosed to enable rapid TV camera and computer based sensing in many practical applications, including, but not limited to, handheld devices, cars, and video games. Several unique forms of social video games are disclosed.

**31 Claims, 22 Drawing Sheets**







**FIG. 1A**



**FIG. 1B**

**FIG. 1C**



**FIG. 2A**

**FIG. 2B**



**FIG. 2C**



# FIG. 2D



# FIG. 4A



**FIG. 3A**



**FIG. 4B**



**FIG. 3B**



**FIG. 3C**



# FIG. 5A



# FIG. 5B



**FIG. 6**



**FIG. 7**

**FIG. 9**



**FIG. 8A**

**FIG. 8B**



FIG. 10A



*FIG. 10B*



**FIG. 11A**



*FIG. 11B*



FIG. 12



*FIG. 13*



*FIG. 14A*



**FIG. 14B**



**FIG. 14C**



*FIG. 15*



*FIG. 16*



**FIG. 17C**



**FIG. 17A**



*FIG. 17B*

US 7,933,431 B2

1

# CAMERA BASED SENSING IN HANDHELD, MOBILE, GAMING, OR OTHER DEVICES

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of application Ser. No. 11/980,710 filed Oct. 31, 2007, now U.S. Pat. No. 7,756,297; which is a continuation of application Ser. No. 10/893,534 filed Jul. 19, 2004, now U.S. Pat. No. 7,401,783; which is a continuation of application Ser. No. 09/612,225 filed Jul. 7, 2000, now U.S. Pat. No. 6,766,036; which claims the benefit of U.S. Provisional Application No. 60/142,777, filed Jul. 8, 1999.

Cross references to related co-pending US applications by the inventor having similar subject matter.

1. Touch TV and other Man Machine Interfaces: Ser. No. 09/435,854 filed Nov. 8, 1999, now U.S. Pat. No. 7,098, 891; which was a continuation of application Ser. No. 07/946,908, now U.S. Pat. No. 5,982,352;
2. More Useful Man Machine Interfaces and Applications: Ser. No. 09/433,297 filed Nov. 3, 1999, now U.S. Pat. No. 6,750,848;
3. Useful Man Machine interfaces and applications: Ser. No. 09/138,339, Pub. Appln. 2002-0036617, now abandoned;
4. Vision Target based assembly: Ser. No. 08/469,907 filed Jun. 6, 1995, now U.S. Pat. No. 6,301,783;
5. Picture Taking method and apparatus: provisional application 60/133,671, and regular application Ser. No. 09/568,552 filed May 11, 2000, now U.S. Pat. No. 7,015, 950;
6. Methods and Apparatus for Man Machine Interfaces and Related Activity: Provisional Application: provisional application 60/133,673 filed May 11, 1999; and regular application Ser. No. 09/568,554 filed May 11, 2000, now U.S. Pat. No. 6,545,670;
7. Tactile Touch Screens for Automobile Dashboards, Interiors and Other Applications: provisional application Ser. No. 60/183,807; and regular application Ser. No. 09/789,538, now U.S. Pat. No. 7,084,859; and
8. Apparel Manufacture and Distance Fashion Shopping in Both Present and Future: provisional application 60/187,397 filed Mar. 7, 2000.

The disclosures of the following U.S. patents and co-pending patent applications by the inventor, or the inventor and his colleagues, are incorporated herein by reference:

1. "Man machine Interfaces": U.S. application Ser. No. 09/435,854 and U.S. Pat. No. 5,982,352, and U.S. application Ser. No. 08/290,516, filed Aug. 15, 1994, now U.S. Pat. No. 6,008,000, the disclosure of both of which is contained in that of Ser. No. 09/435,854;
2. "Useful Man Machine Interfaces and Applications": U.S. application Ser. No. 09/138,339, now Pub. Appln. 2002-0036617;
3. "More Useful Man Machine Interfaces and Applications": U.S. application Ser. No. 09/433,297;
4. "Methods and Apparatus for Man Machine Interfaces and Related Activity": U.S. Appln. Ser. No. 60/133,673 filed as regular application Ser. No. 09/568,554, now U.S. Pat. No. 6,545,670;
5. "Tactile Touch Screens for Automobile Dashboards, Interiors and Other Applications": U.S. provisional Appln. Ser. No. 60/183,807, filed Feb. 22, 2000, now filed as reg. application Ser. No. 09/789,538; and

2

6. "Apparel Manufacture and Distance Fashion Shopping in Both Present and Future": U.S. Appln. Ser. No. 60/187,397, filed Mar. 7, 2000.

## FIELD OF THE INVENTION

The invention relates to simple input devices for computers, particularly, but not necessarily, intended for use with 3-D graphically intensive activities, and operating by optically sensing a human input to a display screen or other object and/or the sensing of human positions or orientations. The invention herein is a continuation in part of several inventions of mine, listed above.

This continuation application seeks to provide further useful embodiments for improving the sensing of objects. Also disclosed are new applications in a variety of fields such as computing, gaming, medicine, and education. Further disclosed are improved systems for display and control purposes.

The invention uses single or multiple TV cameras whose output is analyzed and used as input to a computer, such as a home PC, to typically provide data concerning the location of parts of, or objects held by, a person or persons.

## DESCRIPTION OF RELATED ART

The above mentioned co-pending applications incorporated by reference discuss many prior art references in various pertinent fields, which form a background for this invention. Some more specific U.S. Patent references are for example:

DeMenthon—U.S. Pat. Nos. 5,388,059; 5,297,061; 5,227, 985

Cipolla—U.S. Pat. No. 5,581,276

Pugh—U.S. Pat. No. 4,631,676

Pinckney—U.S. Pat. No. 4,219,847

## DESCRIPTION OF FIGURES

FIG. **1** illustrates a basic computer terminal embodiment of the invention, similar to that disclosed in copending applications.

FIG. **2** illustrates object tracking embodiments of the invention employing a pixel addressable camera.

FIG. **3** illustrates tracking embodiments of the invention using intensity variation to identify and/or track object target datums.

FIG. **4** illustrates tracking embodiments of the invention using variation in color to identify and/or track object target datums.

FIG. **5** illustrates special camera designs for determining target position in addition to providing normal color images.

FIG. **6** identification and tracking with stereo pairs.

FIG. **7** illustrates use of an indicator or co-target.

FIG. **8** illustrates control of functions with the invention, using a handheld device which itself has functions.

FIG. **9** illustrates pointing at an object represented on a screen using a finger or laser pointer, and then manipulating the represented object using the invention.

FIG. **10** illustrates control of automobile or other functions with the invention, using detected knob, switch or slider positions.

FIG. **11** illustrates a board game embodiment of the invention.

FIG. **12** illustrates a generic game embodiment of the invention.

FIG. **13** illustrates a game embodiment of the invention, such as might be played in a bar.

US 7,933,431 B2

3

FIG. **14** illustrates a laser pointer or other spot designator embodiment of the invention.

FIG. **15** illustrates a gesture based flirting game embodiment of the invention.

FIG. **16** illustrates a version of the pixel addressing camera technique wherein two lines on either side of a 1000 element square array are designated as perimeter fence lines to initiate tracking or other action.

FIG. **17** illustrates a 3-D acoustic imaging embodiment of the invention.

THE INVENTION EMBODIMENTS

FIG. **1**

The invention herein and disclosed in portions of other copending applications noted above, comprehends a combination of one or more TV cameras (or other suitable electrooptical sensors) and a computer to provide various position and orientation related functions of use. It also comprehends the combination of these functions with the basic task of generating, storing and/or transmitting a TV image of the scene acquired—either in two or three dimensions.

The embodiment depicted in FIG. **1**A illustrates the basic embodiments of many of my co-pending applications above. A stereo pair of cameras **100** and **101** located on each side of the upper surface of monitor **102** (for example a rear projection TV of 60 inch diagonal screen size) with display screen **103** facing the user, are connected to PC computer **106** (integrated in this case into the monitor housing), for example a 400 Mhz Pentium II. For appearances and protection a single extensive cover window may be used to cover both cameras and their associated light sources **110** and **111**, typically LEDs.

The LEDs in this application are typically used to illuminate targets associated with any of the fingers, hand, feet and head of the user, or objects such as **131** held by a user, **135** with hands **136** and **137**, and head **138**. These targets, such as circular target **140** and band target **141** on object **131** are desirably, but not necessarily, retro-reflective, and may be constituted by the object features themselves (e.g., a finger tip, such as **145**), or by features provided on clothing worn by the user (e.g., a shirt button **147** or polka dot **148**, or by artificial targets such as retroreflectors.

Alternatively, a three camera arrangement can be used, for example using additional camera **144**, to provide added sensitivity in certain angular and positional relationships. Still more cameras can be used to further improve matters, as desired. Alternatively, and or in addition, camera **144** can be used for other purposes, such as acquire images of objects such as persons, for transmission, storage or retrieval independent of the cameras used for datum and feature location determination.

For many applications, a single camera can suffice for measurement purposes as well, such as **160** shown in FIG. **1**B for example, used for simple 2 dimensional (2D) measurements in the xy plane perpendicular to the camera axis (z axis), or 3D (xyz, roll pitch yaw) where a target grouping, for example of three targets is used such as the natural features formed by the two eyes **164**, **165** and nose **166** of a human **167**. These features are roughly at known distances from each other, the data from which can be used to calculate the approximate position and orientation of the human face. Using for example the photogrammetric technique of Pinkney described below, the full 6 degree of freedom solution of the human face location and orientation can be achieved to an accuracy limited by the ability of the camera image processing software utilized to determine the centroids

4

or other delineating geometric indicators of the position of the eyes and nose, (or some other facial feature such as the mouth), and the accuracy of the initial imputing of the spacing of the eyes and their respective spacing to the nose. Clearly if a standard human value is used (say for adult, or for a child or even by age) some lessening of precision results, since these spacings are used in the calculation of distance and orientation of the face of human **167** from the camera **160**.

In another generally more photogrammetrically accurate case, one might choose to use four special targets (e.g., glass bead retro-reflectors, or orange dots) **180-183** on the object **185** having known positional relationships relative to each other on the object surface, such as one inch centers. This is shown in FIG. **1**C, and may be used in conjunction with a pixel addressable camera such as described in FIG. **2** below, which allows one to rapidly determine the object position and orientation and track its movements in up to 6 degrees of freedom as disclosed by Pinkney U.S. Pat. No. 4,219,847 and technical papers referenced therein. For example, the system described above for FIGS. **1** and **2** involving the photogrammetric resolution of the relative position of three or more known target points as viewed by a camera is known and is described in a paper entitled "A Single Camera Method for the 6-Degree of Freedom Sprung Mass Response of Vehicles Redirected by Cable Barriers" presented by M. C. van Wijk and H. F. L. Pinkney to The Society of Photo-optical Instrumentation Engineers.

The stereo pair of cameras can also acquire a two view stereo image of the scene as well, which can be displayed in 3D using stereoscopic or auto-stereoscopic means, as well as transmitted or recorded as desired.

In many applications of the foregoing invention it is desirable not just to use a large screen but in fact one capable of displaying life size images. This particularly relates to human scaled images, giving a life-like presence to the data on the screen. In this way the natural response of the user with motions of hands, head, arms, etc., is scaled in "real" proportion to the data being presented.

FIG. **2**

This embodiment and others discloses special types of cameras useful with the invention. In the first case, that of FIG. **2**A, a pixel addressable camera such as the MAPP2200 made by IVP corporation of Sweden is used, which allows one to do many things useful for rapidly determining location of objects, their orientation and their motion.

For example, as shown in FIG. **2**A, an approximately circular image **201** of a target datum such as **180** on object **185** of FIG. **1**C may be acquired by scanning the pixel elements on a matrix array **205** on which the image is formed. Such an array in the future will have for example 1000×1000 pixels, or more (today the largest IVP makes is 512×512. The IVP also is not desired to be completely randomly addressable, which some future arrays will be).

As an illustration, computer **220** determines, after the array **205** has been interrogated, that the centroid "x, y" of the pixel elements on which the target image lies is at pixel x=500, y=300 (including a sub-fraction thereof in many cases). The centroid location can be determined for example by the moment method disclosed in the Pinkney patent, referenced above.

The target in this case is defined as a contrasting point on the object, and such contrast can be in color as well as, or instead of, intensity. Or with some added preprocessing, it can be a distinctive pattern on the object, such as a checkerboard or herringbone.

US 7,933,431 B2

5

**Subsequent Tracking**

To subsequently track the movement of this target image, it is now only necessary to look in a small pixel window composed of a small number of pixels around the target. For example the square **230** shown, as the new position x'y' of the target image cannot be further distant within a short period of time elapsed from the first scan, and in consideration of the small required time to scan the window.

For example, if the window is 100×100 pixels, this can be scanned in 1 millisecond or less with such a pixel addressing camera, by interrogating only those pixels in the window, while still communicating with the camera over a relatively slow USB serial link of 12 mb transmission rate (representing 12,000 pixel gray level values in one millisecond).

One thus avoids the necessity to scan the whole field, once the starting target image position is identified. This can be known by an initial scan as mentioned, or can be known by having the user move an object with a target against a known location with respect to the camera such as a mechanical stop, and then indicate that tracking should start either by verbally saying so with voice recognition, or by actuating a control key such as **238** or whatever.

It is noted that if the tracking window is made large enough, then it can encompass a whole group of datums, such as **180-183** on an object.

FIG. 2B Reduction in Acquisition Time

Another application of such a pixel addressing camera is shown in FIG. 2B. One can look at the whole field, x y of the camera, **240**, but only address say every 10th pixel such as **250**, **251** and **252**, in each direction, i.e., for a total 10,000 pixels in a field of 1 million (1000×1000, say).

In this case computer **220** simply queries this fraction of the pixels in the image, knowing apriori that the target image such as **260** will have an image size larger than 10×10 pixels, and must be detectable, if of sufficient contrast, by one of the queried pixels. (For smaller or larger target images, the number and spacing of queried pixels can be adjusted accordingly). This for example, allows one to find approximate location of targets with only $\frac{1}{100}$ the pixel interrogation time otherwise needed, for example, plus any gain obtained as disclosed above, by knowing in what region of the image to look (for example during tracking, or given some apriori knowledge of approximate location due to a particular aspect of the physical arrangement or the program in question).

Once a target has been approximately found as just described, the addressing can be optimized for that region of the image only, as disclosed in subsequent tracking section above.

Given the invention, the potential for target acquisition in a millisecond or two thus is achievable with simple pixel addressable CMOS cameras coming on stream now (today costing under $50), assuming the target points are easily identifiable from at least one of brightness (over a value), contrast (with respect to surroundings), color, color contrast, and more difficult, shape or pattern (e.g., a plaid, or herringbone portion of a shirt). This has major ramifications for the robustness of control systems built on such camera based acquisition, be they for controlling displays, or machines or whatever.

It's noted that with new 2000×2000 cameras coming on stream, it may only be necessary to look at every 15th or 20th pixel in each direction to get an adequate feel for target location. This means every 200th to 400th pixel, not enough to cause image rendition difficulties even if totally dark grey (as it might be in a normal white light image if set up for IR wavelengths only).

6

FIG. 2C

Another method for finding the target in the first place with limited pixel interrogation is to look at pixels near a home point where a person for example indicates that the target is. This could be for example, placing ones fingernail such as **270**, whose natural or artificial (e.g., reflective nail polish) features are readily seen by the camera **275** and determined to be in the right corner of a pad **271** in FIG. 2C which approximately covers the field of view **274** of the camera **275**. The computer **220** analyzes the pixels in the right corner **278** of the image field **279** representing the pad portion **271** with the camera **275**, either continuously, or only when the finger for example hits a switch such as **280** at the edge of the pad, or on command (e.g., by the user pushing a button or key, or a voice message inputted via microphone **285** for example). After such acquisition, the target is then tracked to other locations in xy space of the pad, for example as described above. Its noted that it helps to provide a beep or other sound or indication when acquisition has been made.

Pick Windows in Real Time

Another aspect of the invention is that one can also pick the area of the image to interrogate at any desired moment. This can be done by creating a window of pixels with in the field to generate information, for example as discussed relative to a specific car dashboard application of FIG. **10**.

FIG. 2D—Scan Pattern

A pixel addressing camera also allows a computer such as **220** to cause scans to be generated which are not typical raster scans. For example circular or radial, or even odd shapes as desired. This can be done by providing from the computer the sequential addresses of the successive pixels on the camera chip whose detected voltages are to be queried.

A circular scan of pixels addressed at high speed can be used to identify when and where a target enters a field enclosed by the circular pixel scan. This is highly useful, and after that, the approximate location of the target can be determined by further scans of pixels in the target region.

For example consider addressing the pixels c1 c2 c3 . . . cn representing a circle **282** at the outer perimeter of the array, **285**, of 1000×1000 elements such as discussed above. The number of pixels in a full circle is approximately 1000 pi, which can be scanned even with USB (universal serial bus) limits at 300 times per second or better. For targets of $\frac{1}{100}$ field in width, this means that a target image entering the field (which is shown intersecting element cm and its neighbors) would have to travel $\frac{1}{100}$ the field width in 0.0033 seconds to be totally missed in a worst case. If the image field corresponds to 20 inches in object field width this is 0.2 inches×300/sec or 60 inches/second, very fast for human movement, and not likely to be exceeded even where smaller targets are used.

Alternative shapes to circular "trip wire" perimeters may be used, such as squares, zig-zag, or other layouts of pixels to determine target presence. Once determined, a group of pixels such as group **292** can be interrogated to get a better determination of target location.

FIG. **3**

Since many applications of the invention concern, or at least have present a human caused motion, or motion of a part of a human, or an object moved by a human, the identification and tracking problem can be simplified if the features of interest, either natural or artificial of the object provide some kind of change in appearance during such motion.

FIG. **3** illustrates tracking embodiments of the invention using intensity variation to identify and/or track object target datums. In a simple case, a subtraction of successive images can aid in identifying zones in an image having movement of

US 7,933,431 B2

7

features as is well known. It is also useful to add pixel intensities of successive images in computer **220** for example. This is particular true with bright targets (with respect to their usual surroundings) such as LEDs or retro-reflectors. If the pixels in use by the camera are able to gather light preferentially at the same time a special illumination light is on, this will accentuate the target with respect to background. And if successive frames are taken in this way, not only will a stationary image of the special target build up, but if movement takes place the target image then will blur in a particular direction which itself can become identify-able. And the blur direction indicates direction of motion as well, at least in the 2-D plane of the pixel array used.

Another form of movement can take place artificially, where the target is purposely moved to provide an indication of its presence. This movement can be done by a human easily by just dithering ones finger for example (if a portion of the finger such as the tip is the target in question), or by vibrating an object having target features of interest on it, for example by moving the object up and down with ones hand.

For example consider FIG. **3**A, where a human **301** moves his finger **302** in a rapid up and down motion, causing different image positions sequentially in time of bright target ring **320**, **320'** on his finger, as seen by camera **325**. If the camera can read quickly enough each of these positions such as **326** and **327** in image field **328** can be resolved, other wise a blur image such as **330** is registered in the camera and recorded in the computer **335**.

Instead of using ones finger, it is also possible to create movement of a target for example with a tuning fork or other mechanism mechanically energizing the target movement, on what otherwise might be a static object say. And it is possible for the human, or a computer controlling the movement in question to create it in such a manner that it aids identification. For example, a certain number of moves of ones finger (e.g., 4), or 2 moves/sec of ones finger, or horizontal moves of ones finger etc., any or all of these could indicate to the computer upon analysis of the camera image, that a target was present.

The invention comprehends this as a method for acquiring the datum to be tracked in the first place, and has provided a camera mechanism for tracking fast enough not to lose the data, assuming a sufficiently distinct feature. For example, it is desirable to not require sophisticated image processing routines and the like if possible, to avoid the time it takes to execute same with affordable equipment. And yet in many scenes, finding a target cant be done easily today without some aid, either a high contrast target (contrasting brightness or color or both, for example). Or the aid can be movement as noted, which allows the search for the target to be at least localized to a small region of the field of view, and thence take much less time to run, even if a sophisticated algorithm is employed.

FIG. **3**B illustrates an embodiment wherein a target which blinks optically is used. The simplest case is a modulated LED target such **340** on object **341** shown. Successive frames taken with camera **345** looking at pixel window **346** at **300** scans of the pixels within the window per second where the image **347** of the LED target is located, can determine, using computer **349** (which may be separate from, or incorporated with the image sensor), 5 complete blinks of target **340**, if blinked at a 60 hz rate. Both blink frequency, blink spacing, blink pulse length can all be determined if the scan rate is sufficiently faster than the blink rate, or pulse time.

It should be noted that if the target **340** is a retro-reflector as in FIG. **1**, with an illumination source such as **355** near the

8

axis of the camera, then the LEDs (or other sources) of the illuminator can be modulated, causing the same effect on the target.

Somewhat more sophisticated is the situation shown in FIG. **3**C where a target **380** (on object **360**) illuminated by a light source **365** provides a time variant intensity change in the camera image **368** obtained by camera **370** as the target moves its position and that of the image. This can be achieved naturally by certain patterns of material such as herringbone, or by multifaceted reflectors such as cut diamonds (genuine or glass), which "twinkle" as the object moves. A relative high frequency "twinkle" in the image indicates then the presence of the target in that area of the image in which it is found.

When analog sensors such as PSD (position sensing diode) sensor **369** described in a copending application is used in addition to, or instead of a matrix array in camera **370**, the variation in light intensity or twinkle can be obtained directly from the detected output voltage from the signal conditioning of the sensor as shown in trace **375** corresponding to the movement of diamond target **380** a distance in the camera field. From the PSD one can also determine the position of the detected target image, theoretically at least independent of the intensity fluctuation.

For digital array detectors, the intensity variation can also be detected by subtracting images and observing the difference due to such variation. Such images need to be taken frequently if the twinkle frequency is high, and this can cause problems unless high speed camera scanning is possible. For example, in a twinkle mode, a pixel addressable camera using the invention herein could scan every 5th pixel in both x and y. This would allow a 1000 frame per second operation of a camera which would normally go 40 frames per second. Such a rate should be able to capture most twinkle effects with the assumption that the light field changes on more than 25 pixels. If less, then scan density would need to be increased to every 3rd pixel say, with a corresponding reduction in twinkle frequency detection obtainable.

FIG. 4

FIG. **4**A illustrates identification and tracking embodiments of the invention using color and color change in a manner similar in some aspects to the intensity variation from object datums described above.

Color can be used as has been noted previously to identify a target, as can a change in color with time. For example, a target can change its color in order to identify itself to successive interrogations of pixels on a color TV camera. This can be accomplished by having a retro-reflector which is illuminated in succession by light from different colored LEDs for example, in the arrangement of FIG. **1**. For example red led **401** illuminates retro reflector target **405** on object **406** during frame **1** (or partial frame, if not all pixels addressed) taken by camera **410**. Then yellow led **402** illuminates target **405** on the next frame, and so forth. For any reading of successive frames, one point in the image will appear to distinctly change color, while all other points will be more or less the same due to the room lighting overwhelming the led source illumination and the natural color rendition of the objects themselves.

To return color variation when moved, one can employ a target which changes color naturally as it moves, even with illumination of constant color. Such a target can contain a diffractive, refractive, or interference based element, for example, a reflective diffraction grating for example, which splits white light illumination into colors, which are seen differently as the target moves and changes angle with respect to the observer and/or illumination source.

US 7,933,431 B2

9

For example, consider FIG. 4B showing reflective grating **440** on object **445** at initial position P. When illuminated by white light for example from lamp **450**, it reflects the spectrum such that when the object has moved to a new position P' the color (or colors, depending on the grating type, and angles involved) returning to camera **460** is changed. Such gratings can be purchased from Edmund Scientific company, and are typically made as replicas of ruled or holographic gratings.

Some types of natural features which change color are forms of jewelry which have different colored facets pointing in different directions. Also some clothes look different under illumination from different angles. This could be called then "color twinkle".

FIG. 5

FIG. **5** illustrates special camera designs for determining target position in addition to providing normal color images. As was pointed out in a co-pending application, it may be desirable to have two cameras looking at an object or area one for producing images of a person or scene, the other for feature location and tracking. These may be bore-sighted together using beam splitters or the like to look at the same field, or they may just have largely overlapping image fields. The reason this is desirable is to allow one to obtain images of activity in the field of view (e.g., a human playing a game) while at the same time ideally determine information concerning position or other aspects of features on the human or objects associated with him.

It is now of interest to consider a matrix array chip equipped with a special color filter on its face which passes a special wavelength in certain pixel regions, in addition to providing normal color rendition via RGB or other filtering techniques in the remaining regions. The chip could be pixel addressable, but does not have to be.

Version FIG. 5A

One version would have one special pixel filter such as **505**, for each square group of 4 pixels in an array **500** (one special pixel filter **505**, and 3 pixels, **510-512** filtered for RGB (red green blue) or similar, as is commonly used now for example. In one functional example, the special pixel **505** is purposely not read during creation of the normal image of a scene, but rather read only on alternate frames (or as desired) to determine target locations. If the array can be addressed pixel wise, the actual time lost doing this can be low. Since 25% of the pixels are effectively dead in forming the image in this example, and assuming all pixels are of equal area (not necessarily required), then 25% of the image needs to be filled in. This can be done advantageously in the image displayed, by making the color and intensity of this pixel the same as the resultant color and average intensity value of the other 3 in the cluster.

Version FIG. 5B

In this version, related to FIG. **2** above, and shown in FIG. 5b, isolated pixels such as **530** (exaggerated in size for clarity) on array **531** or clusters of pixels such as **540-543**, are used to rapidly find a target with low resolution, such as round dot target image **550**. These pixels can ideally have special filters on their face, for example having near IR bandpass filters (of a wavelength which can still be seen by the camera, typically up to 1 um wavelength max). If takes only a few pixels to see the rough presence of a target, then in an image field of 1000×1000 pixels there could be one or more target images occupying 10×10 pixels or more. Thus in any group of 10×10, you could have 5 near IR filtered receptive pixels say, i.e., only 5% of the total pixel count but sufficient to see the IR targets location to a modest accuracy. Once found, one can also use the "normal" pixels on which the target image also

10

falls to aid in more precise determination of its location, for example using pixel group **555** composed of numerous pixels.

In short by having a camera with certain pixels responsive to selected wavelengths and/or scanned separately one can very rapidly scan for target features, then when found, take a regular picture if desired. Or just take regular pictures, until the necessity arises to determine target location.

Similarly the special filtered pixels such as **505** or **530** could be laser wavelength bandpass filtered for this purpose, used by the array for preferentially detecting laser light projected on an object (while ignoring other wavelengths). In a normal image, such a pixel would be nearly black as little white light passes (except that centered on the laser wavelength). To provide a normal picture using such a camera, the special IR or laser wavelengths pixels readings would be filled in with values and colors of light from the surrounding regions.

Such a laser wavelength filter can be extremely effective, even if a relatively weak laser is used to illuminate a large area, especially where retro-reflectors are used, and the light returned is concentrated by 1000 times or more.

FIG. 6

The embodiments above have dealt with finding just one target, and generally with just one camera, even though two or more cameras may be used for stereo imaging. Where stereo pairs of cameras are used, clearly each camera must see the target, if range via image disparity (the shift in location of a feature in the image in two camera views separated by a baseline) is to be determined.

Using the invention, one camera can be considered a master, the other a slave. The master camera determines target location by any of the means described above. Then the slave need only look at the expected pixel location of the target assuming some a priori knowledge of range which can come from previous target readings, or known range zones where the target has to lie in a given application.

Consider cameras **600** (master) with lens **603** and **601** (slave) having lens **604**, the axes of the two cameras separated by baseline **602** and with interfaced to computer **605**. The image of target **610** on object **615** is formed at position **620** on array **630** of camera **600**, and at position **621** on array **631** of camera **601**. The difference in position x in the direction of the baseline, in this simple situation is directly proportional to range z. The knowledge then of target image position **620** found by interrogating some or all of the pixels of camera **600** can as mentioned be used to more rapidly find image **621** in the image field of the "slave" camera **601**, and thus the z location of the target **610**.

For example if range is known to be an approximate value of z, one can look in the image field of the camera **601** along a line of points at a calculated value x away from the edge of the field, assuming **620** has been found to lie as shown near the corresponding edge of the field of camera **600**.

Two or more cameras may be used for stereo image analysis including object range and orientation data as discussed in FIGS. 1 and 6. Range can also be determined via triangulation with a single camera and one target if projected on to the object in question at an angle to the camera axis from a laser say, or by using a single camera and 3 or more points on an object whose relative relationship is known (including the case of a line of points and an external point).

FIG. 7

As stated above, the TV camera of the invention can be used to see either natural or artificial features of objects. The former are just the object features, not those provided on the object especially for the purpose of enhancing the ability to

US 7,933,431 B2

11

determine the object location or other variable using computer analysis of TV camera images. Such natural features, as has been pointed out in many of the co-pending referenced applications, can be holes, corners, edges, indentations, protrusions, and the like of fingers, heads, objects held in the hand, or whatever.

But using simple inexpensive equipment it is often hard to determine the presence or location of such features in a rapid reliable enough manner to insure function of the application in question. In this case, one can employ one or more artificial features, provided on the object by attaching an artificial target onto the object, or manufacturing the object with such a target.

At least three types of artificial features can be employed.
1. The first is to provide special features required for object location, or orientation determination. Such a special feature can be of an optically contrasting material at the wavelength used to that of the object, for example a bright color, or a retroreflector;
2. The second is to provide one artificial feature (typically capable of more easily being found in an image than natural features of the object), and by finding it, localize to the region of that target environs the problem of finding any other features needed nearby; and
3. The third is to find an artificial feature on an object that actually by its shape, location, or coded features, provides a guide to the location of natural or other artificial features which are to be sensed in order to determine position or orientation of the same or related objects. This has been dubbed by me a co-target in co-pending applications incorporated by reference.

As shown in FIG. 7, object 700 has co-target 701 at one end, visible to camera 705. The co-target in this particular instance is a diamond shape, and is of high contrast for easy acquisition. For example it could be a yellow plastic retroreflector formed of molded corner cubes similar to those used on cars for taillights and other safety purposes.

The diamond shape in this case is significant for two reasons. First it is unusual relative to the object or background when used in the context intended, and makes the target still more identifiable (that is novel color, shape and brightness are all present). In addition, in this particular instance it has been chosen that a diamond shape, should indicate that the corners of the object are to be used for 6 axis position and orientation determination and that the choice of color for example, signifies that the object corners are within some predetermined distance from the target. If desired the target location on the object can also point to the corners. For example, in the drawing, the four corners of the diamond, 720-723, point in the general direction of the four corners 730-733 of the rectangular object 700.

FIG. 8

The invention herein and disclosed in portions of other copending applications noted above, comprehends a combination of one or more TV cameras (or other suitable electro-optical sensors) and a computer to provide various position and orientation related functions of use. It also comprehends the combination of these functions with the basic task of generating, storing and/or transmitting a TV image of the scene acquired either in two or three dimensions.

FIG. 8A illustrates control of functions with the invention, using a handheld device which itself has functions (for example, a cell phone). The purpose is to add functionality to the device, without complicating its base function, and/or alternatively add a method to interact with the device to achieve other purposes.

12

The basic idea here is that a device which one holds in ones hand for use in its own right, can also be used with the invention herein to perform a control function by determining its position, orientation, pointing direction or other variable with respect to one or more external objects, using an optical sensing apparatus such as a TV camera located externally to sense the handheld device, or with a camera located in the handheld device, to sense datums or other information external for example to the device.

This can have important safety and convenience aspects to it, particularly when the device is used while driving a car or operating other machinery. To date voice recognition has been the only alternative to keying data in to small handheld devices, and voice is limited in many cases very limited if some physical movement is desired of the thing being communicated with.

A cellular phone 800 held in the hand of a user can be used to also signal functions in a car using a projected laser spot from built in laser spot projector 801 as in FIG. 14, in this case detected by detector 802 on the dashboard 803. Alternatively and or in conjunction, one may use features such as round dot targets 805-807 on the cell phone which are sensed, for example, by a TV camera 815 located in the car headliner 816 or alternatively for example in the dashboard (in this case the targets would be on the opposite end of the cell phone). More than one set of targets can be used, indeed for most generality, they would be an all sides which point in any direction where a camera could be located to look at them.

Remote control units and dictating units are also everyday examples of some devices of this type which can serve control purposes according to the invention. One of the advantages here is that it keeps the number of switches etc on the device proper to a minimum, while allowing a multitude of added functions, also in noisy environments where voice recognition could be difficult or undesirable for other reasons.

Use of specialized target datums or natural features of devices held in the hand, or used with cameras on such devices, allows photogrammetric techniques such as described in FIG. 1 to be used to determine the location in 6 degrees of freedom of the device with respect to external objects.

As one illustrative example, to signal a fax unit 824 in the car to print data coming through on the phone, the user just points (as illustrated in position 2) the cell phone toward the fax, and the TV camera 815 scans the images of targets 805-807 on the face toward the camera, and the computer 830 connected to the camera analyzes the target images (including successive images if motion in a direction for example is used as an indicator, rather than pointing angle for example), determines the cell phone position and/or orientation or motion and commands the fax to print if such is signaled by the cell phone position orientation or motion chosen. The knowledge in space of the cell phone location and its pointing direction (and motion as pointed out above) provides information as to the fact that the fax was the intended target of the effort. Such data can be taught to the system, after the fact even if the fax or any other item desired to be controlled is added later.

Another version has a camera and requisite computer (and or transmission capability to an external computer) in the handheld device, such as a cell phone or whatever. When pointed at an object, the camera can acquire the image of the object and/or any natural features or special datums on the object which are needed to perform the function desired.

One function is just to acquire an image for transmission via for example the cell phones own connection. This is illustrated in FIG. 8B, where an image of object 849 acquired

US 7,933,431 B2

13            14

by camera **850** of cell phone **851** held by user **852** is transmitted over mobile phone link **853** to a remote location and displayed, for example. While this image can be of the user, or someone or something of interest, for example a house, if a real estate agent is making the call, it is also possible to acquire features of an object and use it to determine something.

For example, one purpose is recognition, for example one can point at the object, and let the computer recognize what it is from its TV image. Or point around in space taking multiple TV frames aiming in different directions, and when computer recognition of a desired object in one of the images takes place, transmit certain data to the object. Or it can be used to acquire and transmit to remote locations, only that data from recognized objects.

Thus the invention can provided on a hand held object for a variety of purposes,

To take images of things;

To determine datums on things; and

To automatically read things.

The combination of any or all of these functions in addition with other object functions such as hand held cell phones, dictation units, telephones, wearable computer devices and the like.

An alternative, shown with phantom lines in FIG. **8A**, to the some aspects of the above described operation of the embodiment is to use a laser pointer **801** in for example a cell phone to designate say the fax machine as shown. Then the TV camera **815** simply detects the presence of the laser pointer projected spot **820** on the fax, and via computer memory it is known that this is a device to be energized or connected in connection with the cell phone.

The camera located in a handheld device can also be used to point at a TV screen, such as that on the dashboard of a car, and to utilize data presented there for some purpose. For example, if pointed at a screen saying email message number 5, the camera of the device can be used to obtain this image, recognize it through known character recognition techniques, and process it for transmission if desired. Or it might just say the message to the user of the phone through the speaker of the cell phone. Such a technique is not required if means exist to directly transmit the incoming information to the cell phone, but this may not be possible.

FIG. **9**

FIG. **9** illustrates pointing at a displayed image of an object represented on a screen using a finger or laser pointer, and then manipulating the represented object or a portion thereof using the invention. For example, consider user **901** pointing a laser pointer **905** at an image generated by computer **910** on display **912**, typically a large screen display (e.g., 5 feet diagonal or more) where control features here disclosed are of most value.

The user with the pointer, can point to an image or portion of the displayed image to be controlled, and then using the action of the pointer move the controlling portion of the image, for example a "virtual" slider control **930** projected on the screen whose lever **935** can be moved from left to right, to allow computer **910** sensing the image (for example by virtue of TV camera **940** looking at the screen as disclosed in copending applications) to make the appropriate change, for example in the heat in a room.

Alternatively one can also point at the object using ones fingers and using other aspects of the invention sense the motions of ones fingers with respect to the virtually displayed images on the screen, such as turning of a knob, moving of a slider, throwing a switch etc.

Such controls are not totally physical, as you don't feel the knob, so to speak. But they are not totally virtual either, as you turn it or other wise actuate the control just as if it was physical. For maximum effect, the computer should update the display as you make the move, so that you at least get visual feedback of the knob turning. You could also get an appropriate sound if desired, for example from speaker **950**, like an increase in pitch of the sound as the knob is "moved" clockwise.

FIG. **10**

The above control aspects can in some forms be used in a car as well even with a small display, or in some cases without the display.

Or it can be a real knob which is sensed, for example by determining position of a target on a steering wheel or the fingers turning it tracked (as disclosed in co-pending application references).

For example, consider car steering wheel rim **1000** in FIG. **10A**. In particular, consider hinged targeted switch, **1010** (likely in a cluster of several switches) on or near the top of the wheel, when the car is pointed straight ahead, and actuated by the thumb of the driver **1011**. A camera **1020** located in the headliner **1025**, and read out by microcomputer **1025** senses representative target **1030** on switch **1010**, when the switch is moved to an up position exposing the target to the camera (or one could cover the target with ones fingers, and when you take a finger off, it is exposed, or conversely one can cover the target to actuate the action).

The camera senses that target **1010** is desired to be signaled and accordingly computer **1025** assures this function, such as turning on the radio. As long as the switch stays in this position, the radio is on. However other forms of control can be used where the switch and target snap back to an original position, and the next actuation, turns the radio off. And too, the time the switch is actuated can indicate a function, such as increasing the volume of the radio until one lets off the switch, and the target is sensed to have swung back to its original position and the increase in volume thus terminated.

In operating the invention in this manner, one can see position, velocity, orientation, excursion, or any other attribute of actuation desired. Because of the very low cost involved in incremental additions of functions, all kinds of things not normally sensed can be economically provided. For example the position of a datum **1040** on manually or alternatively automatically movable plastic air outlet **1041** in the dashboard **1042** can be sensed, indicative of the direction of airflow. The computer **1025** can combine this with other data concerning driver or passenger wishes, other outlets, air temperature and the like, to perfect control of the ambiance of the car interior.

It is also noted that the same TV camera used to sense switch positions, wheel position, duct position, seat position (for example using datum **1045**), head rest position (for example using datum **1046**), and a variety of other aspects of physical positions or motions of both the car controls and the driver or passengers. And it can do this without wires or other complicating devices such as rotary encoders which otherwise add to the service complexity and cost.

When the camera is located as shown, it can also see other things of interest on the dashboard and indeed the human driver himself, for example his head **1048**. This latter aspect has significance in that it can be used to determine numerous aspects such as:

1. The identity of the driver. For example, if a certain band of height isn't reached, such as point P on the drivers head, the ignition can be interlocked. Much simpler than face recog-

US 7,933,431 B2

15

nition, but effective if properly interlocked to prevent repeated retries in a short time period.

2. The position of the head of the driver in case of an accident. As detailed in reference **4**, a camera or cameras can be used to determine head location, and indeed location of the upper torso if the field of view is large enough. This information can be used to control airbag deployment, or head rest position prior to or during an accident (noting too that headrest position can also be monitored without adding any hardware). Particularly of interest is that the pixel addressing camera of the invention can have the frequency response to be useful in a crash, sensing the movement of the person (particularly severe if unrestrained) within a millisecond or two, and providing a measure of the position for airbag deployment. Additional cameras may also be used to aid the determination, by providing other views or observing other features, for example.

Using a pixel addressing camera for camera **1020** confers additional advantages. For example consider the image of the car interior produced by the camera lens **1021**, on matrix of pixels **1061**, whose addressing and processing is controlled by computer **1025**. In the first instance one can confine the window of view of a certain group of pixels of the total matrix **1061** to be only in the region of the steering wheel, as in window **1065** shown. This allows much faster readout of the more limited number of pixels, and thus of the steering wheel switches, at the expense of not seeing anywhere else in that particular reading. But this may be desirable in some cases, since it may only be required to scan for heater controls or seat positions, every 10 seconds say, while scanning for other more immediate items a hundred times per second or more. A good example are safety related functions. 5 per second might suffice for seeing where the turn signal or windshield washer control was, as an example. Window 1066 dotted lines is illustrative of a window specialized for head, headrest and seat positions, say.

Scans in certain areas of the image can also depend on information obtained. For example one may initiate a scan of a control position, based on the increasing or decreasing frequency of an event occurrence. For example if the persons head is in a different location for a significant number of scans made at 15 second intervals for example, then in case of a crash, this data could be considered unreliable. Thus the camera window corresponding to pixels in the zone of the head location **1048** could be scanned more frequently henceforward, either until the car stopped, or until such action settled down for a person. Such action is often the case of a person listening to rock music, for example.

Similarly, if someone is detected operating the heater controls, a scan of predominately heater function controls and related zones like air outlets can be initiated. Thus while normal polling of heater controls might be every 2 seconds say, once action is detected, polling can increase in the window(s) in question to 40 times per second for example. The detection of action can be made first via the camera, or via input from some other input device such as a convention heater knob and electric circuit operable therewith.

Scans in certain areas of the image can also depend on information obtained in other areas of scan, or be initiated by other control actions or by voice. For example, if hard deacceleration is detected by an accelerometer, but before a crash occurred, the camera could immediately be commanded to begin scanning as fast as possible in the region of the image occupied by the driver and/or any other humans in its field of view. This would be for the purpose of monitoring movements in a crash, if a crash came, in order to deploy an airbag for example.

16

One might utilize the invention to actuate a function, based on positions of people or other objects in the vehicle. As one example, suppose the drivers hand is resting on a console mounted gear lever. By scanning the image of this region, one can determine from the image the position of the console shift lever, and use the image thereof to control gear change via computer **1025**. However if the driver rests his hands on the windshield wiper stalk, it could in the same manner, become a column mounted gear lever so to speak. Or just be used for up down gear changes, like a paddle shifter on a racing car. In fact in the latter sense, the camera could be instructed to detect ones finger or hand movement to do this function for example, wherever one desired to rest ones hand (within the camera field of view at least). This function is also useful for physically disabled persons wishing to drive the car. And it can be different for different persons as well, via programming of the control functions associated with any given hand, switch or other position or movement.

FIG. **10**B illustrates alternative types of control mechanisms which can be used with the invention, in this case illustrated on the steering wheel of a car, although as can be appreciated, any suitable function or location may be used or created. And too, combinations of functions can be used. The invention is generic to car steering wheel controls, dishwashers, audio systems in ones home, heating and air conditioning elements and virtually all other forms of human related control functions. The key is that the camera computer combination makes a very inexpensive way to share a wide variety of functions with one or just a few basic systems and over a large population base.

As shown in FIG. **10**B, the steering wheel **1070** has two additional types of controls visible to camera **1020** and able to be sensed and generate the appropriate control function via computer. These are rotating device **1072** built to rotate around the steering wheel rim circular cross section, and expose a continuously variable, or digital or step wise increment component to the camera. For example, three bars are shown, short **1075**, medium **1076**, and long **1077**. The computer senses which of the three is visible by comparing the length to pre-stored values (or taught values, see below), and causes the desired action to occur.

The second control **1080** is a sliding device **1081** which can be slid clockwise, or counterclockwise along a circumferential section of the steering wheel at the top, sides or wherever. As before, Its position is determined by camera **1020** again providing more data than just a switch up or down as shown before.

While illustrated on the steering wheel where it is readily at hand, it can be appreciated that the position of either the slider **1081** or the rotary device **1072**, or other similar devices for the purpose at hand could be elsewhere than the wheel, for example on stalk or on a piece of the dash, or other interior component indeed wherever a camera of the invention can view them without excessive obscuration by persons or things in the car. It need not be on a car either, controls of this type can be in the home or elsewhere. Indeed a viewable control datum can even be on a portable component such as ones key chain, phone, or article of clothing apparel, or whatever. Similarly the camera **1020** can view these items for other purposes as well.

The teach-ability of the invention is achieved by showing the camera the code marker in question (e.g., a short bar located on the wheel), and in the computer recording this data along with what it is supposed to signify as a control function for example, turn rear wiper on to first setting. This added functionality of being easily changed after manufacture is an

US 7,933,431 B2

17

important advantage in some cases, as for example, today after-market addition of wired in accessories is difficult.

Games Using the Invention

The co-pending referenced applications have described games which can be played with target sensing and touch screen based devices, typically but not necessarily, electro-optically based (e.g., TV camera). The cameras of the invention can be used to, for example: Sense the player or players in the game or portions thereof; sense objects held or manipulated by the players (e.g., a ball, a pistol); sense physical tokens used in the game, such as monopoly game tokens; and sense game accessories such as checkerboards, croquet wickets; compare positions of objects with respect to other objects or players.

In addition, the cameras can be used to take images which can be displayed also a major feature given the ability to create life size displays. And the computer of the invention can be used to control the presentation of background image data from stored images, or even images downloaded from the internet for example.

Some or all of these aspects will now be illustrated in some representative game illustrations (again noting that some more are in the co-pending applications).

FIG. 11 Board Game

Even today, popular board games such as Monopoly and the like are being provided in computer playable form, with the "board" represented on the screen of the computer monitor. The invention here builds on this by providing various added features which allow a physical nature of the game just as the real game, but with new aspects and providing physical game play which can be transmitted over the internet to others. These features also can be turned off or on at as desired.

In one version shown in FIG. 11A, the player tokens such as 1101 and 1102 are observed by camera of the invention 1110 placed directly overhead of the play board 1115, which can for example be a traditional monopoly board (chess board, checker board, etc). points on the board such as corners 1130, 1131, 1132, and 1133 can also be observed to establish a reference coordinate system for the computer 1140 to track the moves of the markers, either from their natural features, or from specialized datums thereon (e.g., retro-reflective hat top 1141 on marker 1101). For example a train shape 1102 of a marker can be called from memory, or taught to the computer by showing it to the camera. Rotation invariant image analysis programs such as the PATMAX program from Cognex company can be used to identify the marker in any normal orientation, together with its location on the board (the board itself can be taught to the computer using the camera, but is preferably called up from memory).

The board position and relative scale in the field of view is determined easily by knowing the spacing of the corner points 1130-1133 and using this to calibrate the camera (to provide extra contrast, the corners can have retro-reflective glass bead edging or beading as shown). For example if the points are spaced 20 inch on corners of the board, and the camera is positioned so that 20 inches occupies 80% of its field of view, then the field of view is 25 inches square (for a square matrix of camera pixels), and each pixel of 1000 pixels square, occupies 0.025 inches in the object field.

The play of both players (and others as desired) can be displayed on the monitor 1150, along with an image of the board (which also can be called from computer memory). But other displays can be provided as well. For example to lend more realism to the game, the display (and if desired sound from speaker 1155 connected to computer 1140) can also be programmed to show an image or sound that corresponds to

18

the game. For example, when the camera image has provided information that one player has landed on "Boardwalk" (the most valuable property) a big building could be caused to be shown on the screen, corresponding to it also suitable sounds like wow or something provided.

The camera can be used to see monopoly money (or other game accessories) as well, and to provide input so the computer can count it or do whatever.

A large, wall sized for example, screen can add added realism, by allowing one to actually get the feeling of being inside the property purchased, for example.

One of the exciting aspects of this game is that it can be used to turn an existing board game into something different. For example, in the original monopoly the streets are named after those in Atlantic City. By using the computer, and say a DVD disc such as 1160 stored images of any city desired can be displayed, together with sounds. For example, one could land on the Gritti Palace Hotel in Venice, instead of Boardwalk. As shown in FIG. 11B, the TV camera senses the image of train marker 1101, and conveys this information to computer 1140, which causes the display 1150 and speaker of the invention to display the information desired by the program in use.

Making the game in software in this way, allows one to bring it home to any city desired. This is true of a pure (virtual) computer game as well, where the board only exists on the computer screen.

For added fun, for example in a small town context, local stores and properties could be used, together with local images, local personages appearing on the screen hawking them, and the like. A local bank could be displayed to take your money, (even with sounds of the local banker, or their jingle from the radio) etc. This makes the game much more local and interesting for many people. Given the ease of creating such local imagery and sounds with cameras such as digital camcorder 1151 used as an input of display imagery (e.g., from local celebrity 1158) to the game program, one can make any monopoly experience more interesting and fun at low cost.

The same holds true with other well known games, such as Clue, where local homes could be the mystery solving location, for example. One can also create games to order, by laying out ones own board. If one of the persons is remote, their move can be displayed on the screen 1150.

In the above, the display has been treated as sort of backdrop or illustration related. However, one can also create a whole new class of games in which the display and/or computer and the board are intertwined. For example as one takes a trip around the monopoly board, several chance related drawings opportunities occur during play. In this new game, such could be internet addresses one draws, which, via modem 1152, send the board game computer 1140 to any of a large number of potential internet sites where new experiences await, and are displayed in sight and sound on the display.

It should also be noted that the board can be displayed on the screen as well, or alternatively projected on a wall or table (from overhead). A particularly neat mixture of new and old is shown in FIG. 11B, where the board is displayed on a screen pointed vertically upward just as it would be on a table, and indeed in this case physically resident on a table 1165. The board is displayed (from software images or cad models of the board in computer 1166) on a high resolution table top HDTV LCD screen 1167 with a suitable protective plastic shield (not shown for clarity). Play can proceed just as before using physical tokens such as 1101 and 1102. In this case the

US 7,933,431 B2

19

display used to augment the game can actually be shown on the same screen as the board, if desired.

The TV camera **1110** in this context is used to see the tokens and any other objects of the game, the people as desired, and the play, as desired. The camera can be used to see the display screen, but the data concerning the board configuration displayed may be best imputed to the computer program from direct data used to create the display.

A beauty of the invention is that it allows the interaction of both computer generated images and simulations, with the play using normal objects, such as one might be accustomed to for example, or which give a "real" feel, or experience to the game.

FIG. **12** Sports Game

FIG. **12** illustrates a generic physical game of the invention using points such as **1201-1205** on the human (or humans) **1210** sensed by a TV camera such as stereo camera pair **1215** and transmitted to the computer of the invention **1220**. While points can be sensed in 2D, this illustration uses as stereo camera pair located on large screen display **1225** as shown to provide a unitary package built into the screen display (pointed out in other co-pending applications). In this particular instance a 3D display is illustrated, though this isn't necessary to obtain value and a good gaming experience. The human optionally wears red and green filter glasses **1235** such that red images on the screen are transmitted to one eye, green to another, so as to provide a 3D effect. Similarly crossed polarized filter glasses (with appropriate display), and any other sort of stereoscopic, or autostereoscopic method can also be used, but the one illustrated is simple, requires no connecting wires to the human, and can be viewed by multiple uses, say in a gym aerobics room.

The game is generic, in that it totally depends on the program of the computer. For example, it can be an exercise game, in which one walks on a treadmill **1250**, but the image displayed on screen **1225** and sound from speakers **1255** and **1266** carry one through a Bavarian forest or the streets of New York as one walks, for example.

Or it can be a parasail game in which one flies over the water near Wakiki beach, with suitable images and sounds. In any case action determined by sensing position, velocity acceleration, or orientation of points **1201-1206** on the player, **1210** is converted by computer **1220** into commands for the display and sound system. Note in the figure this player is shown viewing the same screen as the treadmill walker. This has been shown for illustration purposes, and it is unlikely the same game could be applied to both, but it is possible.

It is noted that fast sensing, such as provided by the pixel addressing camera method disclosed above is highly desirable to allow realistic responses to be generated. This is especially true where velocities or accelerations need to be calculated from the point position data present in the image (and in comparison to previous images).

For example, consider points **1201** and **1202** on player **1210**. If point **1201** moves to **1201***a*, and **1202** moves to **1202***a* indicative of a quick jerk movement to turn the displayed parasail, this movement could occur in a 0.1 second. But the individual point movements to trace the action would have to be sensed in 0.01 second or quicker for example to even approximately determine the acceleration and thus force exerted on the glider, to cause it to move.

It is important to note that the invention is not only generic in so far as the variety of these games are concerned, but it also achieves the above with virtually no mechanical devices requiring maintenance and creating reliability problems

20

which can eliminate profits from arcade type businesses especially with ever more sophistication required of the games themselves.

FIG. **13** Bar Game

FIG. **13** illustrates a game which is in a class of gesture based games, in which the flirting game of FIG. **15** is also an example. In such games one senses the position, velocity or acceleration of a part of a person, or an object associated with the person. This can also include a sequence of positions, itself constituting the gesture. The detected data is then related to some goal of the contest. Consider FIG. **13**, wherein the object in ones hand is monitored using the invention, and a score or other result is determined based on the position, velocity, orientation or other variable of the object determined. For example, in a bar one can monitor the position, orientation, and rate of change thereof of drinking glasses.

A two person game is illustrated, but any reasonable number can play as long as the targets can all be tracked sufficiently for the game (in one test over 200 targets were acquired, but as can be appreciated this uses most of the field of view of the camera, and thus speed improvements made possible by pixel addressing become more difficult.

As shown, a single camera **1301** observes one or more targets such as **1305** on glass **1310** held by contestant **1315**, and target **1320** on glass **1325** of contestant **1330**. On a signal, each drinks, and a score is calculated by program resident in computer **1350** based on the time taken to raise the glass, and place it back empty on table **1355**. A display of the score, and an image desired, for example of the winner (taken with camera **1301** or another camera), or a funny image called from computer memory, is displayed on monitor display **1370**.

If the glass features are sufficiently distinct for reliable and rapid acquisition and tracking, for example as might be provided by an orange color, or a distinct shape, then specialized target features are not required.

Alternatively the velocity, path of movement of the glass (or other object), acceleration, or any other variable from which target data is sufficient to calculate, can be used to determine a score or other information to be presented or used.

FIG. **14**

The referenced co-pending applications have described a game where by laser pointers can be used to designate images on a TV screen. In this case of FIG. **14**A, the TV camera of the invention such as **1410** is used in a two player game to see laser pointer spots such as **1420** and **1421** projected by players **1430** and **1431** respectively, using laser pointers **1440** and **1441** respectively. When one player's spot hits the other, the event is recorded in memory of computer **1450** for further analysis and display.

In a somewhat different context, a person can use a laser pointer to point at an object to designate it for some purpose, for example for action. For example consider FIG. **14**B, in which housewife **1460** who points with laser pointer **1462** so as to provide a laser spot **1465** on dishwasher **1470**. TV camera of the invention **1475** in corner of the kitchen **1480** picks up all laser spots in an image of the room (made easier to process in terms of signal to background imagery if one locates a laser wavelength band-pass interference filter **1481** in front of the TV camera as shown) and compares via computer **1483**, the location of the spot detected in the image to stored memory locations of objects such as the dishwasher **1470** or fridge **1485** in the camera field of view, so as to identify the object needing action. In this case too, housewife may signal via a spatially variant laser pointer projection image (see copending referenced applications for further

US 7,933,431 B2

21

examples in other applications), or a series of spots in time, what action is desired, for example to turn the washer on. In this case the computer **1483** can cause a command to do so to be sent to the washer.

Any one with a simple laser pointer can make these commands effective. No learning is needed just point at the item desired, with the TV camera and computer of the invention acquiring the data and interpreting it. This is much simpler than remote controls of today, and a major advantage for those who have difficulty or inclination to learn complex electronic devices and procedures. It should be noted that these pointing procedures can easily be combined with voice recognition to further define the desired control activity for example inputting the housewife's voice in this example by virtue of microphone **1476**.

The stored locations can be taught. For example in a setup mode, one can point a laser pointer at the dishwasher, and indicate to the computer that that spot is the dishwasher. The indication can be provided by keyboard, voice recognition or any other means that is satisfactory.

Clearly other items can be monitored or controlled in this manner. The camera can also detect optical indications provided by other means, for example lights in the appliance itself. And one can detect whether light have been left on at night (or not left on) and cause them to be turned off or on as desired.

Such a camera if it is responsive to normal illumination as well as that of the laser wavelength, can also be used to see movements and locations of people. For example, it can look at the top of the stove, and assure that no movement is near the stove **1486**, or objects on it if programmed to do so, thus sounding an alarm if an infant should get near the stove, for example.

The housewife in the kitchen can also point at a board on which preprogrammed actions are represented. For example consider board **1490**, shown in greater detail in FIG. **14**C, in which 3 squares **1491-1493** are to represent different functions. Thus if **1491** is programmed (via keyboard, voice or whatever) to represent turning on the clothes dryer in the laundry, when the TV camera sees, and via the computer, identifies spot **1496** pointed by the user on square **1491**, it causes the dryer to turn on. Operated in this manner, the board **1490**, in combination with a TV camera of the invention (such as **1475** or a more dedicated one for the board alone) and computer such as **1483** can be considered a form of touch screen, where the user, in this case in the kitchen can point at a portion of the board with a finger, or a laser pointer, and register a choice, much like touching an icon on a conventional computer touch screen.

Similarly, squares or other zones representing choices or the like can be on the item itself. For example, a stove can have four areas on its front, which can be pointed at individually for control purposes, what ever they are (e.g., representing heat settings, burner locations or the like). For security, it could be that only a coded sequence of laser pulses would be seen, or as pointed out in co-pending reference Ser. No. 60/133,673, a spatial code, for example representing the user such as an initial could be projected, and sensed on the object by the TV camera.

The laser pointer can be held in the hand of the user, or, like **1497** attached for example to a finger, such as forefinger **1498**. Or it can be on or in another object, desirably one which is often hand held in the normal course of work, such as a TV remote control, a large spoon, or the like. Or using other aspects of the invention, the finger of the user can be observed **1475** to point directly, and the object being pointed at determined. For example if finger **1498** is moved 4 times, it could indicate

22

to the TV camera and thence computer that channel four was desired on a TV display not shown.

If a special pointer is used, it can be any workable optical device, not necessarily a laser. The camera and computer of the invention can also be used to observe the user pointing directly, and compute the pointing vector, as has been described in my co-pending applications.

FIG. **15** A "Flirting" Game

Another game type is where the camera looks at the human, and the humans expressions are used in the game. In this case it is facial expressions, hand or body gestures that are the thing most used.

For example, one idea is to have a scene in a restaurant displayed on a display screen **1500**, preferably a large HDTV screen or wall projection to be as lifelike as possible, and preferably life size as well which lends extra realism to some games, such as this one due to the human element involved.

Let us consider that seated at the table in the restaurant displayed on the screen is a handsome man **1501** whose picture (likely a 3D rendered animation, or alternatively photo-imagery called from memory), and the goal for the girl **1510** playing the game is to flirt with this man until he gets up and comes over to say hello, ask her out or what ever (what he does, could be a function of the score obtained, even!).

Player **1510** seated at table **1511** (for authenticity, for example) is observed by TV camera **1515** (or stereo pair as desired, depending whether 3D information is thought required) and computer of the invention **1520**, which through software determines the position of eyebrows, lips, hands, fingers and any other features needed for the game. If necessary, specialized targets can be used as disclosed herein and elsewhere to augment this discrimination, for example such as optically contrasting nail polish, lipstick, eyeliner or other. Contrast can be in a color sense, or in a reflectivity sense such as even retro-reflective materials such as Scotchlite 7615 by 3M company. Even special targets can be used to enhance expressions if desired.

This can be a fun type game, as the response of the displayed person can be all kinds of things even contrary to the actual gestures if desired. Sounds, such as from speaker **1530** can also be added. And voice recognition of players words sensed by microphone **1550** can also be used, if verbal as well as expressive flirting is used.

While the game here has been illustrated in a popular flirting context, it is more generally described as a gesture based game. It can also be done with another contestant acting as the other player. And For example, the contestants can be spaced by the communication medium of the internet. The displayed characters on the screen (of the other player) can be real, or characters whose expressions and movements change due to sensed data from the player, transmitted in vector or other form to minimize communication bandwidth if desired.

Other games of interest might be:

"Down on the Farm" in which a farmer with live animals is displayed on a life size screen, and the children playing the game are to help the farmer by calling the animals to come over to them. This would use recognition of voice and gesture to make the animal images move and make sounds.

A player can find someone in a display and point at him, like the "Whereas Waldo" puzzle game. Then the subject moves, child runs to peek at him, and to find him, say running down a street whose image is displayed on the screen.

One can also use the camera of the invention to monitor the progress made by a child building blocks, and show an Video

US 7,933,431 B2

23

displayed image of a real skyscraper progressing as he builds his little version. Note the benefit of group activity like a board game and children's play with each other.

FIG. **16**

FIG. **16** illustrates a version of the pixel addressing camera technique wherein two lines on either side of a 1000 element square array are designated as perimeter fence lines to initiate tracking or other action.

Some "pixel addressing" cameras such as the IVP MAPP 2500 512×512 element camera, are smart, that is can process on the same chip. However, in some cases the control of such a camera may not allow one to actually read just one pixel, say, but rather one must read the whole line on which the pixel rests. Now some processing can be in parallel such that no speed is lost, at least in many instances.

If however, one does have to read a whole line serially into a computer portion, then to fully see a 10×10 pixel round target say, one would have to read at least 10 lines.

If two targets both were located on the same lines, the time involved to read would be the same.

In the same vein, if lines of data must be scanned, then the approach of **2***b* wherein every 20th pixel say is interrogated can be specialized to having such pixels fall on scan lines wherever possible. And where one is restricted to reading all pixels on a scan line and where a target entry zone is anticipated, one can have a scan line oriented to be crossed by such entry. For example in FIG. **16**, the two lines **1601** (line of pixels **3**) and **1602** (line of pixels **997**) of a 1000×1000 element pixel array **1610** are designated as perimeter fence lines, to trigger a target tracking or other function on the entry of a target image on to the array, such as **1615** from either the right or left side in the drawing. This is often the case where entry from top or bottom is precluded by constraints of the application, such as a table top at the bottom, or the height of a person at the top. Or in a stereo example such as FIG. **6**, the baseline defines the direction of excursion of a target as z is varied again calling for crossing of scan lines out of the plane of the paper at some point.

The invention herein has provided an exciting method by which common board games can become more fun. The invention provides a link with that past, as well as all of the benefits of the video and computer revolution, also via the internet.

It is envisioned that the same approach may be applied to many card games as well. It is also thought that the invention will find use in creating ones own games, or in downloading from the internet others creations. For example, common everyday objects can become the tokens of the games, and taught to the game computer by presenting them to the video camera. Similarly, the people playing the game can be taught, including their names and interests.

FIG. **17**

FIG. **17** illustrates a 3D acoustic imaging embodiment of the invention which at low cost may generate accurate 3D images of the insides of objects, when used in conjunction with ultrasonic transducers and particularly a matrix array of ultrasonic transducers.

As shown in FIG. **17**A, the position in xyz of the ultrasonic imaging head **1700** on wand **1701** held in a users hand **1702** is monitored electro-optically as taught in FIG. **1**, using a single camera **1710** and a simple four dot target set **1715** on the head **1700** at the end of the transducer wand **1701** in contact with the object to be examined **1720**. Alternatively, as also taught in FIG. **1**, a stereo pair for example providing higher resolution in angle can be employed.

Computer **1725** combines ultrasonic ranging data from the ultrasound transducer head **1700** and from the sensor of trans-

24

ducer location (in this case performed optically by camera **1710** using the optically visible targets on the transducer head) in order to create a range image of the internal body of the object **1720** which is thus referenced accurately in space to the external coordinate system in the is case represented by the camera co-ordinates xy in the plane of the TV camera scan, and z in the optical axis of the camera.

In many cases it is also desirable to know the pointing angles of the transducer. One instance is where it is not possible to see the transducer itself due to obscuration, in which case the target may alternately be located at the end **1704** of the wand for example. Here the position and orientation of the wand is determined from the target data, and the known length of the wand to the tip is used, with the determined pointing angle in pitch and yaw (obtained from the foreshortening of the target spacings in the camera image field) to calculate the tip position in space.

This pitch and yaw determination also has another use however, and that is to determine any adjustments that need to be made in the ultrasonic transduction parameters or to the data obtained, realizing that the direction of ultrasound propagation from the transducer is also in the pointing direction. And that the variation in ultrasound response may be very dependent on the relation of this direction **1730** with respect to the normal **1735** of the surface **1736** of the object (the normal vector is shown for clarity pointing inward to the object).

The difference in direction can be calculated by using the TV camera (which could be a stereo pair for greater angular resolution) as well to determine the surface normal direction. This can, for example, be done by placing a target set such as **1740** on the surface in the field of the camera as shown. This can be dynamically or statically accomplished using the photogrammetric method described in the Pinkney references.

Differences in direction between the surface normal and the transducer pointing direction are then utilized by software in the computer **1725** of the invention in analysis of the ultrasound signals detected. The pointing angle and the position of the transducer on the surface of the object are used by the computer in predicting the location of various returns from internal points within the object, using a suitable coordinate transformation to relate them to the external coordinate reference of the TV camera.

All data, including transducer signals and wand location is fed to computer **1725** which then allows the 3D image of the inside of the body to be determined as the wand is moved around, by a human, or by a robot. This is really neat as all the images sequentially obtained in this manner can be combined in the computer to give an accurate 3D picture **1745** displayed on monitor **1750**.

In one preferred embodiment as shown in FIG. **17**C, the transducer head **1700** is comprised of a matrix **1755** of 72 individual transducer elements which send and receive ultrasound data at for example, 5 MHZ. This allows an expanded scan capability, since the sensor can be held steady at each discrete location xyz on the object surface, and a 3D image obtained with out movement of the transducer head, by analyzing the outputs of each of the transducers. Some earlier examples are described in articles such as: Richard E. Davidsen, 1996 IEEE Ultrasonics Symposium, A Multiplexed Two-Dimensional Array For Real Time Volumetric and B-Mode; Stephen W. Smith, 1995 IEEE Ultrasonics Symposium, Update On 2-D Array Transducers For Medical Ultrasound, 1995.

If the wand is now moved in space, fine scan resolution is obtained, due to the operation of the individual elements so positioned with out the need to move the wand in a fine pitch

US 7,933,431 B2

25

manner to all points needed for spatial resolution of this order. This eases the operators task, if manually performed, and makes robotization of such examination much easier from a control point of view.

Consider FIG. **17B** which illustrates a transducer as just described, also with automatic compensation at each point for pointing angle, robotically positioned by robot, **1785** with respect to object **1764**. In this case a projection technique such as described in U.S. Pat. No. 5,854,491 is used to optically determine the attitude of the object surface, and the surface normal direction **1760** from the position of target set **1765** projected on the surface by diode laser set **1770**, and observed by TV Camera **1775** located typically near the working end of the robot. Differences between the normal direction and the transducer propagation direction (typically parallel to the housing of the transducer) is then used by computer **1777** to correct the data of the ultrasonic sensor **1780** whose pointing direction in space is known through the joint angle encoders and associated control system **1782** of robot **1785** holding the sensor. Alternatively the pointing direction of this sensor can be monitored by an external camera such as **1710** of FIG. **17A**.

It should be noted that the data obtained by TV camera **1775** concerning the normal to the surface and the surface range from the robot/ultrasonic sensor, can be used advantageously by the control system **1782** to position the robot and sensor with respect to the surface, in order to provide a fully automatic inspection of object **1764**. Indeed the camera sensor operating in triangulation can be used to establish the coordinates of the exterior surface of object **1764** as taught for example in U.S. Pat. No. 5,854,491, while at the same time, the acoustic sensor can determine the range to interior points which can be differentiated by their return signal time or other means. In this manner, a complete 3D map of the total object, interior and exterior, can be obtained relative to the coordinate system of the Robot, which can then be transformed to any coordinate system desired.

The invention has a myriad of applications beyond those specifically described herein. The games possible with the invention in particular are limited only by the imagination.

What is claimed is:

1. A method for controlling a handheld computing device comprising the steps of:

holding said device in one hand;

moving at least one finger in space in order to signal a command to said device;

electro-optically sensing light reflected from said at least one finger using a sensing means associated with said device;

determining from said sensed light the movement of said finger, and

using said sensed finger movement information, controlling said device in accordance with said command.

2. A method according to claim **1**, wherein at least one camera is utilized to effect said electro-optical sensing.

3. A method according to claim **1**, including the further step of acquiring an image of at least a portion of the user of the device.

4. A method according to claim **1**, wherein said movement is sensed in 3 dimensions.

5. A method according to claim **1**, wherein movement of one finger relative to another finger is sensed.

6. A method according to claim **1**, wherein movement of two fingers is sensed.

7. Handheld computer apparatus comprising:

a housing;

a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object;

26

computer means within said housing for analyzing said image to determine information concerning a position or movement of said object; and

means for controlling a function of said apparatus using said information.

8. Apparatus according to claim **7**, wherein said object is a finger.

9. Apparatus according to claim **7**, further including a display function which is controlled.

10. Apparatus according to claim **9**, wherein said display is 3D display.

11. Apparatus according to claim **7**, further including means for transmitting information.

12. Apparatus according to claim **7**, further including a light source for illuminating said object.

13. Apparatus according to claim **7**, wherein said apparatus is a cellular phone.

14. A method for controlling a handheld computing device comprising the steps of:

providing a computer within said device;

associating a camera with said device, said camera viewing at least a portion of the body of a user operating said device or an object held by said user, in order provide image data concerning said portion or object;

using said computer, analyzing said image data to determine information concerning a user input command; and

from said determined information, controlling a function of said device.

15. A method according to claim **14**, wherein reflected light from said body portion or object is imaged by said camera.

16. A method according to claim **14**, wherein said information includes the position of the portion or object.

17. A method according to claim **14**, wherein said information includes the change in position of the portion or object.

18. A method according to claim **14**, wherein said information includes the velocity or path of the portion or object.

19. A method according to claim **14**, wherein said information is obtained in 3 dimensions.

20. A method according to claim **14**, wherein said information includes the pointing direction of the portion or object.

21. A method according to claim **14**, wherein a display is controlled.

22. A method according to claim **21**, wherein a virtual image on said display is moved or changed.

23. A method according to claim **21**, wherein said display is a 3D display.

24. A method according to claim **23**, wherein said display is a stereoscopic display.

25. A method according to claim **14**, including the further step of transmitting data to a further device.

26. A method according to claim **14**, wherein said camera operates at 30 frames per second or greater.

27. A method according to claim **14**, wherein said controlled function relates to a game.

28. A method according to claim **14**, including the further step of acquiring a picture of the user of the handheld device.

29. A method according to claim **14**, wherein two fingers of the user are sensed and a pinching action determined.

30. A method according to claim **14**, wherein said body portion indicates an expression of said user.

31. A method according to claim **14**, wherein said information provides an aid to speech recognition.

\*    \*    \*    \*    \*